UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JANE DOE (A PSEUDONYM),                          **COMPLAINT**

      Plaintiff,                                  **Case No.**

    —against—                                       **PLAINTIFF
                                                 DEMANDS A
                                                 TRIAL BY JURY**

YESHIVA UNIVERSITY, ANDREW "AVI" LAUER,
ESQ., CHAIM NISSEL, SEYFARTH SHAW, LLP,
DOV KESSELMAN, ESQ., and EMILY MILLER, ESQ.,

      Defendants.

-----------------------------------------------------------X


"After [I was raped by a Yeshiva University Student and my rapist was determined "not responsible" by Yeshiva University's Title IX Office following a so-called "independent investigation"], I started to realize that there is indeed a rape culture at Yeshiva University, and it enables rapists to rape without fear of getting in trouble.  YU is not an exception to the rule—its founding pillars have become weak. . . . Students are not safe on campus, and the school cares too much about its image to restore its values or do anything about it.  Rape culture is real at YU, and it needs to be taken seriously."

—Plaintiff, "Jane Doe," as quoted in the Yeshiva University Commentator, "*I Thought Rape Culture Didn't Exist at YU—Until I Was Raped*," August 25, 2021


Respectfully submitted by:

***KEVIN T. MULHEARN, P.C.***

*60 Dutch Hill Road, Suite 6B
Orangeburg, NY 10962
Phone: (845) 613-7059
kmulhearn@ktmlaw.net*

*Attorneys for Plaintiff, JANE DOE*

Plaintiff, JANE DOE (A Pseudonym), by and through her attorneys, Kevin T. Mulhearn, P.C., complaining of the Defendants, hereby alleges that:

### **OVERVIEW**

1. On January 24, 2021, Plaintiff, a full-time Yeshiva University ("YU") student and student-athlete in her early 20s, was raped by "PERRY DOE," a full-time YU student and member of YU's Varsity Basketball Team, at his Washington Heights apartment.

2. On or about February 18, 2021, Plaintiff filed a formal Title IX Complaint against her rapist with YU's Title IX Office.

3. In late February, 2021 or early March, 2021, YU hired Seyfarth Shaw, LLP ("Seyfarth"), its long-time litigation counsel which—from 2013 to present—has defended YU, certain YU administrators, and YU's Board of Directors, from sex abuse facilitation and cover up claims brought by dozens of former students at a YU-affiliated high school, to conduct an "independent investigation" of Plaintiff's rape allegations.

4. Seyfarth, through its attorneys, Dov Kesselman, Esq., and Emily Miller, Esq. ("the Seyfarth attorneys"), completed its "independent investigation" of Plaintiff's rape allegations in April, 2021.

5.     While conducting its "independent investigation," the Seyfarth attorneys deliberately chose to not interview several key fact witnesses identified by Plaintiff who would have provided highly relevant evidence as to Plaintiff's statements and state of mind immediately after her rape.

6.     Plaintiff told the Seyfarth attorneys investigating her rape allegations that she had been given a rape kit by a Nurse Examiner at Columbia Presbyterian Hospital the day after her rape and—at their request, provided the Seyfarth attorneys with her hospital discharge form for that post-rape examination.

7.     While conducting its "independent investigation," the Seyfarth attorneys deliberately chose to not obtain or request access to extremely relevant evidence from Plaintiff's rape kit (taken the day after her rape) which included photographs of bruises on Plaintiff's neck and inner thigh, which corroborated Plaintiff's claim that PERRY DOE had used force and violence during his rape which inflicted visible injuries and marks on Plaintiff's body.

8.     On May 26, 2021, YU, in a letter from Defendant Nissel, YU's Title IX Coordinator, notified Plaintiff that "[a]fter an extensive investigation, it has been determined that evidence does not support a

finding that [PERRY DOE] violated [YU's Non-Discrimination and Anti-Harassment] Policy." (*See* Ex. A hereto).

9. Thereafter, in June, 2021, Plaintiff repeatedly tried to appeal YU's "not-responsible" determination on the grounds that YU failed to consider the extremely relevant evidence contained in her rape kit.

10. Even though Title IX expressly provides that the person or panel handling an appeal of a Title IX dismissal may *not* be a university's Title IX Coordinator, YU—***EXCLUSIVELY*** through its Title IX Coordinator, Defendant Nissel—consistently rejected Plaintiff's appeals and ignored Plaintiff's pleas for YU to review or consider the neglected and ignored critical evidence that was contained in Plaintiff's rape kit.

11. Upon information and belief, the YU Defendants, mindful that Plaintiff was extremely concerned about maintaining her anonymity, believed that Plaintiff would not take any additional action once YU determined that PERRY DOE was "not responsible" for sexually assaulting her and that her appeal of YU's determination was meritless. The YU Defendants were wrong.

12. On August 25, 2021, Plaintiff published an anonymous letter in the Yeshiva University Commentator, "*I Thought Rape Culture Didn't Exist at YU—Until I Was Raped*." This letter was extremely critical of the process

used by YU to investigate her rape allegations, as well as YU's "not responsible" determination.

13.     Plaintiff's August 25, 2021 letter created much controversy at YU, interfered with YU's ongoing fundraising campaign, led many to call into question the competence and reliability of YU's Title IX Office, and prompted many YU students to request that YU administrators take prompt and meaningful remedial action.

14.     At that time, Plaintiff and all other YU students were still under the impression that YU had conducted its investigation under Title IX parameters and had complied with all Title IX rules, regulations, and procedures.

15.     YU did nothing to dispel this impression and, in fact, fostered the notion that it had handled Plaintiff's complaint as a Title IX matter in accordance with Title IX's rules, regulations, and procedures during its investigation of her rape allegations.

16.     On January 11, 2022, in a letter to all YU students, YU Dean Karen Bacon announced the findings of a YU committee to evaluate the University's sexual harassment and assault policies and procedures and told YU students that YU "*follows all federal Title IX and NYS guidelines* and

procedures pertaining to sexual harassment and assault[.]" (Emphasis added).

17.    In March, 2022, YU announced the hiring of Annie Todd, as YU's new Deputy Title IX Coordinator.

18.    YU thus deliberately misled Plaintiff, all YU students, and the YU community-at-large into believing that YU had handled Plaintiff's Title IX Complaint based on her rape by PERRY DOE as a "Title IX" matter in accordance with Title IX rules, regulations, and procedures.

19.    Unbeknownst to Plaintiff and the entire YU community, YU, through its high-ranking administrators and officials, Andrew "Avi" Lauer, Esq., General Counsel, and Chaim Nissel, Title IX Coordinator, handled and treated Plaintiff's rape allegations *not* as a Title IX matter, but as a mere non-Title IX disciplinary matter.

20.    In violation of Title IX, YU, Lauer, and Nissel, failed to notify Plaintiff, in writing or otherwise, that it was dismissing her formal Title IX Complaint.

21.    Title IX itself expressly mandated that YU treat Plaintiff's formal rape complaint as a Title IX matter and provide her with all of Title IX's rules, regulations, and procedural protections and requirements, rather than as a mere "disciplinary matter" which, pursuant to YU's Non-

Discrimination and Anti-Harassment Policy (the "Policy") (Ex. B hereto, updated in December, 2020), vested extraordinary discretionary power in YU's General Counsel and Title IX Coordinator.

22.    Upon information and belief, Defendants Lauer, Nissel, and Seyfarth all had a prominent role in drafting this Policy and executing the Policy in connection with their handling of Plaintiff's Title IX rape complaint.

23.    The Policy, moreover, provides YU's General Counsel and Title IX Coordinator, with broad, practically unfettered discretion in determining the parameters of YU's investigation of any non-Title IX "disciplinary matter" related to sexual misconduct.

24.    The Policy provides, for example, that YU's General Counsel and Title IX Coordinator, can provide a complainant and accused person with a live hearing that resembles the mandated Title IX live hearing for all Title IX rape allegations.

25.    In such a live hearing (for a non-Title IX disciplinary matter), YU's Policy provides that "a hearing officer should convene a hearing and make the finding as to whether [the] Policy has been violated and determine appropriate sanctions."

26.     In this setting (for a non-Title IX disciplinary matter), moreover, "the hearing officer may question the parties in order to assist him/her in deciding whether or not the charges are supported by a preponderance of the evidence."

27.     Even though Plaintiff made a credible rape allegation against PERRY DOE—the most serious charge on the spectrum of all sexual misconduct allegations—Defendants Lauer and Nissel decided *not* to conduct such a live hearing and *not* have anyone conduct an examination of Plaintiff or PERRY DOE to ascertain the credibility of each party with respect to Plaintiff's rape allegations.  YU's decision to not conduct a live hearing further diluted a process that was already in clear violation of the Title IX mandates for a university to review a rape charge.

28.     Upon information and belief, the YU Defendants' complete failure to review, examine, or even question important details about the credibly alleged rape, which includes: (1) the Seyfarth's attorneys' failure to interview key fact witnesses identified by Plaintiff; (2) the Seyfarth attorneys' failure to obtain or request from Plaintiff access to the extremely critical rape kit evidence (which included photographs depicting bruises on Plaintiff's neck and inner thigh); and Lauer and Nissel's decision to deny the parties the right to a live hearing (even in the context of an already watered

down and substandard process) in which a hearing officer could assess the parties' credibility, demonstrates that the YU Defendants were *not* at all interested in a full, fair, and impartial adjudication of Plaintiff's rape complaint.

29.     To the contrary, the YU Defendants took every possible action to deny Plaintiff a full, fair, and impartial adjudication of her rape complaint because each Defendant had conspired to ignore, bury, and cover up Plaintiff's rape allegations against the YU basketball player behind YU's false, fraudulent, and preordained finding that PERRY DOE was "not responsible" for any sexual misconduct towards Plaintiff.

30.     Upon information and belief, YU's ultimate "not responsible" determination was a sham—a carefully coordinated and orchestrated conclusion that was made by the YU Defendants before their stealth and patently deficient "investigation" ever began.

31.     The YU Defendants' decision to handle Plaintiff's matter outside the context of Title IX, when Title IX itself mandated that its rules, regulations, and procedures should have governed any investigation into Plaintiff's rape complaint, both violated Title IX and created the false impression that YU had taken prophylactic and remedial steps to better address the sexual assaults of YU students.

32.     YU never took any real remedial steps and its sexual assault Policy has not changed materially since Plaintiff made her Title IX rape complaint.

33.     In fact, because YU and its General Counsel, Andrew "Avi" Lauer, Esq., and Title IX Coordinator, Chaim Nissel, purposely misconstrued Title IX and YU's Policy to provide themselves with broad, unchecked power to act as investigator, judge, and jury to address and resolve rape and sexual assault allegations of YU students that occurred "off-campus," the YU Defendants knowingly ignored Title IX's mandated rules, regulations, and procedures.   By reason of this fraud and deceit, Defendants were able to orchestrate their intended outcome.

34.     The new Title IX regulations that took effect on August 14, 2020 demonstrate that the YU Defendants' interpretation of the scope and impact of Title IX is contrary to law.

35.     Defendants include a major university and sophisticated, highly experienced and well-compensated attorneys who are well-versed and knowledgeable about Title IX's rules and regulations.   Upon information and belief, therefore, Defendants' refusal to follow the precepts of the law in this area was intentional, willful, malicious, and calculated.

36.    The cosmetic changes to YU's Title IX Office which YU implemented in 2022 are meaningless window-dressing unless and until the YU Defendants actually follow Title IX rules, regulations, and procedures related to Title IX sexual assault complaints made by YU students.

37.    The YU Defendants maliciously and purposefully failed to do that in response to Plaintiff's rape complaint.

38.    YU's still-intact Policy on sexual assault allegations, moreover, which grants Defendants Lauer and Nissel extraordinary and largely unrestrained power, provides these YU Defendants with the same opportunity to cover up additional rapes and sexual assaults.

## **JURISDICTION AND VENUE**

39.    This Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that this matter involves a federal question: did Yeshiva University violate Title IX of the Educational Amendments of 1972.

40.    This Court has supplemental jurisdiction over Plaintiff's claims under New York State law, pursuant to 28 U.S.C § 1367, in that said state claims are inextricably intertwined with the federal claims in this action. Indeed, the state law claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the

United States Constitution.  In the alternative, this Court has subject matter jurisdiction of this action, pursuant to 28 U.S.C. § 1332, as complete diversity exists; as, upon information and belief, Plaintiff is a citizen of and resides in a state in the United States of America other than New York; Defendant YU is a citizen of and maintains its principal offices in the State of New York; Defendant Lauer is a citizen of and resides in the State of New York; Defendant Kesselman is a citizen of and resides in the State of New York; and Defendant Miller is a citizen of and resides in the State of New York; and the matter in controversy exceeds the sum of $75,000.00.

41.    Venue is proper in this District because, pursuant to 18 U.S.C. § 1965(c) and 28 U.S.C. § 1391(b), the incidents at issue occurred and arose within this District, and most of the Defendants reside in, conduct business in, and/or are residents and citizens of this District.

## **PARTIES**

42.    Plaintiff, JANE DOE (A Pseudonym), is an adult individual residing in a state other than New York.  She has attended Yeshiva University—as a full-time student in its education programs and activities from 2018 to present.

43.    Plaintiff, JANE DOE, is proceeding in this case under a pseudonym in order to protect her anonymity.  As a victim of sexual assault,

Plaintiff is entitled to maintain her privacy and to prevent any stigma and/or other negative ramifications that would occur if her identity were publicly disclosed.

44.     Plaintiff has not identified her alleged rapist in this Complaint, and such person shall be referred to herein as "PERRY DOE."

45.     Plaintiff's counsel has confidentially identified Plaintiff to counsel for Yeshiva University and, upon information and belief, each Defendant knows Plaintiff's true identity. With the consent of the Defendants, the parties will submit a proposed Protective/Confidentiality Order to the Court that will preserve the anonymity of Plaintiff throughout this litigation.  Such consent has routinely been received and such orders have routinely been granted in numerous actions—like this one—where a person alleges that she is a victim of rape and/or sexual assault.

46.     From September, 2020 through May, 2022, Plaintiff resided in an apartment in close proximity to YU's Wilf Campus.  In large part due to the COVID-19 pandemic, she took most of her classes online rather than in person.  Plaintiff regularly used YU's library in the Wilf Campus both to study and to sit for her online classes.

47.     In May, 2022, Plaintiff moved out of her Washington Heights apartment and moved into another residence in a different part of New York City.

48.     At all material times, from January, 2021 to present, Plaintiff was and continues to be a student-athlete, a full-time student at YU, and member of a YU varsity athletic team.

49.     Defendant, Yeshiva University ("YU"), is, and at all material times has been, a private undergraduate and graduate university located in New York, New York, which maintains its principal offices at 500 W. 185th Street, New York, New York 10033.

50.     Defendant, Andrew "Avi" Lauer, Esq. ("Lauer"), is, and at all material times has been, the General Counsel of YU, who resides, upon information and belief, in the State of New York.

51.     Defendant, Chaim Nissel ("Nissel"), is, and at all material times has been, YU's Title IX Coordinator and Vice Provost of Student Affairs of YU, who resides, upon information and belief, in the State of New York.

52.     Defendant, Seyfarth Shaw, LLP ("Seyfarth), is, and at all material times has been, a law firm that conducts business in the State of New York and maintains offices located at 620 Eighth Avenue, New York, New York 10018.

53.    Defendant, Dov Kesselman ("Kesselman"), is, and at all material times has been, a partner at Seyfarth, in its New York City office, and, upon information and belief, resides in the State of New York.

54.    Defendant, Emily Miller, Esq. ("Miller"), is, and at all material times has been, an associate at Seyfarth, in its New York City office, and, upon information and belief, resides in the State of New York.

55.    At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller, acted within the course and scope of their employment as agents, servants, and/or employees of Defendant YU. Likewise, at all material times, Defendants Kesselman and Miller acted within the course and scope of their employment  as agents, servants, and/or employees of Defendant Seyfarth Shaw, LLP.

## **BACKGROUND**

56.    Founded in 1886, Yeshiva University ("YU") is a private university under Jewish auspices, which is located in New York, New York.

57.    YU's Mission Statement stresses its "unique dual curriculum that teaches knowledge enlightened by values that helps our students gain the wisdom to make their lives both a secular and spiritual success."

58.    Title IX, 20 U.S.C. § 1681 (a) (1972), provides that a person may not be subjected to discrimination, including discrimination on the basis

of gender (which includes gender-targeted sexual assaults), under any education program or activity receiving federal funds.

59.     This action is brought by a female YU student-athlete who, on January 24, 2021, was raped by a YU male student-athlete ("PERRY DOE") in his apartment located at or near the outer perimeter of YU's Wilf Campus.

60.     On or about February 18, 2021, Plaintiff made a formal Title IX Complaint with respect to her sexual assault to Sarah Asher, Assistant Dean of Student Affairs, and Chaim Nissel, YU's Title IX Coordinator and Vice Provost of Student Affairs.

## YU'S UNPRECEDENTED FUNDRAISING CAMPAIGN

61.     On December 5, 2021, Yeshiva University announced publicly it's launch of "Rise Up: Campaign for Yeshiva University" (https:/riseup.yu/edu), an extraordinarily ambitious and comprehensive fundraising campaign in which Yeshiva University plans to raise Six Hundred and Thirty-One Million Dollars ($631,000,000) over the next five (5) years (i.e., by December 2026) to make substantial investments in various Yeshiva University educational programs, including four areas of strategic focus: values and leadership, science, and technology, entrepreneurship and innovation, and jobs and careers.

62.    According to YU itself, the "quiet phase" of its fundraising campaign began in 2019 and has already been quite successful. Fundraising for the University, indeed, increased from about thirty million ($30,000,000) in calendar year 2018 to about ninety-two million ($92,000,000) in calendar year 2021.

63.    In early 2021, therefore, when Plaintiff made her formal Title IX rape complaint to Yeshiva University's Title IX Office, YU had already embarked on—but had not yet publicly announced—the most aggressive and ambitious fundraising campaign in Yeshiva University's history.

64.    Yeshiva University's Six Hundred and Thirty-One Million Dollar ($631,000,000) fundraising target was specifically selected to model the precise number of commandments contained in the Torah—the first five Books of Moses of the Old Testament.

65.    In December 2021, Dr. Ari Berman, Yeshiva University's President stated: "The Torah teaches 631 ways to honor G_d, show respect for others and build an ethical and flourishing society. Raising Six Hundred and Thirty-One Million Dollar ($631,000,000) for scholarships, faculty, and facilities reflects our core Torah values and meets our need for the future. Committed to academic excellence and geared to empower our students be

the leaders of tomorrow, the flagship Jewish university is on the rise[.] Now is the time to rise up and become a partner in the future."

66.     Upon information and belief, in or about March, 2021, Yeshiva University, its President, its Board of Directors, and its employees and agents, Andrew "Avi" Lauer, Esq. (YU's General Counsel), and Chaim Nissel (YU's Title IX Coordinator), all recognized that Plaintiff's rape allegations against a YU basketball player—if substantiated and publicized—would cause the University to suffer significant negative publicity that would hinder Yeshiva University's "values-based" fundraising effort.

67.     This was especially true because Yeshiva University's varsity basketball team was enjoying unprecedented success (riding a record 50-game winning streak) that was gaining Yeshiva University extraordinarily positive local, national, and international media coverage.

68.     This positive media coverage was, upon information and belief, burnishing Yeshiva University's reputation and helping the "quiet phase" of YU's fundraising campaign (from 2019 through 2021) enormously. YU administrators even referenced the YU Basketball Team's extraordinary success in their public roll-out of YU's "Rise Up" fundraising campaign.

69.     Upon information and belief, in or about late February, 2021 or early March, 2021, Yeshiva University and its agents and employees, Lauer, Nissel, Seyfarth, Kesselman, and Miller, recognized and understood that Plaintiff had not told her parents about her sexual assault by a YU basketball player, had not hired an attorney, and had not even hired or retained an "advisor" to help her navigate her way through Yeshiva University's "investigation" of her formal Title IX Complaint involving her rape by a YU basketball player.

70.     Upon information and belief, in or about late February, 2021 or early March, 2021, soon after Plaintiff made her formal Title IX Complaint to YU's Title IX Office, Yeshiva University, and its agents and employees, Lauer and Nissel, jointly made a knowing, conscious, and calculated decision: (1) to conduct a sham "investigation" of Plaintiff's allegations; (2) to arrive at a preordained "not responsible" verdict with respect to the conduct of Plaintiff's alleged rapist ("PERRY DOE"); (3) to hire as its "investigators" of Plaintiff's allegations,  a law firm, Seyfarth Shaw, LLP ("Seyfarth"), and two attorneys from Seyfarth, Kesselman, and Miller, which—as YU's long-time litigation counsel in myriad sex abuse litigations in New York State—had glaring and obvious conflicts of interests and biases in favor of Yeshiva University and PERRY DOE and against Plaintiff, and

was willing to go along with YU's planned sham investigation and pre-determined outcome; (4) to deliberately breach and fail to comply with numerous specific Title IX rules, regulations, and procedures; (5) to deliberately breach and fail to comply with numerous specific promises and agreements set forth in Yeshiva University's Non-Discrimination and Anti-Harassment Policy and Complaint Procedures (the "Policy" or "YU's Policy"); (6) to ignore substantial evidence that supported Plaintiff's claims; (7) to deliberately fail to interview fact witnesses (including several specifically identified by Plaintiff) who could corroborate Plaintiff's claims by testifying as to her statements and state of mind soon after the incident occurred; and (8) to deliberately choose not to obtain or request access to Plaintiff's rape kit evidence collected by Columbia Presbyterian Hospital the day after Plaintiff's alleged rape, which would have corroborated Plaintiff's allegations that her rapist used force and violence to inflict visible physical injuries on her body during his rape.

71.    Plaintiff does not make these serious allegations lightly. However, the gulf between what YU and its agents and employees, Lauer, Kesselman, and Miller (three experienced attorneys with broad experience handling sex abuse allegations) and Nissel (an experienced Title IX administrator), were required by law to do—and what they in fact did—is so

enormous as to beget but one reasonable conclusion: Yeshiva University and the other Defendants, Andrew "Avi" Lauer, Esq., Chaim Nissel, Seyfarth Shaw, LLP, Dov Kesselman, Esq., and Emily Miller, Esq., conspired to conceal and cover-up the YU basketball player's rape of Plaintiff.

72.    By exonerating PERRY DOE, not imposing any disciplinary action against him, and permitting him to have unrestricted access to and unregulated use of YU's Wilf Campus and all YU facilities, the YU Defendants placed not just Plaintiff, but all female students at YU, in an extraordinarily vulnerable position.

73.    Tragically, this kind of conduct is nothing new for Yeshiva University.

74.    YU, for at least several decades, has created, fostered, and nourished a rape cover-up culture by falsely representing that rapes and sexual assaults do not occur on or near YU's campuses and are not committed by YU students.

## **YU'S 20-YEAR NON-COMPLIANCE WITH THE CLERY ACT**

75.    The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics ("Clery Act"), enacted in 1990, is a federal statute codified at 20 U.S.C. § 1092(f), with implementing regulations in the U.S. Code of Federal Regulations at 34 CFR 668.46.

76.    The law is named after Jeanne Clery, a 19-year-old Lehigh University student who was raped and murdered by a fellow student in her campus residence hall in 1986.

77.    After her rape and murder, Jeanne Clery's parents ascertained for the first time that the attack on their daughter was one of 38 violent crimes recorded at the university from 1984 through 1986.  Her parents argued that, had Lehigh University's crime record been known, Jeanne Clery would not have attended the school.

78.    Jeanne Clery's parents founded Security on Campus, a non-profit organization that lobbied for the passage of The Clery Act, which was signed into law in 1990.

79.    The Clery Act requires all colleges and universities that participate in federal financial aid programs to keep and disclose information about crimes on and/or near their respective campuses.

80.    Compliance is monitored by the U.S. Department of Education, which can impose civil penalties of up to $59,017.00 per violation, against institutions for each infraction and can suspend non-compliant institutions from participating in federal student financial aid programs.

81.    The Clery Act provides that by October 1 of each year, a college or university *must* publish and distribute its Annual Campus Security Report to current and prospective students and employees.

82.    This report is required to provide crime statistics for the past three years, for crimes that occurred on campus, in institution residential facilities, in non-campus buildings, or on public property near campus.

83.    A college or university is required to report on the following specific crimes:

      (1)    Murder;

      (2)    ***Forcible sex offenses (rape and fondling)***;

      (3)    Non-forcible sex offenses (incest and statutory rape);

      (4)    Domestic violence;

      (5)    Dating violence;

      (6)    Stalking;

      (7)    Robbery;

      (8)    Aggravated assault;

      (9)    Burglary;

      (10)    Motor vehicle theft; and

      (11)    Arson.

84.     Beginning in 2001, the U.S. Department of Education publishes on its website the crime statistics as reported by each college or university in the United States that receives federal financial aid.

85.     In or before 2001, upon information and belief, Yeshiva University administrators made a knowing and calculated decision to not report to the U.S. Department of Education any and all sex crimes, including rape or nonconsensual fondling, that occurred on or near the campuses of YU's undergraduate college for men (Wilf Campus) and its undergraduate college for women and schools for post-graduate studies (Beren Campus).

86.     The effect of YU's willful and calculated decision to not comply with The Clery Act's crime reporting requirements and to submit to the Department of Education knowingly false and fraudulent crime data, was to create the false and fraudulent impression for both prospective students and their parents and matriculating students, that rapes and sexual assaults did not occur at or near YU and, *inter alia*, that students who attended YU had not raped or sexually assaulted other YU students since at least 2001.

87.     As evidenced by the U.S. Department of Education website, YU reported to the U.S. Department of Education the following number of forcible sex crimes that occurred on or near YU's Wilf Campus and/or Beren Campus, in YU's residential facilities, or in non-campus buildings:

**YU'S Reports to U.S. Dept. of Educ. of Forcible Sex Crimes:
From 2001 to 2020 (for both Wilf Campus and Beren Campus)**

_____

**Rapes:**

| | | | |
|---|---|---|---|
| 2001: | 0 | 2011: | 0 |
| 2002: | 0 | 2012: | 0 |
| 2003: | 0 | 2013: | 0 |
| 2004: | 0 | 2014: | 0 |
| 2005: | 0 | 2015: | 0 |
| 2006: | 0 | 2016: | 0 |
| 2007: | 0 | 2017: | 0 |
| 2008: | 0 | 2018: | 0 |
| 2009: | 0 | 2019: | 0 |
| 2010: | 0 | 2020: | 0 |

**Fondling:**

| | | | |
|---|---|---|---|
| 2001: | 0 | 2011: | 0 |
| 2002: | 0 | 2012: | 0 |
| 2003: | 0 | 2013: | 0 |
| 2004: | 0 | 2014: | 0 |
| 2005: | 0 | 2015: | 0 |
| 2006: | 0 | 2016: | 0 |
| 2007: | 0 | 2017: | 0 |
| 2008: | 0 | 2018: | 0 |
| 2009: | 0 | 2019: | 0 |
| 2010: | 0 | 2020: | 0 |

**Total Reported <u>Rape</u> Incidents from 2001 through 2020:**     0
**Total Reported <u>Fondling</u> Incidents from 2001 through 2020:**   0

88.    Numerous institutions (including Eastern Michigan University, Michigan State University, Penn State University, University of Montana, and University of California at Berkeley) have been found in non-

compliance of The Clery Act and fined by the U.S. Department of Education for inaccurate and misleading crime statistics.

89.     Each of those institutions, nonetheless, reported *numerous* forcible sex crimes on or near their campuses from 2001 to 2020.

90.     Upon information and belief, Yeshiva University is one of the few universities in the United States of America (if not the only such university) that reported to the U.S. Department of Education **ZERO** forcible rapes or sexual assaults on or near its major campuses from 2001 to 2020.

91.     Upon information and belief, for two decades, YU has spun a malicious, phony, and reckless fairytale about the safety of its campuses and the alleged non-existence of rape and sexual assault at YU.  This purposeful error of commission is far more egregious than a mere error of omission.

92.     Upon information and belief, YU's reports of sex crimes at or near its campuses for both men and women were and continue to be false, fraudulent, malicious, and intended to paint a misleading impression of almost complete safety at YU, particularly for female students (who, according to numerous reputable studies, suffer rapes and sexual assaults at rates exponentially higher than their male student counterparts).

93.     Rape, Abuse & Incest National Network ("RAINN") is the nation's largest anti-sexual violence organization.  RAINN created and operates the National Sexual Assault Hotline (800.646.HOPE, online.rainn.org and rain.org/es) in partnership with more than 1,000 local sexual assault service providers across the country and operates the DoD Safe Helpline for the U.S. Department of Defense.  RAINN also carries out programs to prevent sexual violence, help survivors, and ensure that perpetrators are brought to justice.

94.     According to RAINN's analysis of sexual violence statistics: among undergraduate students in the United States, 26.4% of females and 6.8% of males experience rape or sexual assault through physical force, violence, or incapacitation, and among graduate and professional students, 9.7% of females and 2.5% of males experience rape or sexual assault through physical force, violence, or incapacitation. (*See* https://www.rainn.org/statistics/campus-sexual-violence).

95.     YU's own website provides that all crimes which occur within YU's "security jurisdiction" occur "on campus, [which] include[es] non-campus buildings or properties, on public property or within the Security Department's jurisdiction …" YU itself thus uses an extremely broad definition for its "Campuses."  Plaintiff pleads, in the alternative, that

PERRY DOE's rape of Plaintiff occurred on or within YU's Wilf Campus and, for that reason alone, occurred within YU's education programs and activities.

96.     Upon information and belief, from 2001 through 2021, YU received *numerous* complaints, and was otherwise made aware, of *numerous* alleged criminal rapes and/or sexual assaults of YU students on or near YU's Wilf Campus and/or Beren Campus.

97.     In or about 2018, a YU female student reported to YU's Title IX Office, specifically Defendant Nissel, that she had been raped on or near YU's Wilf Campus by a male YU student.  Upon information and belief, YU and Defendant Nissel dismissed out-of-hand this rape complainant's allegations and took no disciplinary action against the accused YU male student.

98.     Upon information and belief, from 2001 to present, numerous other YU students have reported rapes and/or sexual assaults by other YU students on or near YU's Wilf Campus and/or Beren Campus.

99.     In campus climate surveys conducted for and by YU students, in 2017, 2019, and 2021 (as mandated by New York's "Enough is Enough" Law), *numerous* YU students self-reported that they had been victimized by forcible sexual contact on or near YU's campuses.   Several of these YU

students stated that they had reported these acts of sexual misconduct to YU's Title IX Office.

100.   YU knowingly, maliciously and fraudulently failed   to   report any of these sexual assault allegations—including the specific one made to its Title IX Office and Defendant Nissel in or about 2018—to the U.S. Department of Education, as mandated by The Clery Act.

101.   YU, likewise, knowingly, maliciously, and fraudulently failed to report any of these sexual assault allegations—including the specific one made to its Title IX Office and Defendant Nissel in or about 2018—to YU students (including Plaintiff) and prospective students in their Security Reports (which are published annually on October 1) for calendar years 2017, 2018, 2019, and 2020.

102.   Since 2001 and continuing to present, YU has been in gross non-compliance with and in violation of The Clery Act.

103.   Upon information and belief, this gross non-compliance is not the result of mere negligence, carelessness, or sloppy record-keeping.   It reflects, rather, a knowing, conscious, and calculated choice made by YU administrators and/or YU's Board of Directors.

104.   YU's conscious and calculated choice to deceive and mislead the U.S. Department of Education, YU's female students, and all prospective

female students, about sex crimes that have occurred on or near YU's campuses, has endangered the health, safety, and welfare of every female student who has attended YU for the last 20 years.

105.   It has made every female student who has attended YU, from 2001 through present, including Plaintiff, more vulnerable to rape and sexual assault on or near YU's campuses.

## PLAINTIFF'S RAPE ALLEGATIONS

106.   Plaintiff, at all material times, resided, and still resides in a state in the United States other than New York.

107.   In 2018 through 2021, Plaintiff was enrolled in Yeshiva University as a full-time student in a university education program.

108.   At all material times, Plaintiff was a full-time student at YU, and a participant in its education programs and activities, a student-athlete, and a member of a Yeshiva University varsity athletic team.

109.   In 2020 through May 2022, Plaintiff resided in an apartment in Washington Heights, located within the scope of Yeshiva University's Security office's geographical coverage area (and thus within or near the outer perimeter of YU's Wilf Campus).

110.  Because of the COVID-19 pandemic, in 2020 and 2021, Plaintiff's Stern College classes were primarily conducted remotely, i.e., online via computer only.

111.  In 2020 and 2021, Plaintiff regularly used facilities at Yeshiva University's Wilf Campus, including the library (where she electronically attended online classes), and gymnasium (which she regularly used as a Yeshiva University student-athlete).

112.  In 2020 and 2021, Plaintiff was also required to regularly use Yeshiva University's Furst Hall in order to take COVID-19 tests (as required by Yeshiva University).  After PERRY DOE raped Plaintiff on January 24, 2021, she was terrified that she would encounter PERRY DOE at Furst Hall; Plaintiff was thus compelled to have a number of friends monitor PERRY DOE's presence or absence at Furst Hall, and then notify Plaintiff by telephone when the coast was clear or when PERRY DOE was present at Furst Hall.  This monitoring of PERRY DOE occurred frequently but was imperfect and imprecise, and it detracted substantially from Plaintiff's educational experience at YU.

113.  On January 24, 2021, Plaintiff was on a first date and visiting a Yeshiva University undergraduate student (i.e. "PERRY DOE") at his apartment in Washington Heights, New York.

114. PERRY DOE'S apartment, upon information and belief, was located within the geographic limits of YU's security perimeter, in which Yeshiva University-hired security guards regularly and routinely patrolled the area (and thus was within or quite near YU's Wilf Campus).

115. PERRY DOE'S apartment, upon information and belief, was within the geographic area to which Yeshiva University's security officers regularly provided Yeshiva University students with shuttle service to and from various areas within Yeshiva University's Wilf Campus and other areas within the community in Washington Heights. As such, it was within or near the outer perimeter of YU's Wilf Campus.

116. At all material times, PERRY DOE was a member of the Yeshiva University Varsity Basketball Team and in such capacity as a YU student-athlete, subject to additional Yeshiva University policies and rules which provided Yeshiva University with control and authority over him and his activities to a much greater extent than Yeshiva University normally exercised over its students.

117. At all material times, as Plaintiff was a student-athlete at YU, she was entitled to certain protections and rights from YU that were not normally afforded to non-student-athletes at YU.

118.  At all material times, PERRY DOE was an F-1 Visa foreign student who attended Yeshiva University pursuant to an F-1 Student Visa.

119.  PERRY DOE's status as a foreign student was conditioned upon, *inter alia*, his continued enrollment as a full-time student in an academic education program at Yeshiva University, approval of his Visa by the Student and Exchange Visitors Program, Immigration and Custom Enforcement, his proficiency in English, and his ability to maintain sufficient funds for his self-support.

120.  At all material times, PERRY DOE'S status as an F-1 Visa foreign student made him subject to additional Yeshiva University policies and rules which provided Yeshiva University with control and authority over him and his activities to a much greater extent than Yeshiva University normally exercised over its students who were U.S. citizens and residents.

121.  Upon information and belief, in 2021, Yeshiva University paid all or some of PERRY DOE's rent for his Washington Heights apartment. Upon information and belief, without YU's financial assistance, PERRY DOE could not have afforded to reside in his apartment and would thus not have been able to attend YU.  Moreover, upon information and belief, YU expressly provided PERRY DOE with permission and authorization to reside in his Washington Heights apartment.  PERRY DOE would not have

been able to rent his Washington Heights apartment without YU's expressed permission, approval, and direct involvement and facilitation.   Upon information and belief, the landlord of PERRY DOE's Washington Heights apartment has a policy and practice of not renting apartments to persons under 21-years-old, unless they are students at Yeshiva University.   Upon information and belief, the landlord of PERRY DOE's Washington Heights apartment also has a policy and practice of not renting apartments to non-citizens of the United States, unless they are students at Yeshiva University. Upon information and belief, PERRY DOE would not have been permitted to rent his apartment in Washington Heights, unless he was a student at Yeshiva University and subject to the school's discipline, control, and authority at all times he was residing in or using that apartment.

122.   On January 24, 2021, while Plaintiff was on a first date with PERRY DOE and was visiting him in his apartment, PERRY DOE raped Plaintiff.

123.   Plaintiff had spoken with PERRY DOE on several social media applications for two days prior to meeting him for their date.

124.   Plaintiff initially refused PERRY DOE's invitation to go up to his apartment in Washington Heights.   She suggested, instead, that they go to her apartment and hang out with her roommates in the living room.

125.   PERRY DOE didn't want to do that, however, and instead told Plaintiff that they should go for a walk.  During this walk, PERRY DOE ducked into a store and purchased some beer and soda.  He then asked Plaintiff to help him to carry the beer and soda upstairs to his apartment.

126.   As PERRY DOE had just moved into his apartment, there was no place for Plaintiff to sit other than on PERRY DOE's bed.  When Plaintiff sat on PERRY DOE's bed, he moved close to her and began to touch and kiss her.

127.   Plaintiff told PERRY DOE "no" multiple times and clearly conveyed that she did not want to have any sexual contact of any kind with PERRY DOE.

128.   PERRY DOE is a large and powerfully built man and he refused to accept Plaintiff's multiple "no's."  He subdued Plaintiff and asserted his physical dominance over her by grabbing her leg, pinning it down with his own, and grabbing her neck to hold her down.

129.   PERRY DOE used physical force to effectuate his rape of Plaintiff, in that: (1) PERRY DOE placed his hands around Plaintiff's neck and squeezed, in order to gain physical control and dominion over Plaintiff's body; and (2) he forcefully pressed a knee against Plaintiff's thigh in order to pry open her legs.

130.   PERRY DOE's use of physical force and violence to effectuate his rape of Plaintiff left discernible and visible marks and bruises on Plaintiff's body.

131.   Plaintiff's neck was left with a discernible and visible bruise in the area where PERRY DOE had grabbed her with his hands.

132.   Plaintiff was also left with a discernible and visible large bruise on her inner thigh, which resembled a welt, from PERRY DOE's violent and aggressive pushing of Plaintiff's legs open with his knee.

133.   After PERRY DOE raped Plaintiff, she was crying.  PERRY DOE asked Plaintiff if she was OK?

134.   PERRY DOE then implored Plaintiff to not tell anyone about what had just happened because he respected her and has sisters and would never disrespect anybody.

135.   After PERRY DOE raped Plaintiff, he asked her if she wanted him to walk her home.  Plaintiff declined that invitation.  She walked home alone and arrived back at her apartment at about 10:00 p.m.

136.   On the evening of January 24, 2021, after returning to her apartment, Plaintiff was extremely upset, in pain, and agitated. She told several of her roommates that she had just gone out on a date and had been raped by the man she had visited.

137.   On the evening of January 24, 2021, after returning to her apartment, Plaintiff texted a close male friend and conveyed to him that she had just been raped.

138.   When PERRY DOE was raping Plaintiff, she was in shock, frozen, and in extreme pain. To the extent she could, she disassociated her mind from her body.

139.   Prior to PERRY DOE's rape of her, Plaintiff categorically and unequivocally conveyed to PERRY DOE, several times, that she did *not* consent to having sex with him.

140.   PERRY DOE heard Plaintiff's statements in which she stated "No," and that she was unwilling to have sex with him.  But PERRY DOE pressed forward anyway.  He told Plaintiff that she should just relax and submit because, in words or substance: "this will be fun."

141.   For the entire day of January 25, 2021, the day after her rape, Plaintiff was in extreme pain. In the evening, one of her roommates persuaded her to go to a hospital to get treated.

142.   On the evening of January 25, 2021, Plaintiff was admitted into Columbia Presbyterian Hospital to get examined and treated for the rape that had occurred the previous evening.

143.   On January 25, 2021, the Nurse Examiner conducted a rape kit examination of Plaintiff in which she collected evidence with respect to Plaintiff's rape allegations.

144.   The primary evidence collected by the Nurse Examiner were detailed photographs taken by the Nurse Examiner of: (1) the bruise on Plaintiff's neck; and (2) the bruise/welt on Plaintiff's inner thigh.

145.   These photographs were extremely relevant because they corroborated Plaintiff's account that PERRY DOE had used physical force and violence against Plaintiff while he was raping her.

146.   On the evening of January 25, 2021, after her rape examination, Columbia Presbyterian Hospital provided Plaintiff with a Hospital Discharge Form, which provided that Plaintiff had been treated by and released from the Hospital on January 25, 2021.  Plaintiff kept this form for her records.

147.   Pursuant to Columbia Presbyterian Hospital policies and procedures, Columbia Presbyterian Hospital retained and continues to retain all evidence collected in and for Plaintiff's rape kit, including the above-referenced photographs of Plaintiff's body.

148.   In or about late January, 2021, Plaintiff, who was trying to recover emotionally and physically from the trauma of her rape, missed several classes and failed to complete several assignments.

149.   One of her professors responded angrily and notified Plaintiff that her failure to complete her assignment in his class would negatively impact her grade.

150.   In or about early February 2021, Plaintiff felt compelled to speak with Sarah Asher, Yeshiva University's Assistant Dean of Students.

151.   Plaintiff told Dean Asher that she had recently been raped by a male Yeshiva University student in his apartment and conveyed the troubles she was having in several of her classes because of that incident. Plaintiff did not initially tell Dean Asher the name of the person who had raped her.

152.   Dean Asher told Plaintiff that Plaintiff would need to communicate with each of her professors and explain the circumstances as to why she had missed several classes and assignments.

153.   Although this was extremely difficult and emotionally charged, Plaintiff had such communications with her professors and thus, despite some continued resistance from one of her professors, settled her academic affairs.  (Upon information and belief, Dean Asher communicated with the recalcitrant professor, and further explained Plaintiff's situation to him).

154.   On or about February 10, 2021, Plaintiff communicated further with Dean Asher and conveyed to her the real name of PERRY DOE.

155.   Dean Asher advised Plaintiff that she should make a formal Title IX sexual abuse complaint to Yeshiva University's Title IX Office.

156.   On or about February 18, 2021, Plaintiff conveyed to Dr. Asher, in writing, that she wanted to make a formal Title IX Report to the school's Title IX Office concerning her rape by PERRY DOE.

157.   Thereafter, in late February 2021, Plaintiff had several further communications with Dr. Asher about her Title IX Complaint.

158.   Dr. Asher conveyed to Plaintiff that she would be communicating with Defendant Chaim Nissel, Yeshiva University's Title IX Coordinator, about Plaintiff's rape allegations.

159.   Defendant Nissel, despite the egregiousness of Plaintiff's rape allegations, had no in person or telephonic communications with Plaintiff throughout the duration of Yeshiva University's "investigation" of her Title IX Complaint.

160.   Defendant Nissel did, however, have communications with Andrew "Avi" Lauer, Esq., YU's long-time General Counsel, and—upon information and belief, in late February, 2021 or early March, 2021—these two high-level YU employees developed and executed a nefarious and malicious strategy to address, resolve, and whitewash Plaintiff's Title IX Complaint which stemmed from her alleged rape by PERRY DOE.

161.   On March 4, 2021, Defendant Nissel sent Plaintiff an email in which he stated that Yeshiva University intend[ed] to conduct an investigation of Plaintiff's allegations that PERRY DOE "engaged in Sexual Assault" in violation of Yeshiva University's "Non-Discrimination & Anti-Harassment Policy" (the "Policy").

162.   In this email, Defendant Nissel did not state or suggest that Yeshiva University had dismissed Plaintiff's Title IX Complaint for any reason, including that said alleged sexual assault did not occur within any Yeshiva University education program or activity or because said sexual assault occurred in an off-campus apartment rather than on or within Yeshiva University's Wilf Campus.

163.   In his March 4, 2021 email to Plaintiff, Defendant Nissel notified Plaintiff that "The University has retained an *independent investigator* to conduct this investigation.  The law firm of Seyfarth Shaw, LLP, will be handling the investigation and Dov Kesselman and Emily Miller have been named as investigators for this matter." (Emphasis added).

164.   Title IX regulations expressly provide that any investigator assigned to conduct a Title IX investigation of sexual harassment (including sexual assault) must be free of any "conflict of interest" or "bias" for or against any school, complainant, or respondent (i.e., the accused).

165.  Here, the law firm of Seyfarth Shaw, LLP, and its attorneys, Dov Kesselman, Esq., and Emily Miller, Esq., were not "independent investigators" with an impartial viewpoint and no personal stake in the outcome of Plaintiff's Title IX Complaint.

166.  To the contrary, since in or about 2013, Seyfarth Shaw, LLP ("Seyfarth") has represented Yeshiva University in at least five separate litigation matters brought in New York courts by more than 50 sexual abuse survivors who allege that from the 1960s through 1990s, when they were children, Yeshiva University covered up for several sexually abusive administrators and teachers at Yeshiva University High School for Boys in Manhattan.

167.  In one still active litigation brought by 47 plaintiffs, plaintiffs allege that more than 15 students reported their sexual abuse to at least 20 YU officials (including YU's former President, Norman Lamm) but that YU administrators (including Lamm) had treated these complainants with disdain by threatening reprisals and/or casting doubt on their credibility.

168.  Prior to his death in 2020, YU's former President, Norman Lamm, publicly acknowledged that he had mishandled sexual abuse allegations by former YUHS students.

169.  In 2013, shortly after these sex abuse allegations were first publicized, YU conducted an internal investigation of sex abuse at YU and YUHS, as well as YU administrators' response to that abuse.

170.  In its August 16, 2013 Summary Report, YU's investigators, Sullivan & Cromwell, concluded that: (1) "As part of the Investigation, the Investigative Team reviewed each individual report of sexual and physical abuse, and the response of the University to any such report.   The Investigative Team found that, up until 2001, there were multiple instances in which the University either failed to appropriately act to protect the safety of its students or did not respond to the allegations at all.  Based on what the Investigative Team learned from its interviews with victims, this lack of an appropriate response by the University caused victims to believe that their complaints fell on deaf ears or were simply not believed by the University's administrators."; and (2) "The University's response to allegations of physical and sexual abuse that occurred at the University since 2001 [when, coincidentally or not, the U.S. Department of Justice first began to publish *reported* campus crime statistics for all universities and colleges], however, significantly improved."

171.  Since 2013, Seyfarth, led by its litigation partner, Karen Y. Bitar, Esq. has defended YU (and continues to defend YU), certain YU

administrators, and YU's Board of Directors from the claims of more than 50 men who are suing YU for facilitating and covering up their sexual abuse through, *inter alia*, negligent supervision and negligent retention.

172.   Seyfarth was successful in protecting YU's legal and financial interests in 2013 and 2014 by invoking and hiding behind the then-existing draconian statutes of limitations. On this basis, Seyfarth was able to persuade several federal courts in New York State to dismiss the YUHS plaintiffs' sex abuse cover-up claims solely on statute of limitations grounds.

173.   When New York passed The New York Child Victims Act ("CVA") in 2019, which created a short revival window for previous time-barred claims, including claims that had been previously dismissed on statute of limitations grounds, Seyfarth continued to represent YU, certain YU administrators, and YU's Board of Directors, in multiple sex abuse-related claims brought by CVA plaintiffs.

174.   Seyfarth has used a strategy of delay and obfuscation and, taking advantage of the lengthy delays in the New York courts caused by the COVID-19 pandemic, YU has resisted at every turn plaintiffs' efforts to conduct discovery.  To date, despite numerous demands, YU has refused to produce a single administrator or official for a deposition (even though many

of these persons are now in their mid-to-late 80s) and has refused to turn over a single paper document to plaintiffs' counsel.

175.  Seyfarth has further embarked on its campaign of delay and obfuscation by filing motions to dismiss the CVA plaintiffs' claims on, *inter alia*, constitutional grounds, even though more than a dozen New York state and federal courts have summarily rejected similar (if not nearly identical) constitutional challenges to the CVA.  The effect of these motions to dismiss is to delay discovery, as New York law provides, generally, that discovery cannot begin until after a motion to dismiss is decided by the court.

176.  One such YU motion to dismiss against 47 CVA plaintiffs was fully briefed in January, 2021.  The parties are still waiting for a decision; until then, the case is stalled.

177.  While Seyfarth's tactics of delay and obfuscation have caused the CVA plaintiffs to suffer much emotional distress and mental anguish above and beyond that caused by their sexual assaults as children, Seyfarth's litigation tactics—designed to avoid or at least delay a finding of YU's culpability for facilitating sexual abuse—have been extraordinarily successful and profitable for Seyfarth and its attorneys.

178.  Upon information and belief, since 2013, Seyfarth has received more than $2 million in legal fees from for its defense of dozens of sex

abuse facilitation and/or cover-up claims against YU, certain YU administrators, and members of the YU Board of Directors, by former students of YU or its affiliated schools.

179.   Seyfarth's charge, from 2013, and continuing to present, from YU was (and remains) to defend YU from sex abuse facilitation and cover-up claims, burnish YU's reputation, and minimize the negative publicity and reputational damage that could be incurred by the widespread public disclosure of the craven and calculated actions of high-ranking YU administrators and/or directors who refused to punish, fire, or report to law enforcement officials certain YUHS teachers or administrators, despite having *actual knowledge* that these YU employees were sexual predators who had sexually abused dozens of students (children).

180.   Seyfarth, when selected to be the "investigator" of Plaintiff's Title IX rape claim, was far from an "independent" and "impartial" investigator.

181.   To the contrary, Seyfarth had, and continues to have, a substantial financial stake in YU continuing to maintain a sterling reputation free of taint that would result from a legal finding that YU facilitated or covered up the sexual abuse of its students, and/or failed to adequately respond to reports or allegations of the sexual abuse of any of its students

that was committed by a fellow YU student, teacher, administrator, or anyone else affiliated with YU, and/or maliciously and knowingly participated in a cover-up of any sexual abuse committed against any students (including Plaintiff) at YU or any of its affiliated schools.

182.   Defendant Kesselman, as a partner at Seyfarth, has received and continues to receive substantial remuneration from YU as a direct result of his law firm's near-decade-long defense of YU against dozens of sex-abuse facilitation and/or cover-up claims.

183.   Defendant Kesselman, moreover, along with Karen Y. Bitar, Esq., YU's lead attorney for YU in the CVA cases, is and at all material times has been an active member of Yeshiva University's General Counsel's Council.

184.   According to YU's own website, "[i]n April 2008, the General Counsel formed the Yeshiva University General Counsel's Council, which comprises (sic) attorneys from outside law firms and corporate legal departments **who believe in the mission of the University** and would like to assist through the provisions of pro bono services." (Emphasis added).

185. As Defendant Kesselman is a named member of a group committed to "the mission" of Yeshiva University, he, Seyfarth, and its associate, Defendant Miller, have another clear conflict of interest and bias

in favor of Yeshiva University and PERRY DOE and against anyone, like Plaintiff, who makes sexual abuse allegations that could tarnish the school's reputation or damage its financial bottom-line.

186. Defendants Seyfarth, Kesselman, and Miller's conflicts of interest and biases are particularly pronounced in view of YU's ongoing "Rise Up" fundraising campaign, as the continued success of YU and its "mission" to raise more than half a billion dollars for the school by the end of 2026 is now the publicly stated goal of both YU and Kesselman

187. At no time during its "investigation" did Yeshiva University, Seyfarth, or any of the individual Defendants notify Plaintiff that Seyfarth was its litigation counsel which had defended and was continuing to defend YU, certain YU administrators, and YU's Board of Directors, from legal claims brought by more than 50 men who claim that YU and certain YU administrators covered up and/or facilitated their childhood sexual abuse by several known sexual predator employees of YU.

188. At no time during its "investigation" did Yeshiva University or any of the individual Defendants notify Plaintiff that Seyfarth and Defendant Kesselman had received substantial legal fees for the firm's representation of YU and was continuing to receive such fees for the firm's continued

representation of YU in sex abuse-related litigations filed in New York by more than 50 CVA plaintiffs.

189.  Plaintiff first ascertained Seyfarth's role as YU's litigation counsel for sex abuse claims on March 10, 2022, when she first met with her counsel in this case.

## PLAINTIFF'S REQUESTS FOR SECURITY MEASURES

190.  Beginning in March, 2021 and continuing through November, 2021, Plaintiff repeatedly notified Dean Asher, Defendant Nissel, and Defendants Kesselman and Miller, that PERRY DOE's continued presence on YU's Wilf Campus was causing her much fear and anxiety.

191. Following PERRY DOE's rape of Plaintiff, PERRY DOE's continued and unregulated presence on campus and the accompanying risk that Plaintiff might encounter PERRY DOE on campus created a hostile environment that effectively deprived Plaintiff of the educational benefits and opportunities provided by YU.

192. Following Plaintiff's assault, PERRY DOE's continued, unrestricted, and unregulated presence on Wilf Campus was harassing to Plaintiff because it exposed her to the possibility of another encounter with PERRY DOE and thus caused her to suffer much fear and anxiety.

193.   When Plaintiff made her formal Title IX Complaint to YU, Title IX regulations provided that YU was mandated to discuss and implement appropriate "security measures" to protect Plaintiff both during the pendency of YU's "investigation" and after its determination was made.

194.   Such appropriate and reasonable security measures could have included the following: (1) completely barring PERRY DOE from YU's Wilf Campus; (2) barring PERRY DOE from certain areas at Wilf Campus; (3) barring PERRY DOE, completely or from certain areas, from YU's Wilf Campus at certain designated times (particularly when Plaintiff was scheduled to be on campus); (4) removing PERRY DOE from the YU Basketball Team and all team activities; and (5) providing Plaintiff with campus escorts when she needed to be on YU's Wilf Campus.

195.   At all material times, even though Plaintiff repeatedly expressed to YU officials and agents her great fear and anxiety about encountering PERRY DOE on Wilf Campus, and repeatedly requested that YU implement appropriate security measures that would prevent Plaintiff from encountering PERRY DOE on YU's Wilf Campus, YU failed to implement *any* security measures and failed to take *any* steps that would protect Plaintiff or lessen her vulnerability posed by PERRY DOE's continued and unrestricted presence on campus.

196.   In early September, 2021, during another discussion about YU's implementation of possible security measures to protect Plaintiff, Dean Asher told Plaintiff that, in view of Plaintiff's August 25, 2021 YU Commentator article, there was now "too much bad blood" for YU to implement any security measures to protect Plaintiff from PERRY DOE.

197.   YU, upon information and belief, retaliated against Plaintiff for her protected activities by denying her *any* reasonable security measures. Dean Asher so much as admitted this retaliatory motive in her September, 2021 conversation with Plaintiff.

198.   Dean Asher told Plaintiff that it was entirely up to PERRY DOE as to whether, when, and/or where Plaintiff would encounter PERRY DOE on YU's Wilf Campus.  YU's conscious decision to leave Plaintiff completely vulnerable to PERRY DOE was clear-cut retaliation against Plaintiff by YU in response to Plaintiff's exercise of her right to engage in protected activities.

199.   YU's failure to implement any security measures to protect Plaintiff is even more egregious because YU administrators, officials, directors, employees, and agents, including Defendants Lauer, Nissel, Seyfarth, Kisselman, and Miller, knew or should have known that Plaintiff's

rape allegations against PERRY DOE were credible, truthful, and supported by substantial corroborating evidence.

### YU BELATEDLY NOTIFIED PLAINTIFF THAT IT DID NOT TREAT HER RAPE COMPLAINT AS A TITLE IX MATTER

200.  In November, 2021, Plaintiff spoke directly with Defendant Nissel for the first time.  They discussed her continued concerns and demands for YU to implement reasonable security measures to protect her on YU's Wilf Campus.  Several of Plaintiff's friends participated in this telephone call with Defendant Nissel and another YU administrator.

201.  During this November, 2021 meeting, Defendant Nissel told Plaintiff *for the first time* that YU had not complied with Title IX's rules, regulations, and procedures with respect to her rape complaint against PERRY DOE.

202.  Defendant Nissel also told Plaintiff that he and YU's General Counsel (Defendant Lauer) coordinated YU's response to her formal Title IX Complaint based on PERRY DOE's rape.

203.  Defendant Nissel told Plaintiff that Title IX was not applicable to her rape allegations because her alleged rape occurred "off-campus."

204.  To date, YU has still not implemented *any* security measures to protect Plaintiff and make her less vulnerable to sexual assault and has still failed to take *any* steps that would protect Plaintiff or lessen her

vulnerability as posed by PERRY DOE's unrestricted and unregulated presence on YU's Wilf Campus.

205.   Defendant Nissel's November, 2021 statement to Plaintiff as to the applicability of Title IX was contrary to law and in violation of Title IX.

## TITLE IX DOES NOT AUTOMATICALLY EXCLUDE RAPE INCIDENTS WHICH OCCUR "OFF CAMPUS"

206.   On August 14, 2020, the U.S. Department of Education adopted a number of new regulations pertaining to Title IX.

207.   These regulations were effective as of August 14, 2020, and were memorialized in Volume 85 of the Federal Register, No. 97, May 19, 2020, "Non-Discrimination on the Basis of Sex in Education Programs on Activities Receiving Federal Financial Assistance" ("85 Fed. Reg."), at pp. 30026 to 30579.

208.   Upon information and belief, each of the Defendants was well aware of these new Title IX regulations.   In fact, in 2021, Seyfarth conducted an extensive training program for and/or on behalf of Yeshiva University with respect to the content and impact of the new 2020 Title IX regulations.

209.   The 2020 Title IX regulations, while noting that for Title IX to be applicable, the sexual harassment or sexual abuse must occur within a

school's "education program or activity," defined that term in the context of

both "on campus" and "off campus" conduct:

> Title IX is clearly applicable for "all incidents of sexual harassment occurring on a [school's] campus[.]"

(85 Fed. Reg. at 30196).

> [T]he Department [of Education] reiterates that "off campus" does not automatically mean that the incident occurred outside the [school's] education program or activity.

(*Id.* at 30198).

> The Department [of Education] reiterates that the final regulations do not impose a geographic test or draw a distinction between on-campus misconduct and off-campus misconduct.

(*Id.*).

> [W]hether conduct occurs in a [school's] education program or activity does not necessarily depend on the geographic location of the incident.

(*Id.*).

> Instead, "education program or activity" relies on statutory or regulatory definitions of "program" or "activity," on the statement adoption from the Supreme Court's language in *Davis* added to § 106.44(a) that *education program or activity includes locations, events or circumstances over which the [school] exercised substantial control over the respondent (the accused party) and over the context in which the sexual harassment occurred*, and includes on-campus and off-campus

> buildings owned or controlled by a student organization officially recognized by a post-secondary institution.

(*Id.* at 30198-99) (emphasis added).

> [E]ven if a situation arises off campus it may still be part of the [school's] education program or activity if the [school] exercised substantial control over the context and the alleged harasser.

(*Id.* at 30199 n. 875).

210.   The 2020 Title IX regulations specifically provide that Title IX may be applicable when—as may have occurred here—a sexual assault occurred in an off-campus residential apartment.

> While such situations may be fact specific, [schools] must consider whether, for example, a sexual harassment incident between two students that occurs in an off-campus apartment (i.e., not a dorm room provided by the [school]) is *a situation over which the [school] exercised substantial control; if so, the [school] must respond when it has actual knowledge of sexual harassment or allegations of sexual harassment that occurred there.*

(*Id.*) (emphasis added).

211.   Although "no single factor is determinative [as to] whether a [school] exercised substantial control over the respondent [i.e., the accused harasser] and the context in which the harassment occurred," (85 Fed. Reg. at 30197), the Department of Education mandates that all schools faced with

threshold questions as to whether sexual harassment (or sexual assault) occurred within a school's "education program or activity" to the extent necessary to trigger Title IX protections *must* carefully consider the scope of each school's own education program or activity.  (*Id.* at 30198):

> To ensure that [schools] adequately consider the resulting coverage of Title IX to each [school's] particular circumstances, the final regulations require that every *Title IX Coordinator, investigator, decision-maker*, and person who facilitates an informal resolution process, must be trained on (among other things) "the scope of the [school's] education program or activity."

(*Id.*) (*quoting,* Section 106.45(b)(1)(iii)) (emphasis added).

> [The Department of Education has] also revised § 106.45(b)(10)(i)(D) so that materials used to train Title IX personnel *must be posted on a [school's] website.  These revisions ensure that a school's students and employees, and the public, understand the scope of the [school's] education program or activity for purposes of Title IX.*

(*Id.*) (emphasis added).

212.  Here, there are numerous factors which demonstrate that Yeshiva University exercised substantial control over PERRY DOE, Plaintiff, and the context in which PERRY DOE's rape of Plaintiff (in his apartment) occurred.

213.   YU's Student Bill of Rights (Ex. C hereto), provides in relevant part that:

> The University is committed to providing options, support and assistance to victims/survivors of sexual assault, domestic violence, dating violence, and/or stalking to ensure that they can continue to participate in University-wide and campus programs, activities, and employment. *All victims/survivors of these crimes and violations have the following rights, regardless of whether the crime or violation occurs on campus, off campus*, or while studying abroad.
>
> All students have the right to ... :  2. Have disclosures of ... sexual assault treated seriously ... 4. Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard ...

(Ex. C at 1) (emphasis added).

214.    YU's Anti-Bullying and Hazing Policy for Students (Ex. D hereto), which proscribes "bullying" which includes physical and/or sexual assault, provides in relevant part that:

> This Policy is intended to protect all students of the University, and applies to conduct that occurs on University premises and/or at University-sponsored and affiliated activities and events, whether on University premises or at other locations ... *The University may also address off-campus behavior that occurs at other than University-sponsored or affiliated events if it determines that the behavior, or the continued presence of the accused perpetrator, impairs, obstructs, substantially interferes with or adversely affects the mission, process or functions of the University.*

(Ex. D at 1) (emphasis added).

215.   YU's Policy on Protecting Athletes (Ex. E hereto) provides in relevant part:

> The University is committed to ensuring the well-being, safety and protection of each of its student-athletes and will not tolerate bullying, hazing, harassment or other misconduct.  In light of the influence, power and position of trust wielded by coaches and other members of the athletic staff, *as well as the influence and power that may be wielded by other student-athletes*, the University believes it is important to set forth guidelines to help define appropriate behavior and conduct of its athletic staff and student-athletes in order to cultivate a safe and positive environment for all student-athletes.  *These guidelines apply to the behavior and conduct of* all members of the University athletic staff and *student-athletes, whether on-campus or off-campus.*

(Ex. E at 1) (emphasis added).

> The University prohibits, and will not tolerate, any form of sexual harassment, including sexual abuse/assault.

(Ex. E at 2).

> Sexual violence refers to physical contact with a sexual or intimate part of the body without consent.   It includes various forms of sexual intercourse (e.g., rape, incest, statutory rape) as well as other forms of sexual touching (e.g., fondling).

(Ex. E at 3).

216.  YU's Policy on Protecting Athletes also provides that any violation of that policy should be reported to both YU's Title IX Coordinator and YU's General Counsel.  (Ex. E at 3).

217. YU's Undergraduate Student Bill of Rights and Responsibilities/Undergraduate Student Disciplinary Procedures (attached hereto as Ex. F), provides in relevant part that:

> Respect for one another is essential to preserving the spirit of community at Yeshiva University. Membership in the Yeshiva university community entails certain rights and responsibilities.  All members of the community are accorded those rights, and are equally accountable to uphold their responsibilities.  It is therefore important to maintain a clear statement of basic rights, obligations and responsibilities concerning both academic and personal conduct.

(Ex. F at 2).

> Freedom from Discrimination
>
> Students who are otherwise qualified have the right to participate fully in the University community without discrimination as defined by federal, state and local law.

(Ex. F at 3).

> Safety
>
> Students have the right to an environment that is conducive to learning and without unreasonable concerns for personal safety.  Behavior which is intimidating, threatening or hostile to individuals

or groups is therefore regarded as a serious offense. Abusive or harassing behavior, verbal or physical, which demeans, threatens or injures another is subject to University disciplinary action.

(Ex. F at 3).

<u>Discipline</u>

Students who are subject to University disciplinary action have the right to be treated with fundamental fairness.

(Ex. F at 3).

<u>Responsibilities of Undergraduate Students</u>

The exercise and preservation of these rights requires respect for the rights of all others in the community. Undergraduate students enrolled at Yeshiva University assume an obligation to conduct themselves in a manner that is civil and in accordance with the University's function as an educational institution and performance of its mission. *Students are therefore expected to exhibit responsible behavior regardless of time, place, and medium.*

(Ex. F at 5).

Yeshiva University is a community that has always prided itself on the high standards of behavior and scholarship to which all members are held. To fulfill its function and mission, the University retains the power to maintain order with the University and discipline those who are disruptive of the educational process or fail to abide by the University's rules and regulations.

(Ex. F at 5).

UNDERGRADUATE STUDENT
<u>DISCIPLINARY PROCEDURES</u>

> Yeshiva University undergraduate students are expected and required to abide by the policies, rules and regulations established by the University including, but not limited to, what is stated in the University's publications and websites and in the Undergraduate Student Bill of Rights and Responsibilities.  Students are expected to conduct themselves in accordance with the highest ethical and moral standards.  Prohibited behavior includes acts that are dishonest, immoral or unlawful; acts that cause damage to property or harm to oneself or to others; or acts that bring shame upon the institution.

(Ex. F at 7).

> Students who violate any of these policies, rules, regulations and other requirements are subject to disciplinary action, whether the conduct occurs in any University facility, or in connection with any University-sponsored activity.   In addition, *students whose off campus conduct violates any of those policies, rules, regulations or other requirements may also be subject to University discipline.*   The University may impose appropriate sanction which may include, but are not limited to, letters of admonition, probation, loss of privileges, and/or suspension or expulsion from University housing or the University in general.

(Ex. F at 7) (emphasis added).

218. Yeshiva University, at all material times, thus maintained disciplinary and supervisory authority over PERRY DOE (for his rape of

Plaintiff in his apartment) and YU also had an affirmative duty to take appropriate steps and measures to protect Plaintiff. Accordingly, PERRY DOE's rape of Plaintiff in his apartment constitutes a sexual harassment incident over which YU had substantial control over *both* the respondent (i.e., the accused party, PERRY DOE), the complainant (Plaintiff), and the context in which PERRY DOE's rape/harassment of Plaintiff occurred.

219. YU therefore, pursuant to Title IX and the 2020 Title IX regulations, had a legal duty to respond to Plaintiff's Title IX Complaint, as it occurred within YU's unique "education program and activity."

220. YU, and the YU Defendants, Lauer, Nissel, Seyfarth, Kesselman, and Miller, were legally obligated to apply Title IX and its rules, regulations, and required procedures to Plaintiff's rape complaint against PERRY DOE.

221. The YU Defendants violated Title IX, in the context of their threshold determination—which they never conveyed to Plaintiff—to dismiss her Title IX Complaint for failure to meet Title IX's education program and activity jurisdictional requirement allegedly because Plaintiff claimed that PERRY DOE had raped her in his "off-campus" apartment because: (1) the YU Defendants, YU, Lauer, Nissel, Seyfarth, Kesselman, and Miller, failed to send Plaintiff written notice of their dismissal of her

formal Title IX Complaint in violation of § 106.45(b)(3)(iii); (2) the YU Defendants failed to send Plaintiff written notice of their dismissal of her Title IX Complaint with "the reasons therefor" in violation of § 106.45(b)(3)(iii); (3) the YU Defendants failed to provide Plaintiff with any opportunity to appeal their dismissal of Plaintiff's formal Title IX Complaint, pursuant to § 106.45(b)(3)(i) on the alleged basis that Plaintiff failed to establish that her rape occurred within YU's "education program or activity;" (4) the YU Defendants, specifically Lauer, Nissel, Seyfarth, Kesselman, and Miller, failed to carefully consider the proper scope of YU's "education program and activity" in the context of the circumstances alleged by Plaintiff in violation of the 2020 Title IX Regulations (*see* 85 Fed. Reg. at 30198; Section 106.45(b)(1)(iii)); (5) the YU Defendants, particularly Lauer, Nissel, Seyfarth, Kesselman, and Miller, failed to receive the mandated training on the scope of YU's "education program or activity." (*See* 85 Fed. Reg. at 30198); (6) Yeshiva University failed to post any materials as to the mandatory training of its Title IX personnel with respect to the scope of YU's "education program or activity" on its website. (*See* 85 Fed. Reg. at 30198; Section 106.45(b)(10)(i)(D)); and (7) PERRY DOE's rape of Plaintiff in his apartment met Title IX's "education program or activity" jurisdictional requirement, and implicated all Title IX rules, regulations, and

procedures, because YU had substantial control over PERRY DOE, including broad disciplinary and supervisory authority over him, as well as substantial control over the complainant (Plaintiff), and the context of PERRY DOE's rape of Plaintiff in his apartment.

## YU'S "NOT RESPONSIBLE" DETERMINATION

222.  In March, 2021, Plaintiff was interviewed several times about her rape allegations against PERRY DOE by the Seyfarth attorneys.

223.  The Seyfarth attorneys interviewed Plaintiff in great detail and asked her many of the same questions about emotionally difficult subjects on numerous occasions.  Upon information and belief, the Seyfarth attorneys did not subject PERRY DOE to the same level of scrutiny and did not ask him to repeatedly convey his version of the relevant events.

224.  From March, 2021 through April, 2021, Plaintiff repeatedly told Dean Sara Asher and the Seyfarth attorneys that she had significant fear and anxiety about the likelihood of encountering PERRY DOE on YU's Wilf Campus and, as Plaintiff reasonably feared for her physical safety, she wanted reasonable security measures to be put in place at YU.

225.  On or about April 29, 2021, Defendant Nissel emailed Plaintiff that the Seyfarth attorneys had completed their investigative report and that such report was available for Plaintiff's review.

226.   Defendant Nissel, however, insisted that Plaintiff execute a non-disclosure agreement before YU would provide Plaintiff with access to the Seyfarth attorneys' investigative report.

227.   This request was illegal, as The Clery Act provides that a college or university is required to provide participants (including complainants) with full and unfettered access to all Title IX investigatory reports and relevant evidence and may not place any pre-conditions on such parties' receipt of said reports and/or evidence.

228.   Plaintiff, not represented by a lawyer, did not know that YU was forbidden by law from mandating that she sign a non-disclosure agreement before receiving the investigative report and summary of relevant evidence related to her Title IX rape complaint.

229.   Accordingly, on April 29, 2021, Plaintiff executed the non-disclosure agreement (Ex. G hereto) drafted and tendered to her by YU.

230.   Upon information and belief, said non-disclosure agreement is null and void and of no force and effect.  Plaintiff seeks a declaratory judgment from this Court which makes that legal determination and finding.

231.   YU provided Plaintiff with an encrypted copy of the Seyfarth attorneys' investigative report on or about April 30, 2021.

232.   As this investigative report rehashed her traumatic rape narrative, and contained complicated legal language, Plaintiff reviewed this investigative report from her computer but did not understand many of its terms as well as its overall impact and effect.

233.   YU caused the encrypted document to no longer be reviewable, by Plaintiff and/or an attorney or advisor, within just a few days after her receipt of that encrypted document.

234.   When YU erased the encrypted document from Plaintiff's computer, Plaintiff had not reviewed such document with an attorney or anyone else.

235.   At the outset of their "investigation," Plaintiff advised the Seyfarth attorneys that she had undergone a rape examination at Columbia Presbyterian Hospital, and that the Hospital had collected "rape kit" evidence from her, on January 25, 2021 (the day after her rape).  Plaintiff also provided Seyfarth attorneys with a copy of her discharge form from Columbia Presbyterian Hospital for January 25, 2021.

236.   At no time during their "investigation," did the Seyfarth attorneys ever ask Plaintiff to provide her consent for them to obtain her rape kit evidence (including photographs of bruises on her body) from Columbia Presbyterian Hospital.

237.  At no time during their "investigation," did the Seyfarth attorneys ask Plaintiff for her consent for them to interview the Nurse Examiner who conducted Plaintiff's rape kit examination at Columbia Presbyterian Hospital on January 25, 2021.

238.  Plaintiff was not aware that she needed to provide the Seyfarth attorneys with her specific consent to examine the rape kit evidence in order for Seyfarth attorneys to obtain or examine that evidence from Columbia Presbyterian Hospital.  When she provided Seyfarth with her hospital discharge form (for January 25, 2021), she assumed that the Seyfarth attorneys had access to obtain and review her rape kit evidence.  The Seyfarth attorneys never told her or suggested otherwise.

239.  The Seyfarth attorneys' failure to obtain or request Plaintiff's rape kit evidence—which would have provided strong evidentiary support for Plaintiff's rape allegations—has no innocent or innocuous explanation.

240.  Only "investigators" who had no interest in ascertaining the truth would have turned their backs on this extremely probative evidence.

241.  On May 26, 2021, Defendant Nissel forwarded a letter to Plaintiff (Ex. A hereto) in which he stated that "After an extensive investigation, it has been determined that the evidence does not support a

finding that [PERRY DOE] violated the [University's Non-Discrimination and Anti-Harassment] Policy."

242.   This May 26, 2021 letter did not provide any reasons or rationale for YU's "not responsible" determination and failed to summarize the evidence considered or YU's assessment of the credibility of the witnesses and the evidence considered by YU's "investigators."

243.   Nor did this May 26, 2021 letter provide Plaintiff with notice that the Seyfarth attorneys' potential conflicts of interest or biases in favor of YU and PERRY DOE may have served as a basis for an appeal.

244.   In this May 26, 2021 letter, Defendant Nissel did not summarize the relevant evidence and provided no facts, grounds, reasons, or rationales for YU's "not responsible" determination.

245.   Defendant Nissel also failed to notify Plaintiff that, *inter alia*, conflicts of interest or biases were a potential basis of appeal of YU's dismissal of Plaintiff's Title IX Complaint.

246.   In or about June, 2021, Plaintiff repeatedly attempted to appeal YU's "not responsible" determination on the basis that YU failed to consider her probative rape kit evidence.

247.   Defendant Nissel repeatedly rejected her efforts at appeal, failed to convene an appeal panel as required by both Title IX and YU's own

Policy, and failed to review or have any appeal panel, or any YU employee or agent, review Plaintiff's unexamined yet critical rape kit evidence.  Upon information and belief, Defendant Nissel consulted with and received advice or direction from Defendant Lauer, YU's General Counsel, prior to rejecting Plaintiff's repeated attempts to appeal YU's "not responsible" determination based on the probative rape kit evidence that the YU "investigators" ignored.

248.  YU's and Defendant Nissel's consistent failure to permit Plaintiff to allow her probative "rape kit" evidence to be reviewed and considered on appeal, has no innocent or innocuous explanation.

249.  Only a university and Title IX Coordinator who have no interest in ascertaining the truth and are invested in the success of a rape cover-up, would continue to block Plaintiff from being able to present her "rape kit" evidence to the YU fact-finders.

## COUNT ONE:
## VIOLATION OF TITLE IX (AGAINST YESHIVA UNIVERSITY)

250.  Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

251.  Title IX, 20 U.S.C. § 1681 (a) (1972), provides in pertinent part that:

> No person in the United States shall, on the basis
> of sex, be excluded from participation in, be
> denied the benefits of, or be subjected to

discrimination under any education program or
activity receiving Federal financial assistance.

252.   Title IX regulates all schools that receive federal funding,
including Yeshiva University.

253.   Title IX provides a private cause of action against a recipient of
federal funds for discrimination based on sex, sexual harassment, and sexual
abuse.

254.   Indeed, a single sexual assault (which Plaintiff in this case
suffered) constitutes severe and objectively offensive sexual harassment for
Title IX purposes.

255.   YU, upon information and belief, is and was at all material
times a university that is a recipient of federal financial assistance, and is
thus subject to Title IX.

**<u>Post-Assault Claim</u>**

256.   YU is liable to the Plaintiff under Title IX because, at all
material times, high-ranking administrators and officials of YU with
remedial and corrective authority were deliberately indifferent to a known
act of sexual abuse and/or sexual harassment (i.e., PERRY DOE's rape of
Plaintiff), which occurred under YU's substantial control of PERRY DOE
and the context of his rape of Plaintiff, as part of YU's unique education
programs and activities.

257.  Indeed, Defendant YU's deliberate indifference to its high-ranking administrators' and officials' actual knowledge of PERRY DOE's rape of Plaintiff in his apartment, made female students (particularly Plaintiff), vulnerable to sexual abuse, sexual harassment, and discrimination at YU.

258.  As YU took no punitive action against PERRY DOE and no remedial action on behalf of Plaintiff, and YU failed to conduct a real, legitimate, fair, and impartial investigation, failed to implement any reasonable security measures, and failed to permit Plaintiff to appeal YU's "not responsible" determination, Plaintiff was subject to frequent and regular interactions with PERRY DOE on YU's campus. These interactions made Plaintiff particularly vulnerable to further sexual abuse, sexual harassment, and discrimination from PERRY DOE.   YU's deliberate indifference to the conduct of PERRY DOE, and its failure to restrict, regulate, or monitor PERRY DOE's presence on YU's Wilf Campus, or to provide Plaintiff with any reasonable security measures at YU's Wilf Campus, created a hostile educational environment at YU (particularly on its Wilf Campus) which caused Plaintiff to fear for her physical safety.

259.  Plaintiff, moreover, did suffer continued sexual harassment and discrimination at YU as a result of the deliberate indifference of high-

ranking YU administrators and officials with remedial and corrective authority in the face of their actual knowledge that Plaintiff had suffered, and was continuing to suffer, sexual abuse, sexual harassment, and discrimination at YU.

260.   At least one of the other members of the YU basketball team ascertained that Plaintiff had accused PERRY DOE of rape.  This basketball player, formerly Plaintiff's friend, proceeded to slut-shame her in a social situation, called her a "whore" and a "slut," insulted her character, and impugned her credibility.  This former friend told Plaintiff:  "You're so dumb for letting this happen to you."

261.   Upon information and belief, at all material times, YU and its high-ranking administrators and officials had actual knowledge of a substantial risk of serious harm to students, such as Plaintiff and other female students, in a context where multiple prior allegations of rape, sexual abuse, and sexual harassment of female YU students had been lodged against various YU students and these sexual misconduct, rape, and sexual harassment allegations (including Plaintiff's allegations against PERRY DOE) were well known to various high-ranking administrators, Board of Directors members, officials, and employees of YU.

262.   Upon information and belief, at all material times, PERRY DOE targeted, discriminated against, raped, and sexually harassed Plaintiff at YU, because she was a female, and YU's high-ranking administrators, officials, and directors, had actual knowledge that PERRY DOE, a participant in YU's education programs and activities, had sexually abused and sexually harassed Plaintiff because she was a woman.

263.   YU and its administrators and directors, at all material times, had the authority and obligation to investigate Plaintiff's rape and sexual abuse allegations against PERRY DOE as a Title IX matter, and take all appropriate enforcement, punitive, or remedial actions against PERRY DOE or on behalf of Plaintiff, but deliberately and maliciously chose not to do so, and deliberately and maliciously deceived Plaintiff about their Title IX jurisdictional and legal authority.

264.   YU and its administrators, officials, and directors, therefore, at all material times, had the authority and obligation to punish and take appropriate enforcement action against one of its students, PERRY DOE, for his rape and sexual abuse of Plaintiff, but deliberately and maliciously chose not to do so, and deliberately and maliciously lied to Plaintiff about YU's Title IX jurisdictional and legal authority to punish and take appropriate enforcement action against PERRY DOE.

265.   Plaintiff, at all material times, relied upon YU's aforesaid representations (orally and in writing) to her.

266.   YU took no remedial action, failed to conduct a real, bona fide, fair, and impartial investigation of Plaintiff's rape allegations, implemented no security measures to protect Plaintiff, failed to impose any disciplinary measures against PERRY DOE for his alleged misconduct, and failed to permit Plaintiff to appeal YU's "not responsible" determination.

267.   YU's deliberate indifference to its actual knowledge of Plaintiff's Title IX Complaint, includes its blatant disregard for the rules, regulations, and procedures of Title IX and its implementing regulations.

268.   Indeed, YU violated Title IX by, *inter alia:*

(1)   failing to provide Plaintiff with notice of its dismissal of Plaintiff's Title IX Complaint;

(2)   failing to provide Plaintiff with the reasons for its dismissal of Plaintiff Title IX Complaint;

(3)   failing to carefully consider the scope of YU's education program and activities in the context of allegations that one YU student-athlete raped another YU student-athlete in his residential apartment;

(4)    failing to provide its Title IX Coordinator and/or its Title IX investigators (i.e., the Seyfarth attorneys) with the requisite training as to the scope of its education programs or activities;

(5)    failing to publish on the YU website such training materials and information;

(6)    failing to conduct a live hearing for Plaintiff's rape complaint;

(7)    failing to provide Plaintiff with an attorney/advisor with respect to the "investigation" of her rape allegations against PERRY DOE;

(8)    failing to subject PERRY DOE to examination or cross-examination with respect to Plaintiff's rape allegations against him;

(9)    failing to fairly and impartially collect and examine all relevant evidence;

(10)    failing to interview several fact witnesses whom Plaintiff had specifically identified;

(11)    failing to request and obtain Plaintiff's probative rape kit evidence from Columbia Presbyterian Hospital;

(12)   failing to notify Plaintiff that she was required to provide her consent to Columbia Presbyterian Hospital in order for Columbia Presbyterian Hospital to provide and/or show the Seyfarth attorneys Plaintiff's probative rape kit evidence;

(13)   failing to request and examine photographs taken by Columbia Presbyterian Hospital's Nurse Examiner, which depicted bruises that PERRY DOE inflicted upon Plaintiff's body while he raped her;

(14)   failing to conduct a real, bona fide, and impartial investigation of Plaintiff's rape allegations against PERRY DOE;

(15)   failing to permit Plaintiff to appeal YU's "not responsible" determination;

(16)   failing to disclose to Plaintiff the blatant conflicts of interest and biases of Seyfarth Shaw, LLP, Kesselman, and Miller, in favor of YU and PERRY DOE and against Plaintiff;

(17)   failing to notify Plaintiff that the "conflict of interest" or "bias" of the "investigators" of her rape allegation was a

possible ground for her to appeal YU's "not responsible" determination;

(18)   failing and refusing to provide Plaintiff with *any* reasonable security measures to protect Plaintiff from possible encounters with PERRY DOE on YU's Wilf Campus; and

(19)   failing to treat Plaintiff and PERRY DOE equally and impartially as, upon information and belief, the Seyfarth attorneys cruelly asked Plaintiff to answer the same or nearly identical questions about the most traumatic event of her life on multiple occasions while *not* affording PERRY DOE that same level of scrutiny with respect to his version of events.

269.   As a direct and proximate result of the aforesaid actions of YU, Plaintiff suffered severe emotional distress, mental anguish, and emotional and physical pain and suffering.

270.   YU's response to PERRY DOE's known discrimination against Plaintiff constitutes deliberate indifference and was clearly unreasonable in light of all of the known circumstances.

**Pre-Assault Claim**

271.   Even prior to PERRY DOE's rape of Plaintiff on January 24, 2021, YU engaged in conduct which violated Title IX.

272.   At all times from 2001 to present, by expressly adopting and approving a policy to not report all sex crimes that occurred on or near YU's Wilf Campus and/or Beren Campus, to the U.S. Department of Education (and to its students and prospective students in YU's annual Security Reports for its campuses), YU maintained a policy of deliberate indifference to sexual harassment and sexual misconduct.

273.   At all material times from 2001 to present, YU and its high-ranking administrators and directors, including YU Presidents, Norman Lamm, Richard Joel, and Ari Berman, its General Counsel, Andrew "Avi" Lauer, Esq., and its Title IX Coordinator, Chaim Nissel, had actual and specific knowledge that female participants in YU's education programs and activities had a heightened risk of sexual assault, rape, and sexual harassment because of their participation in such education programs or activities.

274.   Indeed, by adopting its policy of gross non-compliance with The Clery Act's crime reporting requirements, and its deliberate non-reporting of sex crimes that occurred on or near YU's campuses, YU and its

high-ranking administrators deliberately and maliciously painted a false and inaccurate picture of safety at or near YU's campuses for female students, and this increased YU's female students' risks of suffering rapes and sexual assaults (particularly by other YU students) on or near YU's campuses.

275.   Moreover, by reason of YU's non-reporting policy, YU and its administrators knew that female students at YU were deprived of a reasonable ability or mechanism to report rapes or sexual assaults that occurred on or near YU's campuses and/or were perpetuated by male YU students against female YU students.

276.   At all material times, all student participants in YU's education programs and activities, including Plaintiff and PERRY DOE, were subject to the control, jurisdiction, and authority of YU, pursuant to Title IX, YU's school policies, procedures, and practices, and/or otherwise.

277.   As a direct and proximate result of YU's acts and omissions *prior to* PERRY DOE's rape of Plaintiff on January 24, 2021, Plaintiff was raped by PERRY DOE and thus suffered harassment and sexual abuse that was so severe, pervasive, and objectively unreasonable, that it deprived Plaintiff of educational opportunities and benefits provided by YU.

278.   Accordingly, YU is liable to Plaintiff under Title IX for adopting, implementing, and maintaining a policy of deliberate non-

reporting of sex crimes (in violation of The Clery Act) that occurred on or near YU's campuses to the U.S. Department of Education and all YU students and/or prospective YU students.

279.   YU's adoption of the non-reporting of sex crimes as the University's official school policy, discriminated against all female student participants in YU's education programs and activities (including Plaintiff) on the basis of sex.

**<u>Harm Caused By YU's Title IX Violations</u>**

280.   At all material times, YU's conduct towards Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of Plaintiff's rights, interests, and welfare.

281.   At all material times, YU's conduct towards Plaintiff was seriously harmful to the public—which has a compelling interest in ensuring that college students within the community—including Plaintiff—be free from sexual abuse and harassment, as well as retaliation in the form of unwarranted adverse actions, in a college or university environment.

282.   As a direct and proximate result of YU's conduct prior to January 24, 2021, Plaintiff was raped by PERRY DOE and suffered and

continues to suffer from severe emotional distress, pain and suffering, and mental anguish.

283.   As a direct and proximate result of YU's violation of Title IX, Plaintiff suffered horrendous sexual abuse, sexual harassment, verbal abuse, and severe emotional distress and mental anguish.

284.   As a direct and proximate result of YU's misconduct, Plaintiff has suffered, and continues to suffer, from severe emotional distress and emotional anguish.

285.   PERRY DOE's rape of Plaintiff on January 24, 2021, and YU's failure to restrict or limit his presence on YU's Wilf Campus thereafter, constituted gender bias and harassment so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to the educational opportunities and benefits provided by YU.

286.   PERRY DOE's rape, sexual abuse and harassment of Plaintiff was exacerbated by the post-assault sexual harassment and verbal abuse of Plaintiff by other YU students, in which they mocked and ridiculed Plaintiff for her rape allegations, and impugned Plaintiff's honesty and credibility about her rape allegations.

287.   All of this harassment had a concrete, negative effect on Plaintiff's ability to receive an education at YU.

288.   The aforementioned sexual harassment of Plaintiff by PERRY DOE and others, was so severe, pervasive and objectively offensive, that it grossly undermined and detracted from Plaintiff's educational experience at YU, impacted her ability to perform academically, and effectively denied Plaintiff equal access to YU's resources, opportunities, and benefits.

289.   All of this harm to Plaintiff was reasonably foreseeable to YU at the time of its violation[s] of Title IX.

290.   Plaintiff, pursuant to 42 U.S.C. § 1988, and related authority, also seeks and is entitled to receive all reasonable attorneys' fees, costs, and expenses, to be incurred in connection with his Title IX claims.

291.   Plaintiff is thus entitled to compensatory damages and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of her Title IX claims, from Defendant YU.

### COUNT TWO:
### RETALIATION IN VIOLATION OF TITLE IX
### (AGAINST YESHIVA UNIVERSITY)

292.   Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

293.   Retaliation against individuals because they complain of sex discrimination is intentional discrimination that violates the clear terms of Title IX.

294.   On or about February 18, 2021, Plaintiff was engaged in protected activities when she complained to YU's Title IX Office about PERRY DOE's rape and sexual abuse.

295.   From March, 2021 through June, 2021, Plaintiff was engaged in protected activities when she participated in YU's "investigation" of her rape allegations.

296.   From February, 2021 through November, 2021, Plaintiff was engaged in protected activities when she repeatedly requested that YU implement reasonable security measures to protect her from PERRY DOE on YU's Wilf Campus.

297.   At all material times, Defendant, YU, and its various high-ranking administrators, agents, and employees, including Lauer and Nissel, had actual and/or constructive knowledge of the aforesaid protected activities of Plaintiff.

298.   In or about 2021, Defendant YU took adverse school-related action against Plaintiff, through its administrators, agents, and employees, by failing and refusing to provide Plaintiff with a real, bona fide, fair, and impartial investigation of her rape allegations against PERRY DOE, failing and refusing to implement *any* reasonable security measures to protect Plaintiff from PERRY DOE on YU's Wilf Campus, and failing to permit

Plaintiff to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct.

299.  As a direct and proximate result of Plaintiff's rape, sexual abuse, and sexual harassment claims, Defendant YU took the aforesaid school-related adverse retaliatory actions against Plaintiff shortly after Plaintiff complained to Defendant YU and its administrators, repeatedly, and in detail, about her rape, sexual abuse, and sexual harassment by PERRY DOE—shortly after Plaintiff requested that YU implement reasonable security measures that would protect her from PERRY DOE on YU's Wilf Campus—and shortly after Plaintiff attempted to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct.

300.  YU took all of these school-related adverse actions against Plaintiff in retaliation for her allegations of rape and sexual abuse against PERRY DOE.

301.  As a direct and proximate result of Defendant YU's conduct, Plaintiff suffered severe emotional anguish and pain and suffering, a severe loss of self-esteem, self-confidence, and self-worth, and humiliation.

302.  As a direct and proximate result of the aforesaid actions of YU, Plaintiff suffered severe emotional distress, mental anguish and emotional and physical pain and suffering.

303.   At all material times, a retaliatory motive held and acted upon by the YU Defendants played a part in YU's above-referenced adverse actions against Plaintiff.  The YU Defendants, indeed, were enraged and horrified that a female YU student-athlete would publicly accuse a fellow YU student-athlete of a violent and unprovoked rape, and YU became even more enraged when Plaintiff refused to accept YU's sham investigation and bogus determination of her rape complaint—and wrote a critical letter to YU's student newspaper which documented her ordeal.

304.   The temporal proximity of Plaintiff's protected activities and YU's adverse actions against her is by itself sufficient to establish the requisite causal connection for Plaintiff's Title IX retaliation claim.

305.   The above-described actions of Defendant YU against Plaintiff were willful, wanton, and malicious, harmed the community's interest in ensuring that its colleges and universities do not tolerate an environment where the rape, sexual abuse, and/or sexual harassment of students by other students is tolerated, condoned, or encouraged.

306.   Plaintiff is entitled to recover reasonable attorneys' fees from Defendant YU, pursuant to 42 U.S.C. § 1988, or other authority.

307.   As a direct and proximate result of Defendant YU's aforesaid conduct towards Plaintiff, Plaintiff is entitled to recover compensatory damages, and reasonable attorneys' fees.

## COUNT THREE:
## VIOLATION OF NYCHRL, N.Y.C. ADMIN. CODE § 8-107(4)
## (AGAINST YESHIVA UNIVERSITY)

308.   Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

309.   Pursuant to the New York City Council's enactment of the Local Civil Rights Restoration Act of 2005 ("Restoration Act"), claims under the New York City Human Rights Law ("NYCHRL") should not be treated merely as coextensive with state and federal civil rights statutes.

310.   The NYCHRL, indeed, is a one-way ratchet, by which interpretations of state and federal civil rights statutes can only serve as a floor below which the City's Human Rights Law cannot fall.

311.   Thus, the NYCHRL's standards governing discrimination claims are as or more generous to plaintiffs than those under analogous federal statutes—including Title IX—so that a claim that satisfies federal law necessarily satisfies the NYCHRL.

312.   Moreover, NYCHRL provisions must be construed liberally for the accomplishment of its uniquely broad and remedial purposes.

313.   This is true even if similar federal or New York State civil and human rights laws with comparably worded provisions have been construed more narrowly.

314.  Because the NYCHRL standard is more liberal than the corresponding federal and state law standards, courts must analyze NYCHRL claims separately and independently from any federal and state law claims.

315.   A plaintiff who has sufficiently pleaded a discrimination claim under Title IX has also adequately pleaded a corresponding discrimination claim under the NYCHRL.

316.   N.Y.C. Admin. Code § 8-107(4) provides in relevant part:

> 4. Public accommodations.
>
> a. It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation:
>
> 1. Because of any person's actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation, uniformed service or immigration or citizenship status, directly or indirectly:
>
> (a) To refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or

privileges of the place or provider of public accommodation; …

317.   N.Y.C. Admin. Code § 8-102, which sets forth the definitions of terms used under the NYCHRL, defines place or provider of public accommodation as follows:

> The term "place or provider of public accommodation" includes providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold, or otherwise made available. Such term does not include any club which proves that it is in its nature distinctly private. A club is not in its nature distinctly private if it has more than 400 members, provides regular meal service and regularly receives payments for dues, fees, use of space, facilities, services, meals or beverages directly or indirectly from or on behalf of non-members for the furtherance of trade or business. **For the purposes of this definition, a corporation incorporated under the benevolent orders law or described in the benevolent orders law but formed under any other law of this state, or a religious corporation incorporated under the education law or the religious corporation law is deemed to be in its nature distinctly private.** No club that sponsors or conducts any amateur athletic contest or sparring exhibition and advertises or bills such contest or exhibition as a New York state championship contest or uses the words "New York state" in its announcements is a private exhibition within the meaning of this definition.

(Emphasis added).

318.   Yeshiva University is not a "religious corporation" that is exempt from § 8-107(4), pursuant to § 8-102.

319.   YU is, and at all material times, has been, incorporated under the New York Education Law.

320.   YU's own Amendment to its Charter adopted December 15, 1967 provides that:

> 1. This corporation, incorporated as The Rabbi Isaac Eichanan Theological Seminary Association under the Membership Corporations Law of the State of New York on March 20, 1897, the name of which was subsequently changed by the Regents of the University of the State of New York to Yeshiva University, is hereby continued as an **educational corporation under the Education Law** of the State of New York …
>
> …
>
> 9. Yeshiva University is and continues to be organized and operated **exclusively for educational purposes …**

(Emphasis added).

321.   YU's organizing documents do not expressly indicate that YU has a religious purpose.   To the contrary, YU organized itself as an "educational corporation" and for educational purposes, exclusively.

322.   YU's amended charter represented a departure from its initial charter which stated an exclusively religious purpose, to wit, "to promote the study of Talmud".

323.   Then, in 1967, YU amended its charter to state that it "is and continues to be organized and operated exclusively for educational purposes".

324.   In an April 27, 2021 letter from faculty members of YU's Benjamin N. Cardozo Law School to YU's President, Ari Berman, the authors emphasized that YU, "as a non-sectarian institution of higher education, must abide by the "proscriptions" contained "under federal, state, and city civil rights laws, all of which prohibit discrimination on the basis of sex[.]"

325. Law professors within YU's own community have thus recognized that YU is not a religious corporation and is subject to the NYCHRL.

326.   While the 1965 NYCHRL excluded "colleges and universities" from classification as a place of public accommodation, in 1991 the New York City Council removed this exemption from the NYCHRL.   The NYCHRL thus applies to Yeshiva University.

327.   The legislative intent of the NYCHRL requires that any exemptions be narrowly construed in order to minimize discriminatory conduct.

328.   YU is a place of public accommodation as set forth in N.Y.C. Admin. Code § 8-107(4).

329.   N.Y.C. Admin. Code § 8-107(4) prohibits any entity which is a place of public accommodation, from discriminating against any person, through any of its agents or employees, on the basis of sex.

330.   For the reasons set forth above, pursuant to the NYCHRL, Plaintiff is entitled to recover compensatory damages from YU.

331.   YU's conduct, and the conduct of YU's agents and employees, was willful, malicious, shocking, outrageous, and negatively affected the emotional and physical health of Plaintiff, caused Plaintiff to suffer severe emotional distress and mental anguish, and gives rise to egregious emotional distress damages.

332.   YU engaged in discrimination against Plaintiff on the basis of sex with willful and wanton negligence or recklessness, as well as a conscious disregard of the rights of others, and/or engaged in conduct so reckless as to amount to such disregard.

333.   At all material times, Defendants had knowledge that their conduct towards Plaintiff, and their handling of her rape allegations, was in violation of city, state, and federal anti-discrimination laws.

334.   As a result of YU's violation of the NYCHRL, Plaintiff is entitled to punitive damages.

335.   Plaintiff, pursuant to N.Y.C. Admin. Code § 8-502(g), and related authority, also seeks and is entitled to receive all reasonable attorneys' fees, costs, and expenses, to be incurred in connection with her NYCHRL claims.

336.   Plaintiff is thus entitled to compensatory damages, including damages for her severe and extreme emotional distress, punitive damages, and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of her NYCHRL claims, from Defendant YU.

**COUNT FOUR:**
**VIOLATION OF NYCHRL, N.Y.C. ADMIN. CODE § 8-107(7)**
**"RETALIATION" (AGAINST YESHIVA UNIVERSITY)**

337.   Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

338.   N.Y.C. Admin. Code § 8-107(7) ("Retaliation"), provides that "[i]t shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate against any

person because such person has (i) opposed any practice forbidden under this chapter …; (v) requested a reasonable accommodation under this chapter …"

339.  As set forth above, Plaintiff opposed and complained about YU's discrimination against Plaintiff, which is a practice forbidden by the NYCHRL, and, on numerous occasions, requested reasonable accommodations from YU (i.e., with respect to her numerous requests for YU to implement reasonable security measures), and attempted to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct.

340.  YU, nonetheless, discriminated and retaliated, and continues to discriminate and retaliate, against Plaintiff by: (1) continuing to deprive her of a real, bona fide, fair, and impartial investigation of her rape allegations against PERRY DOE; (2) continuing to deny her requests to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct; and (3) continuing to deny her numerous requests for YU to provide her with reasonable accommodations and implement reasonable security measures at its Wilf Campus.

341.  Pursuant to § 8-107(7) of the NYCHRL, therefore, Plaintiff is entitled to receive compensatory damages from YU.

342.   YU's conduct, and the conduct of YU's agents and employees, was willful, malicious, shocking, outrageous, and negatively affected the emotional and physical health of Plaintiff, caused Plaintiff to suffer severe emotional distress and mental anguish, and gives rise to egregious emotional distress damages.

343.   YU engaged in retaliation and discrimination against Plaintiff by, *inter alia*, failing to conduct a real, bona fide, fair, and impartial investigation of her rape allegations against PERRY DOE, failing to provide Plaintiff with any ability to appeal YU's predetermined finding of "not responsible," and failing to provide Plaintiff with any reasonable accommodations, including implementing reasonable security measures at YU's Wilf Campus.

344.  YU thus engaged in retaliation and discrimination against Plaintiff on the basis of sex with willful and wanton negligence or recklessness, as well as a conscious disregard of the rights of others, and/or engaged in conduct so reckless as to amount to such disregard.

345.  At all material times, Defendants had knowledge that their conduct towards Plaintiff, and their retaliation and discrimination against her, was in violation of city, state, and federal anti-discrimination laws.

346.   As a result of YU's violation of § 8-107(7) of the NYCHRL, Plaintiff is entitled to punitive damages.

347.   Plaintiff, pursuant to N.Y.C. Admin. Code § 8-502(g), and related authority, also seeks and is entitled to receive all reasonable attorneys' fees, costs, and expenses, to be incurred in connection with her NYCHRL claims.

348.   Plaintiff is thus entitled to compensatory damages, including damages for her severe and extreme emotional distress, punitive damages, and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of her NYCHRL claims, from Defendant YU.

### COUNT FIVE:
### VIOLATION OF NYCHRL, N.Y.C. ADMIN. CODE § 8-107(6), "AIDING AND ABETTING" (AGAINST ANDREW "AVI" LAUER, ESQ., CHAIM NISSEL, SEYFARTH SHAW, LLP, DOV KESSELMAN, ESQ. AND EMILY MILLER, ESQ.)

349.   Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

350.   N.Y.C. Admin. Code § 8-107(6) ("Aiding and Abetting"), provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

351.  Plaintiff has valid claims for discrimination and retaliation against YU in violation of NYCHRL (Sections 8-107(4) and 8-107(7)).

352.  As set forth above, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller each actively participated in, and had a direct and primary role with significant responsibilities, in YU's discrimination against Plaintiff in violation of § 8-107(4).

353.  As set forth above, Defendants, Lauer, Nissel, Seyfarth, Kesselman, and Miller each actively participated in, and had a direct and primary role with significant responsibilities, in YU's retaliation and discrimination against Plaintiff in violation of § 8-107(7).

354.  At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller, were in charge of, or had vital roles in YU's sham "investigation" as to Plaintiff's alleged rape by PERRY DOE.

355.  At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller, were involved in YU's sham "investigation" as to Plaintiff's Title IX Complaint regarding her alleged rape by PERRY DOE, and participated in, developed, formulated and/or ratified said "investigation's" processes, procedures, rules, findings, conclusions, and determinations.

356. At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller intentionally and maliciously conducted, participated in, and/or ratified a sham investigation that (1) was specifically designed to shield and protect PERRY DOE from any serious consequences for his sexual harassment and sexual abuse of Plaintiff; and (2) retaliated against Plaintiff for making such charges against PERRY DOE by refusing to provide her with any supportive measures and refusing to permit Plaintiff to appeal YU's "not responsible" determination.

357. At all material times, therefore, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller "aided and abetted" Defendant YU's harm to Plaintiff's rights and interests in violation of § 8-107(6) of the NYCHRL.

358. For the reasons set forth above, pursuant to § 8-107(6) of the NYCHRL, Plaintiff is entitled to receive compensatory damages from Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller.

359. The conduct of Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller was willful, malicious, shocking, outrageous, and negatively affected the emotional and physical health of Plaintiff, caused Plaintiff to suffer emotional distress and mental anguish, and gives rise to egregious emotional distress damages.

360.   Defendants, Lauer, Nissel, Seyfarth, Kesselman, and Miller aided and abetted YU's discrimination and retaliation against Plaintiff on the basis of her sex with willful and wanton negligence or recklessness, as well as conscious disregard of the rights of others, and/or engaged in conduct so reckless as to amount to such disregard.

361.   At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller had knowledge that their conduct towards Plaintiff, and their willful participation in YU's sham investigation of Plaintiff's rape allegations, aided and abetted YU's violations of city, state, and federal anti-discrimination laws, in violation of § 8-107(6).

362.   As a result of Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller's violations of § 8-107(6) of the NYCHRL, Plaintiff is entitled to punitive damages.

363.   Plaintiff, pursuant to N.Y.C. Admin. Code § 8-502(g), and related authority, also seeks and is entitled to receive all reasonable attorneys' fees, costs, and expenses, to be incurred in connection with her NYCHRL claims.

364.   Plaintiff is thus entitled to compensatory damages, including damages for her severe and extreme emotional distress, punitive damages, and reasonable attorneys' fees, costs, and expenses incurred in the

prosecution of her NYCHRL "aiding and abetting" claims, from Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller.

## COUNT SIX:
## BREACH OF FIDUCIARY DUTIES (AGAINST
## YESHIVA UNIVERSITY and CHAIM NISSEL)

365.   Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

366.   Under New York law, a fiduciary relation exists between two persons when one of them is under a duty to act or give advice for the benefit of the other upon matters within the scope of relation.

367.   Here, at all material times, Plaintiff had a fiduciary relationship (and special relationship), with YU and Defendant Nissel, and YU and Defendant Nissel owed fiduciary duties to Plaintiff, because it is obvious that Plaintiff relied on YU and Defendant Nissel and reasonably trusted YU and Defendant Nissel to act reasonably, honestly, and fairly with respect to Plaintiff's participation in YU's educational programs and activities, and especially with respect to her participation in her Title IX Complaint to YU's Title IX Office following her rape by PERRY DOE.

368.   At all material times, the relationship between Plaintiff and YU and Defendant Nissel was one in which: (1) Plaintiff had extreme vulnerability to YU and Defendant Nissel, which (2) resulted in the

empowerment of YU and Defendant Nissel, the stronger parties, by Plaintiff, the weaker party, (3) which empowerment had been solicited and accepted by YU and Defendant Nissel, and (4) prevented Plaintiff from effectively protecting herself with respect to her participation in YU's education programs and activities and YU's and Defendant Nissel's "investigation" and dismissal of her Title IX Complaint.

369.   To the extent that Plaintiff and YU had themselves engaged in a contract for Plaintiff to attend YU as a student, the fiduciary duties of YU arising from that contract were independent of that contract.

370.   At all material times, Plaintiff placed and reposed great trust and confidence in YU and Defendant Nissel and reasonably relied upon YU's and Defendant Nisell's superior expertise or knowledge with respect to the issues of Plaintiff's Title IX Complaint, YU's "investigation" of Plaintiff's rape allegations, and the mandated rules, regulations, and procedures with respect thereto.

371.   At all material times, YU and Defendant Nissel owed duties to Plaintiff to fully disclose material facts related to the applicability of Title IX to her rape complaint and the blatant conflicts of interests and biases of the Seyfarth attorneys in favor of YU and PERRY DOE and against Plaintiff.

372.   YU and Defendant Nissel, by their aforesaid acts and omissions, including their failures to disclose to Plaintiff that Title IX was in fact applicable to her rape allegations, that all Title IX rules, regulations, and procedures should have governed and dictated the form and content of YU's investigation of Plaintiff's rape allegations, and that the Seyfarth attorneys (Seyfarth, Kesselman, and Miller) had glaring and obvious conflicts of interest and biases in favor of YU and PERRY DOE and against Plaintiff which should have disqualified them from serving as "investigators" of Plaintiff's rape complaint against PERRY DOE, breached their fiduciary duties to Plaintiff.

373.   As a direct and proximate result of YU's and Defendant Nissel's breach of fiduciary duties to Plaintiff, Plaintiff has suffered, and continues to suffer, severe emotional distress, mental anguish, and pain and suffering.

374.   At all material times, YU's and Defendant Nissel's conduct towards Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of Plaintiff's rights, interests, and welfare, and was seriously harmful to the public—which has a compelling interest in ensuring that college and university students within the community—including Plaintiff—be given a

full and fair opportunity to enjoy the benefits of higher education free from fraud, retaliation (for reporting rape and sexual abuse), violations of her civil rights, and other gross misconduct.

375.   The aforesaid conduct of YU and Defendant Nissel entitles Plaintiff to receive punitive damages, as well as compensatory damages.

## COUNT SEVEN:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST EACH DEFENDANT)

376.   Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

377.   As described herein, the Defendants' conduct towards Plaintiff, a member in good-standing in a YU education program, who had the great misfortune of being raped and sexually abused by PERRY DOE, a YU undergraduate student, was extreme and outrageous.

378.   The Defendants' conduct against Plaintiff was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

379.   The Defendants' aforesaid conduct against Plaintiff, in which the Defendants conspired to cover-up Plaintiff's rape allegations, conducted a sham investigation that ignored probative evidence that supported

Plaintiff's account of the incident, and rendered a preordained "not responsible" verdict against PERRY DOE, was intended to cause, or made with a disregard of the probability of causing, Plaintiff to suffer severe emotional distress.

380.   Plaintiff, in fact, suffered severe emotional distress as a direct and proximate result of the Defendants' aforesaid acts and omissions.

381.   By reason of the foregoing, and as a direct and proximate result of the Defendants' conduct, Plaintiff sustained physical and psychological injuries, including but not limited to, severe emotional distress, depression, humiliation, embarrassment, fright, anger, anxiety, and has been caused to suffer pain and mental anguish, emotional and psychological damage as a result thereof, and, upon information and belief, some or all of these injuries are of a permanent and lasting nature.

382.   At all material times, the Defendants' conduct towards Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of Plaintiff's rights, interests, and welfare, and was seriously harmful to the public—which has a compelling interest in ensuring that college and university students within the community—including Plaintiff—be given a full and fair opportunity to enjoy the benefits of higher education free from sexual assault, fraud,

retaliation (for reporting rape and sexual abuse), violations of her civil rights, and other gross misconduct.

383.   The aforesaid conduct of the Defendants entitles Plaintiff to receive punitive damages, as well as compensatory damages.

**COUNT EIGHT:**
**DECEPTIVE PRACTICES IN VIOLATION OF NEW YORK**
**GENERAL BUSINESS LAW § 349 (DECEPTIVE ACTS AND**
**PRACTICES) (AGAINST YESHIVA UNIVERSITY)**

384.   Plaintiff repeats and realleges each of the allegations contained in this Complaint as if each said allegation has been set forth at length.

385.   New York General Business Law ("GBL") § 349 prohibits deceptive and misleading business practices, and its scope is broad.

386.   GBL § 349 on its face applies to virtually all economic activity.

387.   GBL § 349 applies to educational services and/or goods provided to educational consumers by private universities like YU.

388.   GBL § 349 thus encompasses a significantly wider range of deceptive business practices that were never previously condemned by decisional law.  Indeed, GBL § 349 was intended to be broadly applicable, extending far beyond the reach of common law fraud.

389.   At all material times, Plaintiff (as well as her parents) were consumers of educational services.

390.   At all material times, YU engaged in a broad-based marketing scheme, which was designed to induce Jewish students to enroll in, and complete, their post-secondary and graduate studies at YU.

391.   Said marketing scheme appealed, *inter alia*, to young Jewish women who lived in the New York tri-state area, as well as young Jewish women who lived in other states and abroad.

392.   The YU marketing scheme included, each and every year from 2001 to 2020, YU's Security Reports for each campus at YU, including YU's Wilf Campus.

393.   At all material times, as stated above and otherwise, YU made material misrepresentations to Plaintiff (and her parents), as well as every other female student at YU, and thousands of prospective female students or applicants, by making false, deceptive, misleading, and fraudulent statements in its Security Reports as to the number and frequency of sex crimes (i.e., rape and forcible fondling) that occurred on or near YU''s campuses, including YU's Wilf Campus.

394.   Upon information and belief, at all material times, YU knew that the above representations were false in that, *inter alia*:

(i)      YU knew that numerous female students had been raped and/or sexually assaulted on or near YU's campuses

(including YU's Wilf Campus) from 2001 through January 24, 2021.

(ii)   Many of these rapes and sexual assaults were reported to, and otherwise known by, YU and YU administrators and/or directors.

(iii)   YU and its administrators and directors made the craven but conscious decision to conceal their knowledge of these rapes and sexual assaults from female students at YU (including Plaintiff), parents, and thousands of prospective female students and applicants.

(iv)   YU knew that information on rapes and sexual assaults on or near YU's campuses (including Wilf Campus) would have had an impact on the decision of prospective students and students, including Plaintiff, to apply for admission and enroll as students at YU, or to continue their studies at YU.

(vii)   YU and its administrators intended to misrepresent the safety of the school's campuses in order to induce female students (including Plaintiff) to enroll at YU and to induce students already enrolled at YU (including

Plaintiff) to continue their studies at YU's undergraduate and graduate education programs.

395.  Each of YU's aforesaid misrepresentations was likely to mislead and deceive a reasonable consumer acting reasonably under the circumstances.

396.  YU's aforesaid conduct constitutes consumer-oriented conduct in that YU engaged in acts or practices that had and continue to have a broad impact on consumers at large, not just Plaintiff.

397.  Every female student who attended YU, and every prospective female student considering YU as her college or university program, was impacted by YU's aforesaid deceptive practices.  This is especially true of the numerous female students, from 2001 through 2022, who attended YU and were raped and sexually assaulted on or near YU's campuses, including YU's Wilf Campus.

398.  Each of the aforesaid misrepresentations related to YU's campus safety, and prevalence of sex crimes on or near YU's campuses, was likely to mislead and deceive a reasonable consumer acting reasonably under the circumstances.

399.  In determining what types of conduct may be deceptive practices under New York law, New York courts should apply an objective

standard which asks whether the representation or omission was likely to mislead a reasonable consumer acting reasonably under the circumstances, taking into account not only the impact on the average consumer, but also on the vast multitude which the statutes were enacted to safeguard—including the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.

400.   Here, YU took great pains, at great expense, to make sure that appearances and general impressions, buttressed by a bombardment of positive yet false representations about campus safety and sex crimes on or near YU's campuses, would lead a reasonable education consumer into thinking that YU provided female students a chance to obtain an exemplary post-secondary and/or graduate education, rooted in Jewish traditions, in a safe and nurturing environment.

401.   YU thus engaged in "deceitful conduct" in violation of GBL § 349.

402.   The aforesaid conduct of YU evinces a high degree of moral culpability, was so flagrant as to transcend mere carelessness, constitutes willful and wanton negligence or recklessness, and thus gives rise to punitive damages.

403.   Moreover, as a result of the YU's violation of GBL § 349, Plaintiff is entitled to receive treble damages, compensatory damages, as well as reasonable attorneys' fees, pursuant to GBL § 349 (h), and/or other authority.

404.   Plaintiff is entitled to receive compensatory damages against YU, treble damages, punitive damages, and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of these claims.

**COUNT NINE:**
**FALSE ADVERTISING IN VIOLATION OF NEW YORK**
**GENERAL BUSINESS LAW § 350 (FALSE ADVERTISING)**
**(AGAINST YESHIVA UNIVERSITY)**

405.   Plaintiff repeats and realleges each of the allegations contained in this Complaint as if each said allegation has been set forth at length.

406.   New York General Business Law ("GBL") § 350 (False Advertising) prohibits false advertising "in the conduct of any business, trade or commerce or in the furnishing of any service."

407.   GBL § 350-a(1) defines false advertising as advertising that is "misleading in a material respect."

408.   Pursuant to the aforesaid acts and omissions, particularly with respect to the reporting of crimes that were published in YU's annual

Security Reports, YU engaged in "false advertising" in violation of GBL §
350.

409.   The aforesaid conduct of YU evinces a high degree of moral
culpability, was so flagrant as to transcend mere carelessness, constitutes
willful and wanton negligence or recklessness, and thus gives rise to
punitive damages.

410.   Moreover, as a result of the YU's violation of GBL § 350,
Plaintiff is entitled to receive treble damages, compensatory damages, as
well as reasonable attorneys' fees, pursuant to GBL § 349 (h), and/or other
authority.

411.   Plaintiff is entitled to receive compensatory damages against
YU, treble damages, punitive damages, and reasonable attorneys' fees, costs,
and expenses incurred in the prosecution of these claims.

## COUNT TEN:
## VIOLATION OF N.Y. EXECUTIVE LAW, § 296(7)
## (AGAINST YESHIVA UNIVERSITY)

412.   Plaintiff hereby repeats and realleges each of the allegations in
this Complaint as if each has been fully set forth at length.

413.   Claims under the New York Human Rights Law are evaluated
under the same standards as analogous claims under Title IX.

414.   New York Executive Law § 296(7) provides that:

> It shall be unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he…has opposed any practice under this article or because he…has filed a complaint, testified or assisted in any proceeding under this article.

415.   Section 296(7) applies to "persons," which, pursuant to New York Executive Law § 292(1), include "individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers."

416.   Defendant YU, moreover, is a "corporation" under New York law.

417.   New York Executive Law § 296 prohibits any person, including a school or university, from discriminating against any other person on the basis of sex.

418.   For the reasons set forth above, YU discriminated and retaliated against Plaintiff, in violation of New York Executive Law § 296(7), because, *inter alia*, she opposed and complained of PERRY DOE's rape (which in itself constituted discrimination and harassment), filed a formal complaint against PERRY DOE with YU's Title IX Office, requested that YU implement reasonable security measures at YU's Wilf Campus, and sought

to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct.

419.   Pursuant to New York Executive Law § 296(7), therefore, Plaintiff is entitled to recover compensatory damages, including damages for egregious emotional distress and mental anguish, from YU.

## COUNT ELEVEN:
## VIOLATION OF N.Y. EXECUTIVE LAW, § 296(4)
## (AGAINST YESHIVA UNIVERSITY)

420.   Plaintiff hereby repeats and realleges each of the allegations contained in this Complaint as if each has been fully set forth at length.

421.   Claims under the New York Human Rights Law are evaluated under the same standards as analogous claims under Title IX.

422.   New York Executive Law § 296(4) provides that:

> It shall be unlawful discriminatory practice for an educational institution . . . to permit the harassment of any student . . . by reason of her . . . sex or status as a victim of domestic violence[.]

423.   Section 296(4) applies to "educational institutions," which includes private colleges and universities, like Yeshiva University, which are not under the supervision of the regents of the State of New York and are not otherwise public schools.

424.   New York Executive Law § 296 prohibits any person, including a school or university, from discriminating against any other person on the basis of sex.

425.   For the reasons set forth above, in violation of New York Executive Law § 296(4), YU discriminated against Plaintiff on the basis of her sex and gender.

426.   Pursuant to New York Executive Law § 296(4), therefore, Plaintiff is entitled to recover compensatory damages, including damages for egregious emotional distress and mental anguish, from YU.

## COUNT TWELVE:
## VIOLATION OF NEW YORK EXECUTIVE LAW § 296(6) ("AIDING AND ABETTING"): AGAINST ANDREW "AVI" LAUER, ESQ., CHAIM NISSEL, SEYFARTH SHAW, LLP, DOV KESSELMAN, ESQ., and EMILY MILLER, ESQ.

427.   Plaintiff hereby repeats and realleges each of the allegations contained in this Complaint as if each has been fully set forth at length.

428.   Section 296(6) of the New York Executive Law provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or to attempt to do so."

429.   At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller, were in charge of, or had vital roles YU's sham "investigation" as to Plaintiff's alleged rape by PERRY DOE.

430.   At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller, were involved in YU's sham "investigation" as to Plaintiff's Title IX Complaint regarding her alleged rape by PERRY DOE, and participated in, developed, formulated and/or ratified said "investigation's" processes, procedures, rules, findings, conclusions and determinations.

431.   At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller: (1) intentionally and maliciously conducted, participated in, and/or ratified a sham investigation that was specifically designed to shield and protect PERRY DOE from any serious consequences for his sexual harassment and sexual abuse of Plaintiff, and to protect Yeshiva University from any reputational damage that could result from a finding that a YU student had raped another YU student; and (2) retaliated against Plaintiff for making such charges against PERRY DOE by failing to conduct a fair and impartial investigation of her rape allegations against PERRY DOE, refusing to provide her with any reasonable supportive measures that would protect her at YU's Wilf Campus, and failing to permit

her to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct.

432.   At all material times, therefore, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller "aided and abetted" Defendant YU's harm to Plaintiff's rights and interests in violation of New York Executive Law § 296(6).

433.   For the reasons set forth above, pursuant to New York Executive Law § 296(6), Plaintiff is entitled to recover compensatory damages, including damages for egregious emotional distress and mental anguish, from YU.

### COUNT THIRTEEN: BREACH OF CONTRACT (AGAINST YESHIVA UNIVERSITY)

434.   Plaintiff repeats and realleges each of the allegations contained in this Complaint as if each has been fully set forth at length.

435.   In New York, the relationship between a university and its students is contractual in nature.

436.   When a student is admitted into a university, an implied contract arises between the parties which states that if the student complies with the terms proscribed by the university, she will obtain the degree she seeks.

437.   The rights and obligations of the parties as contained in the university's bulletins, circulars, regulations, and policy statements made available to the student, become a part of this contract.

438.   The rights and obligations of Yeshiva University and Plaintiff contained in YU's "Non-Discrimination and Anti-Harassment Policy & Complaint Procedures," updated December 31, 2020 (Ex. B hereto), are part of such a contract between YU and Plaintiff.

439.   YU breached such contract with Plaintiff by violating and failing to honor the following *specific* promises made by YU to Plaintiff in its Non-Discrimination Policy that are subject to quantification and/or objective evaluation:

> (1) "YU will respond to all [student] complaints thoroughly, fairly, and impartially."

(Ex. B at 1).

> (2) "The University will make supportive measures available to those reporting violations of the Policy…"

(Ex. B at 1).

> (3) "Upon receipt of a complaint, the University will conduct a fair and impartial investigation into reported incidents of discrimination or harassment, as well as sexual abuse/assault … or other sexual misconduct."

(Ex. B at 1).

(4) "The Title IX Coordinator will consider the individual's wishes with respect to implementing supportive measures, and will consider the individual's wishes with respect to implementing supportive measures, and will notify individuals of the availability of supportive measures with or without filing a formal complaint."

(Ex. B at 12).

(5) "The alleged victim … will be afforded the rights set forth in this Policy."

(Ex. B at 1).

(6) "The prohibition against Title IX Sexual Harassment … applies to conduct that occurs in University premises and/or at University-sponsored and affiliated activities and events, whether on University premises or at other locations … The prohibition against Title IX Sexual Harassment … applies to conduct that occurs in the University's education programs and activities. *Education programs and activities include locations, events or circumstances where the University exercised substantial control over both the person accused of the misconduct and the context which the harassment occurred[.]*"

(Ex. B at 4) (emphasis added).

(7) "Title IX prohibits discrimination on the basis of sex in education programs and activities in the United States. Sexual harassment and sexual assault are forms of sex discrimination prohibited by Title IX.  The University has designated an employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX.  This employee is called the Title IX Coordinator and is responsible for ensuring Title IX compliance at the University, as well as compliance with this Policy.  The Title IX Coordinator is responsible for the effective implementation of security measures … The Title IX Coordinator is responsible for ensuring the prompt and

> equitable resolution of all Title IX complaints and other complaints under this Policy, identifying and addressing any patterns of systemic problems that are found based on review of such complaints or otherwise, and providing education and training about this Policy to the University Community."

(Ex. B at 11).

## WITH RESPECT TO TITLE IX COMPLAINTS

(8) "Upon receipt of a complaint involving Title IX Sexual Harassment, other sexual Misconduct, or any other violation of this Policy …, a fair and impartial investigation will commence in accordance with the procedures set forth in this Policy."

(Ex. B at 16).

(9) "The parties will be notified of such additional information as required by the applicable Appendix B [for "Formal Resolution of Complaints Involving Title IX Sexual Harassment, Including Sexual Abuse/Assault, Stalking, Domestic Violence and Dating Violence"] or C [for "Formal Resolution of Complaints Not Involving Title IX Sexual Harassment]."

(Ex. B at 16).

(10) "In all cases, the complainant and respondent will be provided with equal opportunity to present witnesses (fact and expert), as well as inculpatory and exculpatory evidence."

(Ex. B at 16-17)

(11) "For all investigations into allegations of Title IX Sexual Harassment, both the complainant and respondent shall have the right to appeal the outcome of the investigation as more fully described in Appendix B."

(Ex. B at 17).

> (12) "The Title IX Coordinator, Deputy Title IX Coordinator, Investigators, Decision-Makers, University administrators rendering decisions or sanctions and appeal, and any other person who facilitates an informal resolution process will receive training on the definition of Title IX Sexual Harassment, the scope of the University's education program or activity, how to conduct an investigation and grievance process including hearings, appeals, and informed resolution processes …, and how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias."

(Ex. B at 21).

> (13) "The University will make materials used to train those individuals publicly available on its website."

(Ex. B at 21 n. 3).

> (14) "Upon initial evaluation, if the Title IX Coordinator or that person's designee determines that the alleged conduct: (even if proven), would not constitute Title IX Sexual Harassment…; [or] (2) did not occur in a University education program or activity …—then the University *must* dismiss the complaint with respect to that conduct[.] … *Where a complaint is dismissed, the Title IX Coordinator or that person's designee will notify both parties in writing of the dismissal and the reason(s) for it.*"

(Ex. B at 30) (emphasis added).

> (15) "During the hearing portion of the [Title IX] formal complaint process, it is *required* that the complainant and respondent have an advisor.  If a party does not have an advisor at that time, the University will select and provide an advisor at no fee or cost to the party."

(Ex. B at 30).

    (16)  "The investigator … will promptly, fully, fairly, and impartially investigate the complaint, and each party will have equitable opportunities to present witnesses, and review and present information and relevant inculpatory and exculpatory evidence."

(Ex. B at 31).

    (17)  "The Investigator will provide the parties with periodic status updates."

(Ex. B at 31).

    (18)  "The Investigator is responsible for gathering information sufficient to reach a determination about the respondent's responsibility.  The Investigator will review all information gathered or provided by the parties and determine the appropriateness, relevance and probative value of the information developed or received during the investigation."

(Ex. B at 31).

    (19)  "<u>LIVE HEARING</u>

        Upon receipt of the final investigative report from the Investigator, the Title IX Coordinator or Deputy Coordinator will identify a decision-maker to conduct a live hearing after which the decision-maker will render a determination regarding the respondent's responsibility based on a preponderance of the evidence (i.e., that it is more likely than not that the Title IX Sexual Harassment occurred).  The parties will learn the decision-maker's identity at least 48 hours prior to the hearing.[4]

---

[4] If either party is concerned that the decision-maker should be excluded for reasons of bias or conflict of interest, the party should notify the Title IX Coordinator or Deputy Title IX Coordinator of the concern, and that person will have the discretion to determine whether someone else should be assigned.

The decision-maker will schedule a hearing promptly after his/her receipt of the investigative report.  The decision-maker will notify the parties as soon as practicable of the date, time and place of the hearing.  The hearing will be closed to the public.

The live hearing will be conducted in real time.  By request of either party, the University will arrange so that the parties are not in the same physical space during the hearing.  In such circumstances, the University will arrange for the use of technology to enable all participants to see and hear the witness or party answering questions in real time.

The University may elect on its own to conduct the live hearing virtually, provided that all participants can simultaneously see and hear each other.  When a hearing is conducted virtually, the University must still create an audio or audiovisual recording, or transcript, of the virtual proceeding and make it available to the parties for inspection and review.

The decision-maker will set an agenda for the hearing, including what order events will occur, how long statements or questioning may last, and any other issues that the decision-maker determines needs to be addressed.

Each party <u>must</u> have an advisor accompany them to the hearing.  The University will provide an advisor, without fee, to any party who does not have one.  At the hearing, the advisor will have the opportunity to ask relevant questions and follow-up questions of any party or witness (sometimes referred to as "cross-examination"), including those challenging credibility.  *Only an advisor may conduct cross-examination*—a party may not do so.

The decision-maker may choose to exclude any question on cross-examination that he or she deems irrelevant—the decision-maker must explain why the question is not relevant.  Questions and evidence about the complainant's prior sexual behavior are not relevant unless offered to prove

that someone other than the respondent committed the alleged misconduct or concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.

The decision-maker will not rely on any statement made by someone who does not participate in the hearing or who refuses to answer questions posed on cross-examination, but the decision-maker will not draw any adverse inferences from that person's absence or refusal to answer questions."

(Ex. B at 32).

(20) "<u>DECISION</u>

As soon as practicable, the decision-maker will issue a written decision simultaneously to each party regarding the respondent's responsibility bases on a preponderance of the evidence.   This written decision will: (i) identify the allegations, (ii) describe the procedural steps taken from the receipt of the formal complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held, (iii) identify findings of fact that support the determination, (iv) make conclusions regarding the application of this Policy to the facts, (v) include a statement of, and rationale for, the results as to each allegation, including a determination regarding responsibility and any disciplinary sanctions the recipient imposes on the respondent, (vi) provide information about whether remedies designed to restore or preserve access to the University's education programs or activities will be provided, and (vii) provide information about the procedures for sanctioning (if applicable) and bases for appeal.

The University will audio record the live hearing, and upon request, the Title IX Coordinator or Deputy Title IX Coordinator will make a copy of the recording available to the parties to review.

Where a respondent is found responsible for any of the alleged conduct, the parties will be provided with the opportunity to submit an impact statement for the decision-maker's consideration during the sanctioning stage.

Impact statements should be submitted with 3 days of the notice of the decision—and if submitted, will be shared with the other party.   In deciding an appropriate disciplinary action, the decision-maker may consider the respondent's past violations of University policy, as well as the nature and severity of the violation(s), the impact statements of the parties, and any mitigating circumstances.   The decision-maker will decide the appropriate disciplinary actions as soon as practicable.   The Title IX Coordinator or Deputy Title IX Coordinator will simultaneously notify the parties as soon as practicable of the sanctions to be imposed, and the right to appeal (as provided below).

The University expects all cases involving a finding of sexual violence, stalking, domestic violence and dating violence to involve consideration of suspension or expulsion for students, and termination of employment for employees. Other sanctions that may be imposed include a warning, disciplinary probation, restriction from employment by the University, removal from University housing, removal from courses or activities, loss of privileges, no contact, exclusion from areas of the campus and facilities, removal or non-renewal of scholarships, a notation on respondent's official University transcript, community service, restitution, and a fine.   In addition, the respondent may also be required to undergo an assessment and treatment by a therapist or counselor, attend an intervention treatment program and/or issue a letter of apology.

(Ex. B at 33).

(21)   For an appeal of a Title IX determination "[t]he Title IX Coordinator or Deputy Title IX Coordinator will appoint an appeal panel of two or more individuals … to review the

matter.  The appeal will be conducted in a fair and impartial manner."

(Ex. B at 34).

<h2 align="center">WITH RESPECT TO NON-TITLE IX COMPLAINTS</h2>

(22)  "The Title IX Coordinator or Deputy Title IX Coordinator (or other designated investigator) will fully, fairly and impartially investigate the complaint, and each party equally will have the opportunity to present witnesses and other evidence to the investigator."

(Ex. B at 35).

(23)  "The Title IX Coordinator or Deputy Title IX Coordinator will explore possible supportive measures with both parties."

(Ex. B at 36).

(24)  "The Title IX Coordinator or Deputy Title IX Coordinator (or other designated investigator will endeavor, as promptly as feasible, to interview all relevant parties and review all evidence, *including witnesses and evidence identified by the parties.*"

(Ex. B at 36) (emphasis added).

(25)  "The Title IX Coordinator or Deputy Title IX Coordinator (or his/her designee) will provide the complainant with periodic status updates."

(Ex. B at 36).

(26)  "The Title IX Coordinator or Deputy Title IX Coordinator (or other designated investigator) will compile a neutral investigative report[.]"

(Ex. B at 36).

(27) "Either party may appeal the decision of the Title IX Coordinator or Deputy Title IX Coordinator (or other designated investigator/person) or hearing officer as applicable, … to an Appeal Panel of two or more persons, or as otherwise may be required by applicable law, rules or regulation) selected by the Title IX Coordinator … (in consultation with the Office of the General Counsel) depending on the nature of the case and the parties involved."

(Ex. B at 38).

(28) "The Title IX Coordinator … (or other designated investigator/person) … may not serve on the Appeal Panel."

(Ex. B at 38).

(29) "The appeal will be conducted in a fair and impartial manner."

(Ex. B at 38).

(30) "The Appeal Panel (by majority vote of panelists, or by unanimous decision of less than 3 panelists) can affirm the original determination of responsibility, alter the determination of responsibility either in who or in part, and/or alter the sanctions, depending on the circumstances. The matter can also be referred back for further investigation or consideration of appropriate."

(Ex. B at 39-39).

440.   Without excuse or justification, YU failed to abide any of the specific promises that it made in its Policy (as set forth in each of the preceding paragraphs).

441.   At all material times, Plaintiff complied with all rules and regulations for YU students as set forth in the Policy, as well as all other codes of conduct promulgated by YU (i.e., YU's Student Bill of Rights; YU's Policy on Protecting Student-Athletes; and YU's Anti-Bullying Policy).

442.   As a direct and proximate result of YU's breaches of contract, Plaintiff suffered, and continues to suffer, extreme emotional distress, pain, and suffering and mental anguish.

443.   Accordingly, as Defendant YU breached its obligations under its pertinent agreements with Plaintiff (including those as set forth in YU's Policy), Plaintiff is entitled to receive compensatory damages, including damages for egregious emotional distress and mental anguish, from YU.

## COUNT FOURTEEN:
## FRAUD:  (AGAINST YESHIVA UNIVERSITY)

444.   Plaintiff repeats and realleges each of the allegations contained in this Complaint as if each has been fully set forth at length.

445.   The Clery Act has, at all material times, imposed upon YU an obligation to report and disclose to the U.S. Department of Education, all YU students, and prospective YU students, all reported rapes and sexual assaults that occurred on or near YU's campuses (including YU's Wilf Campus).

446.   Upon information and belief, numerous sexual assaults were reported to the administration and Title IX Office of YU prior to Plaintiff's rape on January 24, 2021 (from 2001 to January 21, 2021), but YU deliberately failed to report or disclose those reported attacks.

447.   One such sexual assault occurred, upon information and belief, in 2018, and was reported directly to YU's Title IX Office and Defendant Nissel, YU's Title IX Coordinator.   This reported sexual assault was not publicly disclosed by Yeshiva University as required by The Clery Act.

448.   Upon information and belief, Defendants Nissel and Lauer were involved in implementing and/or executing YU's policy and/or decisions to not disclose reported sexual assaults as required by The Clery Act.

449.   YU's failure to disclose reported sexual attacks, from 2001 to 2021, falsely gave female students (including Plaintiff) and prospective female students (including Plaintiff) the impression that YU was safer than it actually was.   Such information was material to Plaintiff's decisions to attend YU and to continue her studies at YU.

450.   Upon information and belief, YU's Annual Security Report for YU's Wilf Campus, dated October 1, 2016, falsely and fraudulently reported that ZERO forcible sexual offenses had occurred on or near YU's Wilf Campus in 2013, 2014, and 2015.

451.   Upon information and belief, YU's Annual Security Report for YU's Wilf Campus, dated October 1, 2017, falsely and fraudulently reported that ZERO forcible sexual offenses had occurred on or near YU's Wilf Campus in 2014, 2015, and 2016.

452.   Upon information and belief, YU's Annual Security Report for YU's Wilf Campus, dated October 1, 2018, falsely and fraudulently reported that ZERO forcible sexual offenses had occurred on or near YU's Wilf Campus in 2015, 2016, and 2017.

453.   Upon information and belief, YU's Annual Security Report for YU's Wilf Campus, dated October 1, 2019, falsely and fraudulently reported that ZERO forcible sexual offenses had occurred on or near YU's Wilf Campus in 2016, 2017, and 2018.

454.   Upon information and belief, YU's Annual Security Report for YU's Wilf Campus, dated October 1, 2020, falsely and fraudulently reported that ZERO forcible sexual offenses had occurred on or near YU's Wilf Campus in 2017, 2018, and 2019.

455.   At all material times, YU deliberately and maliciously intended to misrepresent, and did misrepresent, the safety of the school's Wilf Campus in order to induce female students, including Plaintiff, to enroll in YU or to continue their studies there.

456. At all material times, YU deliberately and maliciously intended to misrepresent, and did misrepresent (through, *inter alia*, the above-referenced Campus Security Reports), the number of rapes and sexual assaults that occurred on or near YU's Wilf Campus, in order to induce students, including Plaintiff, to enroll in YU or continue their studies there.

457. At all material times, YU deliberately and maliciously intended to misrepresent, and did misrepresent, the number of male YU students who were credibly accused of raping and/or sexually assaulting female YU students on or near YU's Wilf Campus, in order to induce female students, including Plaintiff, to enroll in YU or continue their studies there.

458. At all material times, Plaintiff reasonably relied upon the false impression of safety created by Yeshiva University, as memorialized by YU in its false, misleading, and deceptive Campus Security Reports (as referenced herein), in deciding: (1) to attend YU, (2) to continue her studies at YU, and (3) where to travel to on or near YU's Wilf Campus.

459. As a direct and proximate result of YU's false representations and omissions, Plaintiff was fraudulently induced to enroll as a student at YU, and to continue to attend YU and its education programs and activities, and travel to and/or near YU's Wilf Campus, as she reasonably believed that YU's Wilf Campus was a safe campus for female students with no recently

reported sexual rapes or sexual assaults on or in close proximity to the campus.

460.   As a direct and proximate result of Defendant YU's fraud, and YU's abject failure to provide truthful and accurate sex crime information and data, Plaintiff sustained physical injuries (i.e., her rape) and psychological injuries, including severe emotional distress and mental anguish.

461. As a direct and proximate result of Defendants' conduct, Plaintiff has been required to obtain psychological care, treatment, and therapy for her severe emotional distress and mental anguish, at considerable costs, and will likely continue to need psychological care, treatment, and therapy for a considerable period of time.

462.   By reason of the foregoing, and as a direct and proximate result of the Defendants' conduct, Plaintiff sustained physical and psychological injuries, including but not limited to, severe emotional distress, depression, humiliation, embarrassment, fright, anger, anxiety, and has been caused to suffer pain and mental anguish, emotional and psychological damage as a result thereof, and, upon information and belief, some or all of these injuries are of a permanent and lasting nature.

463.   At all material times, the Defendants' conduct towards Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of Plaintiff's rights, interests, and welfare, and was seriously harmful to the public—which has a compelling interest in ensuring that college and university students within the community—including Plaintiff—be given a full and fair opportunity to enjoy the benefits of higher education free from sexual assault, fraud, retaliation (for reporting rape and sexual abuse), violations of her civil rights, and other gross misconduct.

464.   The aforesaid fraudulent conduct of the Defendants entitles Plaintiff to receive punitive damages, as well as compensatory damages.

## <u>NOTE ON DAMAGES</u>

465.   While Plaintiff will leave it to the jury to determine the appropriate amount of the damages to which she is entitled, Plaintiff emphasizes that Yeshiva University, in large part by covering up her meritorious rape allegations against a YU basketball player, reaped a substantial financial whirlwind in 2021 on the back of the considerable pain and suffering and mental anguish that Defendants intentionally and maliciously inflicted upon Plaintiff.

466.   To wit, in 2021—the year YU blatantly and unconscionably covered up Plaintiff's rape by a YU basketball player—YU raised approximately $92 million for its education programs and activities, as opposed to the mere $30 million it raised in 2018.

467.   This $62 million differential, the poisonous fruit of YU's "values-based" fundraising effort, would not have been possible but for YU's calculated and well-coordinated cover-up of PERRY DOE's rape of Plaintiff—and should thus be considered by the fact-finder in determining the appropriate damages award to which Plaintiff is entitled.

## AD DAMNUM CLAUSE

WHEREFORE, based on the aforesaid, Plaintiff hereby demands judgment in her favor and against each of the Defendants, jointly and severally, as follows:

1.   As and for Count I, Violation of Title IX (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff, and, pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, and/or any other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case; and

2.      As and for Count II, Retaliation in Violation of Title IX (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff, and, pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, and/or any other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case; and

3.      As and for Count III, Violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(4), (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff, a sum to be determined at trial in punitive damages for Plaintiff, and, pursuant to New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(g) and/or any other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case; and

4.      As and for Count IV, Retaliation in Violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7), (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff, a sum to be determined at trial in punitive damages for Plaintiff, and, pursuant to New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(g) and/or any other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case; and

5.      As and for Count V, Violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(6) ("Aiding and Abetting") (against Andrew "Avi" Lauer, Esq., Chaim Nissel, Seyfarth Shaw, LLP, Dov Kesselman, Esq., and Emily Miller, Esq.), a sum to be determined at trial in compensatory damages for Plaintiff, a sum to be determined at trial in punitive damages for Plaintiff, and, pursuant to New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(g) and/or any other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case; and

6.      As and for Count VI, Breach of Fiduciary Duties (against Yeshiva University and Chaim Nissel), a sum to be determined at trial in compensatory damages for Plaintiff, and a sum to be determined at trial in punitive damages for Plaintiff, and

7.      As and for Count VII, Intentional Infliction of Emotional Distress, (against all Defendants), a sum to be determined at trial in compensatory damages for Plaintiff, and a sum to be determined at trial in punitive damages for Plaintiff, and

8.      As and for Count VIII, Violation of New York General Business Law § 349 (Deceptive Acts and Practices), (against Yeshiva University), a sum to be determined at trial for Plaintiff in compensatory

damages, treble damages (in the amount and to the extent appropriate), and, pursuant to New York General Business Law § 349(h), and/or other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case;

9.     As and for Count IX, Violation of New York General Business Law § 350 (False Advertising), (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff, treble damages (in the amount and to the extent appropriate), and, pursuant to New York General Business Law § 349(h), and/or other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case; and

10.     As and for Count X, Violation of New York Executive Law § 296(7), (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff; and

11.     As and for Count XI, Violation of New York Executive Law § 296(4), (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff; and

12.     As and for Count XII, Violation of New York Executive Law § 296(6) ("Aiding and Abetting"), (against Andrew "Avi" Lauer, Esq., Chaim Nissel, Seyfarth Shaw, LLP, Dov Kesselman, Esq., and Emily Miller, Esq.),

a sum to be determined at trial in compensatory damages for Plaintiff; and

13.    As and for Count XIII, Breach of Contract (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff; and

14.    As and for Count XIV, Fraud (against Yeshiva University), a sum to be determined at trial in compensatory damages for Plaintiff, and a sum to be determined at trial in punitive damages for Plaintiff; and

15.    Any pre-judgment interest to which Plaintiff is entitled; and

16.    A declaratory judgment declaring and adjudging Defendant, Yeshiva University, to be in violation of The Clery Act for false, fraudulent, and inaccurate reporting of campus crime data and statistics to the United States Department of Education, from 2001 through 2021; and

17.    A declaratory judgment declaring that the Non-Disclosure Agreement executed by Plaintiff on April 29, 2021 (Ex. G hereto) is in violation of The Clery Act, null and void, and of no force and effect.

18.    Any other, different or further relief as this Honorable Court may deem just, proper, or necessary.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: June 27, 2022
        Orangeburg, New York

Respectfully submitted,

**KEVIN T. MULHEARN, P.C.**

Kevin T. Mulhearn /S

_____
KEVIN T. MULHEARN (KM 2301)
DARREN J. EPSTEIN (*OF COUNSEL*)

60 Dutch Hill Road, Suite 6B
Orangeburg, New York 10962
(845) 613-7059
kmulhearn@ktmlaw.net

*Attorneys for Plaintiff, JANE DOE*