# EXHIBIT 1
# (Part 1 of 2)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

JANE DOE (A PSEUDONYM), WHOSE REAL
NAME IS
            REDACTED

            Plaintiff,

            —against—

YESHIVA UNIVERSITY, ANDREW "AVI" LAUER,
ESQ., CHAIM NISSEL, SEYFARTH SHAW, LLP,
DOV KESSELMAN, ESQ., and EMILY MILLER, ESQ.,

            Defendants.

-----------------------------------------------------------X

**AMENDED**
**COMPLAINT**

**1:22-cv-05405-PKC**

**PLAINTIFF**
**DEMANDS A**
**TRIAL BY JURY**

# *TO BE FILED "UNDER SEAL"*

Respectfully submitted by:

*KEVIN T. MULHEARN, P.C.*

*60 Dutch Hill Road, Suite 6B*
*Orangeburg, NY 10962*
*Phone: (845) 613-7059*
*kmulhearn@ktmlaw.net*

*Attorney for Plaintiff, JANE DOE*

Plaintiff, JANE DOE (A Pseudonym), whose real name is REDACTED REDACTED by and through her attorneys, Kevin T. Mulhearn, P.C., complaining of the Defendants, hereby alleges that:

## JURISDICTION AND VENUE

1.       This Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that this matter involves a federal question: did Yeshiva University violate Title IX of the Educational Amendments of 1972.

2.       This Court has supplemental jurisdiction over Plaintiff's claims under New York State law, pursuant to 28 U.S.C § 1367, in that said state claims are inextricably intertwined with the federal claims in this action. Indeed, the state law claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution. In the alternative, this Court has subject matter jurisdiction of this action, pursuant to 28 U.S.C. § 1332, as complete diversity exists; as, upon information and belief, Plaintiff is a citizen of and resides in a state in the United States of America other than New York; Defendant YU is a citizen of and maintains its principal offices in the State of New York; Defendant Lauer is a citizen of and resides in the State of New York; Defendant Kesselman is a citizen of and resides in the State of New

York; and Defendant Miller is a citizen of and resides in the State of New York; and the matter in controversy exceeds the sum of $75,000.00.

3.      Venue is proper in this District because, pursuant to 18 U.S.C. § 1965(c) and 28 U.S.C. § 1391(b), the incidents at issue occurred and arose within this District, and most of the Defendants reside in, conduct business in, and/or are residents and citizens of this District.

## PARTIES

4. Plaintiff, JANE DOE (A Pseudonym), whose real name is REDACTED , is an adult individual residing in a state other than New York. She has attended Yeshiva University in New York—as a full-time student in its education programs and activities from 2018 to present.

5. Plaintiff has not identified her alleged rapist in this Complaint, and such person shall be referred to herein as "PERRY DOE."

6. From September, 2020 through May, 2022, Plaintiff resided in an apartment in close proximity to YU's Wilf Campus. In large part due to the COVID-19 pandemic, she took most of her classes online rather than in person. Plaintiff regularly used YU's library in the Wilf Campus both to study and to sit for her online classes.

7. In May, 2022, Plaintiff moved out of her Washington Heights apartment and moved into another residence in New York City.

8. Defendant, Yeshiva University ("YU"), is, and at all material times has been, a private undergraduate and graduate university located in New York, New York, which maintains its principal offices at 500 W. 185th Street, New York, New York 10033.

9. Defendant, Andrew "Avi" Lauer, Esq. ("Lauer"), is, and at all material times has been, the General Counsel of YU, who resides, upon information and belief, in the State of New York.

10. Defendant, Chaim Nissel ("Nissel"), is, and at all material times has been, YU's Title IX Coordinator and Vice Provost of Student Affairs of YU, who resides, upon information and belief, in the State of New York.

11. Defendant, Seyfarth Shaw, LLP ("Seyfarth), is, and at all material times has been, a law firm that conducts business in the State of New York and maintains offices located at 620 Eighth Avenue, New York, New York 10018.

12. Defendant, Dov Kesselman ("Kesselman"), is, and at all material times has been, a partner at Seyfarth, in its New York City office, and, upon information and belief, resides in the State of New York.

13. Defendant, Emily Miller, Esq. ("Miller"), is, and at all material times has been, an associate at Seyfarth, in its New York City office, and, upon information and belief, resides in the State of New York.

14. At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller, acted within the course and scope of their employment as agents, servants, and/or employees of Defendant YU. Likewise, at all material times, Defendants Kesselman and Miller acted within the course and scope of their employment as agents, servants, and/or employees of Defendant Seyfarth Shaw, LLP.

## BACKGROUND

15. This action is brought by a female YU student-athlete who, on January 24, 2021, was raped by a YU male student-athlete ("PERRY DOE") in his apartment located at or near the outer perimeter of YU's Wilf Campus.

16. On or about February 18, 2021, Plaintiff made a formal Title IX Complaint with respect to her sexual assault to Sarah Asher, Assistant Dean of Student Affairs, and Chaim Nissel, YU's Title IX Coordinator and Vice Provost of Student Affairs.

## YU'S UNPRECEDENTED FUNDRAISING CAMPAIGN

17. On December 5, 2021, Yeshiva University announced publicly it's launch of "Rise Up: Campaign for Yeshiva University" (https://riseup.yu.edu/), an extraordinarily ambitious and comprehensive fundraising campaign in which Yeshiva University plans to raise Six Hundred and Thirteen Million Dollars ($613,000,000) over the next five (5)

years (i.e., by December 2026) to make substantial investments in various Yeshiva University educational programs, including four areas of strategic focus: values and leadership, science, and technology, entrepreneurship and innovation, and jobs and careers.

18.     According to YU itself, the "quiet phase" of its fundraising campaign began in 2019 and has already been quite successful. Fundraising for the University, indeed, increased from about thirty million ($30,000,000) in calendar year 2018 to about ninety-two million ($92,000,000) in calendar year 2021.

19.     In early 2021, therefore, when Plaintiff made her formal Title IX rape complaint to Yeshiva University's Title IX Office, YU had already embarked on—but had not yet publicly announced—the most aggressive and ambitious fundraising campaign in Yeshiva University's history.

20.     Yeshiva University's Six Hundred and Thirteen Million Dollar ($613,000,000) fundraising target was specifically selected to model the precise number of commandments contained in the Torah—the first five Books of Moses of the Old Testament.

21.     Upon information and belief, in or about late February, 2021 or March, 2021, Yeshiva University, its President, its Board of Directors, and its employees and agents, Andrew "Avi" Lauer, Esq. (YU's General

Counsel), and Chaim Nissel (YU's Title IX Coordinator), all recognized that Plaintiff's rape allegations against a YU basketball player—if substantiated and publicized—would cause the University to suffer significant negative publicity that would hinder Yeshiva University's "values-based" fundraising effort.

22.     This was especially true because Yeshiva University's varsity basketball team was enjoying unprecedented success (riding a record 50-game winning streak) that was gaining Yeshiva University extraordinarily positive local, national, and international media coverage.

23.     This positive media coverage was, upon information and belief, burnishing Yeshiva University's reputation and helping the "quiet phase" of YU's fundraising campaign (from 2019 through 2021) enormously. YU administrators even referenced the YU Basketball Team's extraordinary success in their public roll-out of YU's "Rise Up" fundraising campaign.

24.     Upon information and belief, in or about late February, 2021 or early March, 2021, Yeshiva University and its agents and employees, Lauer, Nissel, Seyfarth, Kesselman, and Miller, recognized and understood that Plaintiff had not told her parents about her sexual assault by a YU basketball player, had not hired an attorney, and had not even hired or retained an "advisor" to help her navigate her way through Yeshiva University's

"investigation" of her formal Title IX Complaint involving her rape by a YU basketball player.

     25.    Upon information and belief, in or about late February, 2021 or early March, 2021, soon after Plaintiff made her formal Title IX Complaint to YU's Title IX Office, Yeshiva University, and its agents and employees, Lauer and Nissel, jointly made a knowing, conscious, and calculated decision: (1) to conduct a sham "investigation" of Plaintiff's allegations; (2) to arrive at a preordained "not responsible" verdict with respect to the conduct of Plaintiff's alleged rapist ("PERRY DOE"); (3) to hire as its "investigators" of Plaintiff's allegations, a law firm, Seyfarth Shaw, LLP ("Seyfarth"), and two attorneys from Seyfarth, Kesselman, and Miller, which—as YU's long-time litigation counsel in myriad sex abuse litigations in New York State—had glaring and obvious conflicts of interests and biases in favor of Yeshiva University and PERRY DOE and against Plaintiff, and was willing to go along with YU's planned sham investigation and pre-determined outcome; (4) to deliberately breach and  fail to comply with numerous specific Title IX rules, regulations, and procedures; (5) to deliberately breach and fail to comply with numerous specific promises and agreements set forth in Yeshiva University's Non-Discrimination and Anti-Harassment Policy and Complaint Procedures (the "Policy" or "YU's

Policy"); (6) to ignore substantial evidence that supported Plaintiff's claims; (7) to deliberately fail to interview fact witnesses (including several specifically identified by Plaintiff) who could corroborate Plaintiff's claims by testifying as to her statements and state of mind soon after the incident occurred; and (8) to deliberately choose not to obtain or request access to Plaintiff's rape kit evidence collected by Columbia Presbyterian Hospital the day after Plaintiff's alleged rape, which would have corroborated Plaintiff's allegations that her rapist used force and violence to inflict visible physical injuries on her body during his rape.

26.     The gulf between what YU and its agents and employees, Lauer, Kesselman, and Miller (three experienced attorneys with broad experience handling sex abuse allegations) and Nissel (an experienced Title IX administrator), were required by law to do—and what they in fact did—is so enormous as to beget but one reasonable conclusion: Yeshiva University and the other Defendants, Andrew "Avi" Lauer, Esq., Chaim Nissel, Seyfarth Shaw, LLP, Dov Kesselman, Esq., and Emily Miller, Esq., conspired to conceal and cover-up the YU basketball player's rape of Plaintiff.

27.     By exonerating PERRY DOE, not imposing any disciplinary action against him, and permitting him to have unrestricted access to and

unregulated use of YU's Wilf Campus and all YU facilities, the YU Defendants placed not just Plaintiff, but all female students at YU, in an extraordinarily vulnerable position.

28.    YU, moreover, for at least several decades, has created, fostered, and nourished a rape cover-up culture by falsely representing that rapes and sexual assaults do not occur on or near YU's campuses and are not committed by YU students.

## YU'S 20-YEAR NON-COMPLIANCE WITH THE CLERY ACT

29.    The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics ("Clery Act"), enacted in 1990, is a federal statute codified at 20 U.S.C. § 1092(f), with implementing regulations in the U.S. Code of Federal Regulations at 34 CFR 668.46.

30.    The Clery Act requires all colleges and universities that participate in federal financial aid programs to keep and disclose information about crimes on and/or near their respective campuses.

31.    Compliance is monitored by the U.S. Department of Education, which can impose civil penalties of up to $59,017.00 per violation, against institutions for each infraction and can suspend non-compliant institutions from participating in federal student financial aid programs.

32.    The Clery Act provides that by October 1 of each year, a college or university *must* publish and distribute its Annual Campus Security Report to current and prospective students and employees.

33.    This report is required to provide crime statistics for the past three years, for crimes that occurred on campus, in institution residential facilities, in non-campus buildings, or on public property near campus.

34.    A college or university is required to report on the following specific crimes:

(1)    Murder;

(2)    *Forcible sex offenses (rape and fondling)*;

(3)    Non-forcible sex offenses (incest and statutory rape);

(4)    Domestic violence;

(5)    Dating violence;

(6)    Stalking;

(7)    Robbery;

(8)    Aggravated assault;

(9)    Burglary;

(10)   Motor vehicle theft; and

(11)   Arson.

35.     Beginning in 2001, the U.S. Department of Education publishes on its website the crime statistics as reported by each college or university in the United States that receives federal financial aid.

36.     In or before 2001, upon information and belief, Yeshiva University administrators made a knowing and calculated decision to not report to the U.S. Department of Education any and all sex crimes, including rape or nonconsensual fondling, that occurred on or near the campuses of YU's undergraduate college for men (Wilf Campus) and its undergraduate college for women and schools for post-graduate studies (Beren Campus).

37.     The effect of YU's willful and calculated decision to not comply with The Clery Act's crime reporting requirements and to submit to the Department of Education knowingly false and fraudulent crime data, was to create the false and fraudulent impression for both prospective students and their parents and matriculating students, that rapes and sexual assaults did not occur at or near YU and, *inter alia*, that students who attended YU had not raped or sexually assaulted other YU students since at least 2001.

38.     As evidenced by the U.S. Department of Education website, YU reported to the U.S. Department of Education the following number of forcible sex crimes that occurred on or near YU's Wilf Campus and/or Beren Campus, in YU's residential facilities, or in non-campus buildings:

## YU'S Reports to U.S. Dept. of Educ. of Forcible Sex Crimes:
## From 2001 to 2020 (for both Wilf Campus and Beren Campus):

**Rapes:**

| | | | |
|---|---|---|---|
| 2001: | 0 | 2011: | 0 |
| 2002: | 0 | 2012: | 0 |
| 2003: | 0 | 2013: | 0 |
| 2004: | 0 | 2014: | 0 |
| 2005: | 0 | 2015: | 0 |
| 2006: | 0 | 2016: | 0 |
| 2007: | 0 | 2017: | 0 |
| 2008: | 0 | 2018: | 0 |
| 2009: | 0 | 2019: | 0 |
| 2010: | 0 | 2020: | 0 |

**Fondling:**

| | | | |
|---|---|---|---|
| 2001: | 0 | 2011: | 0 |
| 2002: | 0 | 2012: | 0 |
| 2003: | 0 | 2013: | 0 |
| 2004: | 0 | 2014: | 0 |
| 2005: | 0 | 2015: | 0 |
| 2006: | 0 | 2016: | 0 |
| 2007: | 0 | 2017: | 0 |
| 2008: | 0 | 2018: | 0 |
| 2009: | 0 | 2019: | 0 |
| 2010: | 0 | 2020: | 0 |

**Total Reported Rape Incidents from 2001 through 2020:**      0
**Total Reported Fondling Incidents from 2001 through 2020:**   0

39.   Upon information and belief, Yeshiva University is one of the few universities in the United States of America that reported to the U.S. Department of Education **ZERO** forcible rapes or sexual assaults on or near its major campuses from 2001 to 2020.

40.   Upon information and belief, for two decades, YU has spun a malicious, phony, and reckless fairytale about the safety of its campuses and

the alleged non-existence of rape and sexual assault at YU. This purposeful error of commission is far more egregious than a mere error of omission.

41.    Upon information and belief, YU's reports of sex crimes at or near its campuses for both men and women were and continue to be false, fraudulent, malicious, and intended to paint a misleading impression of almost complete safety at YU, particularly for female students (who, according to numerous reputable studies, suffer rapes and sexual assaults at rates exponentially higher than their male student counterparts).

42.    Rape, Abuse & Incest National Network ("RAINN") is the nation's largest anti-sexual violence organization.   RAINN created and operates    the    National    Sexual    Assault    Hotline    (800.646.HOPE, online.rainn.org and rain.org/es) in partnership with more than 1,000 local sexual assault service providers across the country and operates the DoD Safe Helpline for the U.S. Department of Defense. RAINN also carries out programs to prevent sexual violence, help survivors, and ensure that perpetrators are brought to justice.

43.    According to RAINN's analysis of sexual violence statistics: among undergraduate students in the United States, 26.4% of females and 6.8% of males experience rape or sexual assault through physical force, violence, or incapacitation, and among graduate and professional students,

9.7% of females and 2.5% of males experience rape or sexual assault through physical force, violence, or incapacitation. (*See* https://www.rainn.org/statistics/campus-sexual-violence).

44.    YU's own website provides that all crimes which occur within YU's "security jurisdiction" occur "on campus, [which] include[es] non-campus buildings or properties, on public property or within the Security Department's jurisdiction ..." YU itself thus uses an extremely broad definition for its "Campuses."

45.    Plaintiff pleads, in the alternative, that PERRY DOE's rape of Plaintiff occurred on or within YU's Wilf Campus and, for that reason alone, occurred within YU's education programs and activities.

46.    Upon information and belief, from 2001 through 2021, YU received *numerous* complaints, and was otherwise made aware, of *numerous* alleged criminal rapes and/or sexual assaults of YU students on or near YU's Wilf Campus and/or Beren Campus.

47.    In or about 2018, a YU female student reported to YU's Title IX Office, specifically Defendant Nissel, that she had been raped on or near YU's Wilf Campus by a male YU student. Upon information and belief, YU and Defendant Nissel dismissed out-of-hand this rape complainant's

allegations and took no disciplinary action against the accused YU male student.

48.     Upon information and belief, from 2001 to present, numerous other YU students have reported rapes and/or sexual assaults by other YU students on or near YU's Wilf Campus and/or Beren Campus.

49.     In campus climate surveys conducted for and by YU students, in 2017, 2019, and 2021 (as mandated by New York's "Enough is Enough" Law), *numerous* YU students self-reported that they had been victimized by forcible sexual contact on or near YU's campuses.   Several of these YU students stated that they had reported these acts of sexual misconduct to YU's Title IX Office.

50.     YU knowingly, maliciously and fraudulently failed   to   report any of these sexual assault allegations—including the specific one made to its Title IX Office and Defendant Nissel in or about 2018—to the U.S. Department of Education, as mandated by The Clery Act.

51.     YU, likewise, knowingly, maliciously, and fraudulently failed to report any of these sexual assault allegations—including the specific one made to its Title IX Office and Defendant Nissel in or about 2018—to YU students (including Plaintiff) and prospective students in their Security

Reports (which are published annually on October 1) for calendar years 2017, 2018, 2019, and 2020.

52. Since 2001 and continuing to present, YU has been in gross non-compliance with and in violation of The Clery Act.

53. Upon information and belief, this gross non-compliance is not the result of mere negligence, carelessness, or sloppy record-keeping. It reflects, rather, a knowing, conscious, and calculated choice made by YU administrators and/or YU's Board of Directors.

54. YU's conscious and calculated choice to deceive and mislead the U.S. Department of Education, YU's female students, and all prospective female students, about sex crimes that have occurred on or near YU's campuses, has endangered the health, safety, and welfare of every female student who has attended YU for the last 20 years.

55. It has made every female student who has attended YU, from 2001 through present, including Plaintiff, more vulnerable to rape and sexual assault on or near YU's campuses.

## PLAINTIFF'S RAPE ALLEGATIONS

56. Plaintiff, at all material times, resided, and still resides in a state in the United States other than New York.

57.   In 2018 through 2021, Plaintiff was enrolled in Yeshiva University as a full-time student in a university education program.

58.   At all material times, Plaintiff was a full-time student at YU, and a participant in its education programs and activities, a student-athlete, and a member of a Yeshiva University varsity athletic team.

59.   In 2020 through May 2022, Plaintiff resided in an apartment in Washington Heights, located within the scope of Yeshiva University's Security office's geographical coverage area (and thus within or near the outer perimeter of YU's Wilf Campus).

60.   Because of the COVID-19 pandemic, in 2020 and 2021, Plaintiff's Stern College classes were primarily conducted remotely, i.e., online via computer only.

61.   In 2020 and 2021, Plaintiff regularly used facilities at Yeshiva University's Wilf Campus, including the library (where she electronically attended online classes), and gymnasium (which she regularly used as a Yeshiva University student-athlete).

62.   In 2020 and 2021, Plaintiff was also required to regularly use Yeshiva University's Furst Hall in order to take COVID-19 tests (as required by Yeshiva University).  After PERRY DOE raped Plaintiff on January 24, 2021, she was terrified that she would encounter PERRY DOE at Furst Hall;

Plaintiff was thus compelled to have a number of friends monitor PERRY DOE's presence or absence at Furst Hall, and then notify Plaintiff by telephone when the coast was clear or when PERRY DOE was present at Furst Hall. This monitoring of PERRY DOE occurred frequently but was imperfect and imprecise, and it detracted substantially from Plaintiff's educational experience at YU.

63.    On January 24, 2021, Plaintiff was on a first date and visiting a Yeshiva University undergraduate student (i.e., "PERRY DOE") at his apartment in Washington Heights, New York.

64.    PERRY DOE'S apartment, upon information and belief, was located within the geographic limits of YU's security perimeter, in which Yeshiva University-hired security guards regularly and routinely patrolled the area (and thus was within or quite near YU's Wilf Campus).

65.    PERRY DOE'S apartment, upon information and belief, was within the geographic area to which Yeshiva University's security officers regularly provided Yeshiva University students with shuttle service to and from various areas within Yeshiva University's Wilf Campus and other areas within the community in Washington Heights. As such, it was within or near the outer perimeter of YU's Wilf Campus.

66.    At all material times, PERRY DOE was a member of the Yeshiva University Varsity Basketball Team and in such capacity as a YU student-athlete, subject to additional Yeshiva University policies and rules which provided Yeshiva University with control and authority over him and his activities to a much greater extent than Yeshiva University normally exercised over its students.

67.    At all material times, as Plaintiff was a student-athlete at YU, she was entitled to certain protections and rights from YU that were not normally afforded to non-student-athletes at YU.

68.    At all material times, PERRY DOE was an F-1 Visa foreign student who attended Yeshiva University pursuant to an F-1 Student Visa.

69.    PERRY DOE's status as a foreign student was conditioned upon, *inter alia*, his continued enrollment as a full-time student in an academic education program at Yeshiva University, approval of his Visa by the Student and Exchange Visitors Program, Immigration and Custom Enforcement, his proficiency in English, and his ability to maintain sufficient funds for his self-support.

70.    At all material times, PERRY DOE'S status as an F-1 Visa foreign student made him subject to additional Yeshiva University policies and rules which provided Yeshiva University with control and authority over

him and his activities to a much greater extent than Yeshiva University normally exercised over its students who were U.S. citizens and residents.

71.     Upon information and belief, in 2021, Yeshiva University paid all or some of PERRY DOE's rent for his Washington Heights apartment.

72.     Upon information and belief, without YU's financial assistance, PERRY DOE could not have afforded to reside in his apartment and would thus not have been able to attend YU.

73.     Moreover, upon information and belief, YU expressly provided PERRY DOE with permission and authorization to reside in his Washington Heights apartment.    PERRY DOE would not have been able to rent his Washington Heights apartment without YU's expressed permission, approval, and direct involvement and facilitation.

74.     Upon information and belief, the landlord of PERRY DOE's Washington Heights apartment has a policy and practice of not renting apartments to persons under 21-years-old, unless they are students at Yeshiva University.

75.     Upon information and belief, the landlord of PERRY DOE's Washington Heights apartment also has a policy and practice of not renting apartments to non-citizens of the United States, unless they are students at Yeshiva University.

76.    Upon information and belief, PERRY DOE would not have been permitted to rent his apartment in Washington Heights, unless he was a student at Yeshiva University and subject to the school's discipline, control, and authority at all times he was residing in or using that apartment.

77.    On January 24, 2021, while Plaintiff was on a first date with PERRY DOE and was visiting him in his apartment, PERRY DOE raped Plaintiff.

78.    Plaintiff had spoken with PERRY DOE on several social media applications for two days prior to meeting him for their date.

79.    Plaintiff initially refused PERRY DOE's invitation to go up to his apartment in Washington Heights.   She suggested, instead, that they go to her apartment and hang out with her roommates in the living room.

80.    PERRY DOE didn't want to do that, however, and instead told Plaintiff that they should go for a walk.   During this walk, PERRY DOE ducked into a store and purchased some beer and soda.   He then asked Plaintiff to help him to carry the beer and soda upstairs to his apartment.

81.    As PERRY DOE had just moved into his apartment, there was no place for Plaintiff to sit other than on PERRY DOE's bed.   When Plaintiff sat on PERRY DOE's bed, he moved close to her and began to touch and kiss her.

82.   Plaintiff told PERRY DOE "no" multiple times and clearly conveyed that she did not want to have any sexual contact of any kind with PERRY DOE.

83.   PERRY DOE is a large and powerfully built man and he refused to accept Plaintiff's multiple "no's." He subdued Plaintiff and asserted his physical dominance over her by grabbing her leg, pinning it down with his own, and grabbing her neck to hold her down.

84.   PERRY DOE used physical force to effectuate his rape of Plaintiff, in that: (1) PERRY DOE placed his hands around Plaintiff's neck and squeezed, in order to gain physical control and dominion over Plaintiff's body; and (2) he forcefully pressed a knee against Plaintiff's thigh in order to pry open her legs.

85.   PERRY DOE's use of physical force and violence to effectuate his rape of Plaintiff left discernible and visible marks and bruises on Plaintiff's body.

86.   Plaintiff's neck was left with a discernible and visible bruise in the area where PERRY DOE had grabbed her with his hands.

87.   Plaintiff was also left with a discernible and visible large bruise on her inner thigh, which resembled a welt, from PERRY DOE's violent and aggressive pushing of Plaintiff's legs open with his knee.

88. After PERRY DOE raped Plaintiff, she was crying. PERRY DOE asked Plaintiff if she was OK?

89. PERRY DOE then implored Plaintiff to not tell anyone about what had just happened because he respected her and has sisters and would never disrespect anybody.

90. After PERRY DOE raped Plaintiff, he asked her if she wanted him to walk her home. Plaintiff declined that invitation. She walked home alone and arrived back at her apartment at about 10:00 p.m.

91. On the evening of January 24, 2021, after returning to her apartment, Plaintiff was extremely upset, in pain, and agitated. She told several of her roommates that she had just gone out on a date and had been raped by the man she had visited.

92. On the evening of January 24, 2021, after returning to her apartment, Plaintiff texted a close male friend and conveyed to him that she had just been raped.

93. When PERRY DOE was raping Plaintiff, she was in shock, frozen, and in extreme pain. To the extent she could, she disassociated her mind from her body.

94.   Prior to PERRY DOE's rape of her, Plaintiff categorically and unequivocally conveyed to PERRY DOE, several times, that she did *not* consent to having sex with him.

95.   PERRY DOE heard Plaintiff's statements in which she stated "No," and that she was unwilling to have sex with him.  But PERRY DOE pressed forward anyway.  He told Plaintiff that she should just relax and submit because, in words or substance: "this will be fun."

96.   For the entire day of January 25, 2021, the day after her rape, Plaintiff was in extreme pain. In the evening, one of her roommates persuaded her to go to a hospital to get treated.

97.   On the evening of January 25, 2021, Plaintiff was admitted into Columbia Presbyterian Hospital to get examined and treated for the rape that had occurred the previous evening.

98.   On January 25, 2021, the Nurse Examiner conducted a rape kit examination of Plaintiff in which she collected evidence with respect to Plaintiff's rape allegations.

99.   Primary evidence collected by the Nurse Examiner included detailed photographs taken by the Nurse Examiner of: (1) the bruise on Plaintiff's neck; and (2) the bruise/welt on Plaintiff's inner thigh.

100. These photographs were extremely relevant because they corroborated Plaintiff's account that PERRY DOE had used physical force and violence against Plaintiff while he was raping her.

101. On the evening of January 25, 2021, after her rape examination, Columbia Presbyterian Hospital provided Plaintiff with a Hospital Discharge Form, which provided that Plaintiff had been treated by and released from the Hospital on January 25, 2021. Plaintiff kept this form for her records.

102. Pursuant to Columbia Presbyterian Hospital policies and procedures, Columbia Presbyterian Hospital retained and continues to retain all evidence collected in and for Plaintiff's rape kit, including the above-referenced photographs of Plaintiff's body.

103. In or about late January, 2021, Plaintiff, who was trying to recover emotionally and physically from the trauma of her rape, missed several classes and failed to complete several assignments.

104. One of her professors responded angrily and notified Plaintiff that her failure to complete her assignment in his class would negatively impact her grade.

105. In or about early February 2021, Plaintiff felt compelled to speak with Sarah Asher, Yeshiva University's Assistant Dean of Students.

106.   Plaintiff told Dean Asher that she had recently been raped by a male Yeshiva University student in his apartment and conveyed the troubles she was having in several of her classes because of that incident. Plaintiff did not initially tell Dean Asher the name of the person who had raped her.

107.   Dean Asher told Plaintiff that Plaintiff would need to communicate with each of her professors and explain the circumstances as to why she had missed several classes and assignments.

108.   Although this was extremely difficult and emotionally charged, Plaintiff had such communications with her professors and thus, despite some continued resistance from one of her professors, settled her academic affairs. (Upon information and belief, Dean Asher communicated with the recalcitrant professor, and further explained Plaintiff's situation to him).

109.   On or about February 10, 2021, Plaintiff communicated further with Dean Asher and conveyed to her the real name of PERRY DOE.

110.   Dean Asher advised Plaintiff that she should make a formal Title IX sexual abuse complaint to Yeshiva University's Title IX Office.

111.   On or about February 18, 2021, Plaintiff conveyed to Dr. Asher, in writing, that she wanted to make a formal Title IX Report to the school's Title IX Office concerning her rape by PERRY DOE.

112.   Thereafter, in late February 2021, Plaintiff had several further communications with Dr. Asher about her Title IX Complaint.

113.   Dr. Asher conveyed to Plaintiff that she would be communicating with Defendant Chaim Nissel, Yeshiva University's Title IX Coordinator, about Plaintiff's rape allegations.

114.   Defendant Nissel, despite the egregiousness of Plaintiff's rape allegations, had no in person or telephonic communications with Plaintiff throughout the duration of Yeshiva University's "investigation" of her Title IX Complaint.

115.   Defendant Nissel did, however, have communications with Andrew "Avi" Lauer, Esq., YU's long-time General Counsel, and—upon information and belief, in late February, 2021 or early March, 2021—these two high-level YU employees developed and executed a nefarious and malicious strategy to address, resolve, and whitewash Plaintiff's Title IX Complaint which stemmed from her alleged rape by PERRY DOE.

116.   On March 4, 2021, Defendant Nissel sent Plaintiff an email in which he stated that Yeshiva University intend[ed] to conduct an investigation of Plaintiff's allegations that PERRY DOE "engaged in Sexual Assault" in violation of Yeshiva University's "Non-Discrimination & Anti-Harassment Policy" (the "Policy").

117.  In this email, Defendant Nissel did not state or suggest that Yeshiva University had dismissed Plaintiff's Title IX Complaint for any reason, including that said alleged sexual assault did not occur within any Yeshiva University education program or activity or because said sexual assault occurred in an off-campus apartment rather than on or within Yeshiva University's Wilf Campus.

118.  In his March 4, 2021 email to Plaintiff, Defendant Nissel notified Plaintiff that "The University has retained an *independent investigator* to conduct this investigation.  The law firm of Seyfarth Shaw, LLP, will be handling the investigation and Dov Kesselman and Emily Miller have been named as investigators for this matter." (Emphasis added).

119.  Title IX regulations expressly provide that any investigator assigned to conduct a Title IX investigation of sexual harassment (including sexual assault) must be free of any "conflict of interest" or "bias" for or against any school, complainant, or respondent (i.e., the accused).

120.  Here, the law firm of Seyfarth Shaw, LLP, and its attorneys, Dov Kesselman, Esq., and Emily Miller, Esq., were not "independent investigators" with an impartial viewpoint and no personal stake in the outcome of Plaintiff's Title IX Complaint.

121.  To the contrary, since in or about 2013, Seyfarth Shaw, LLP ("Seyfarth") has represented Yeshiva University in at least five separate litigation matters brought in New York courts by more than 50 sexual abuse survivors who allege that from the 1960s through 1990s, when they were children, Yeshiva University covered up for several sexually abusive administrators and teachers at Yeshiva University High School for Boys in Manhattan.

122.  In one still active litigation brought by 47 plaintiffs, plaintiffs allege that more than 15 students reported their sexual abuse to at least 20 YU officials (including YU's former President, Norman Lamm) but that YU administrators (including Lamm) had treated these complainants with disdain by threatening reprisals and/or casting doubt on their credibility.

123.  Prior to his death in 2020, YU's former President, Norman Lamm, publicly acknowledged that he had mishandled sexual abuse allegations by former YUHS students.

124.  Since 2013, Seyfarth, led by its litigation partner, Karen Y. Bitar, Esq. has defended YU (and continues to defend YU), certain YU administrators, and YU's Board of Directors from the claims of more than 50 men who are suing YU for facilitating and covering up their sexual abuse through, *inter alia*, negligent supervision and negligent retention.

125.   Seyfarth was successful in protecting YU's legal and financial interests in 2013 and 2014 by invoking and hiding behind the then-existing draconian statutes of limitations. On this basis, Seyfarth was able to persuade several federal courts in New York State to dismiss the YUHS plaintiffs' sex abuse cover-up claims solely on statute of limitations grounds.

126.   When New York passed The New York Child Victims Act ("CVA") in 2019, which created a short revival window for previous time-barred claims, including claims that had been previously dismissed on statute of limitations grounds, Seyfarth continued to represent YU, certain YU administrators, and YU's Board of Directors, in multiple sex abuse-related claims brought by CVA plaintiffs.

127.   Seyfarth's long-time representation of YU, and certain YU administrators, and the YU Board of Directors, with the intent to avoid or at least delay a finding of YU's culpability for facilitating sexual abuse—has been extraordinarily successful and profitable for Seyfarth and its attorneys.

128.   Upon information and belief, since 2013, Seyfarth has received more than $2 million in legal fees from for its defense of dozens of sex abuse facilitation and/or cover-up claims against YU, certain YU administrators, and members of the YU Board of Directors, by former students of YU or its affiliated schools.

129.   Seyfarth's charge, from 2013, and continuing to present, from YU was (and remains) to defend YU from sex abuse facilitation and cover-up claims, burnish YU's reputation, and minimize the negative publicity and reputational damage that could be incurred by the widespread public disclosure of the craven and calculated actions of high-ranking YU administrators and/or directors who refused to punish, fire, or report to law enforcement officials certain YUHS teachers or administrators, despite having *actual knowledge* that these YU employees were sexual predators who had sexually abused dozens of students (children).

130.   Seyfarth, when selected to be the "investigator" of Plaintiff's Title IX rape claim, was far from an "independent" and "impartial" investigator.

131.   To the contrary, Seyfarth had, and continues to have, a substantial financial stake in YU continuing to maintain a sterling reputation free of taint that would result from a legal finding that YU facilitated or covered up the sexual abuse of its students, and/or failed to adequately respond to reports or allegations of the sexual abuse of any of its students that was committed by a fellow YU student, teacher, administrator, or anyone else affiliated with YU, and/or maliciously and knowingly

participated in a cover-up of any sexual abuse committed against any students (including Plaintiff) at YU or any of its affiliated schools.

132.   Defendant Kesselman, as a partner at Seyfarth, has received and continues to receive substantial remuneration from YU as a direct result of his law firm's near-decade-long defense of YU against dozens of sex-abuse facilitation and/or cover-up claims.

133.   Defendant Kesselman, moreover, along with Karen Y. Bitar, Esq., YU's lead attorney for YU in the CVA cases, is and at all material times has been an active member of Yeshiva University's General Counsel's Council.

134.   According to YU's own website, "[i]n April 2008, the General Counsel formed the Yeshiva University General Counsel's Council, which comprises (sic) attorneys from outside law firms and corporate legal departments *who believe in the mission of the University* and would like to assist through the provisions of pro bono services." (Emphasis added).

135.   As Defendant Kesselman is a named member of a group committed to "the mission" of Yeshiva University, he, Seyfarth, and its associate, Defendant Miller, have another clear conflict of interest and bias in favor of Yeshiva University and PERRY DOE and against anyone, like

Plaintiff, who makes sexual abuse allegations that could tarnish the school's reputation or damage its financial bottom-line.

136.  Defendants Seyfarth, Kesselman, and Miller's conflicts of interest and biases are particularly pronounced in view of YU's ongoing "Rise Up" fundraising campaign, as the continued success of YU and its "mission" to raise more than half a billion dollars for the school by the end of 2026 is now the publicly stated goal of both YU and Kesselman

137.  At no time during its "investigation" did Yeshiva University, Seyfarth, or any of the individual Defendants notify Plaintiff that Seyfarth was its litigation counsel which had defended and was continuing to defend YU, certain YU administrators, and YU's Board of Directors, from legal claims brought by more than 50 men who claim that YU and certain YU administrators covered up and/or facilitated their childhood sexual abuse by several known sexual predator employees of YU.

138.  At no time during its "investigation" did Yeshiva University or any of the individual Defendants notify Plaintiff that Seyfarth and Defendant Kesselman had received substantial legal fees for the firm's representation of YU and was continuing to receive such fees for the firm's continued representation of YU in sex abuse-related litigations filed in New York by more than 50 CVA plaintiffs.

139. Plaintiff first ascertained Seyfarth's role as YU's litigation counsel for sex abuse claims on March 10, 2022, when she first met with her counsel in this case.

## PLAINTIFF'S REQUESTS FOR SECURITY MEASURES

140. Beginning in March, 2021 and continuing through November, 2021, Plaintiff repeatedly notified Dean Asher, Defendant Nissel, and Defendants Kesselman and Miller, that PERRY DOE's continued presence on YU's Wilf Campus was causing her much fear and anxiety.

141. Following PERRY DOE's rape of Plaintiff, PERRY DOE's continued and unregulated presence on campus and the accompanying risk that Plaintiff might encounter PERRY DOE on campus created a hostile environment that effectively deprived Plaintiff of the educational benefits and opportunities provided by YU.

142. Following Plaintiff's assault, PERRY DOE's continued, unrestricted, and unregulated presence on Wilf Campus was harassing to Plaintiff because it exposed her to the possibility of another encounter with PERRY DOE and thus caused her to suffer much fear and anxiety.

143. When Plaintiff made her formal Title IX Complaint to YU, Title IX regulations provided that YU was mandated to discuss and

implement appropriate "security measures" to protect Plaintiff both during the pendency of YU's "investigation" and after its determination was made.

144. Such appropriate and reasonable security measures could have included the following: (1) completely barring PERRY DOE from YU's Wilf Campus; (2) barring PERRY DOE from certain areas at Wilf Campus; (3) barring PERRY DOE, completely or from certain areas, from YU's Wilf Campus at certain designated times (particularly when Plaintiff was scheduled to be on campus); (4) removing PERRY DOE from the YU Basketball Team and all team activities; and (5) providing Plaintiff with campus escorts when she needed to be on YU's Wilf Campus.

145. At all material times, even though Plaintiff repeatedly expressed to YU officials and agents her great fear and anxiety about encountering PERRY DOE on Wilf Campus, and repeatedly requested that YU implement appropriate security measures that would prevent Plaintiff from encountering PERRY DOE on YU's Wilf Campus, YU failed to implement *any* security measures and failed to take *any* steps that would protect Plaintiff or lessen her vulnerability posed by PERRY DOE's continued and unrestricted presence on campus.

146. In early September, 2021, during another discussion about YU's implementation of possible security measures to protect Plaintiff,

Dean Asher told Plaintiff that, in view of Plaintiff's August 25, 2021 YU Commentator article, there was now "too much bad blood" for YU to implement any security measures to protect Plaintiff from PERRY DOE.

147. YU, upon information and belief, retaliated against Plaintiff for her protected activities by denying her *any* reasonable security measures. Dean Asher so much as admitted this retaliatory motive in her September, 2021 conversation with Plaintiff.

148. Dean Asher told Plaintiff that it was entirely up to PERRY DOE as to whether, when, and/or where Plaintiff would encounter PERRY DOE on YU's Wilf Campus. YU's conscious decision to leave Plaintiff completely vulnerable to PERRY DOE was clear-cut retaliation against Plaintiff by YU in response to Plaintiff's exercise of her right to engage in protected activities.

149. YU's failure to implement any security measures to protect Plaintiff is even more egregious because YU administrators, officials, directors, employees, and agents, including Defendants Lauer, Nissel, Seyfarth, Kisselman, and Miller, knew or should have known that Plaintiff's rape allegations against PERRY DOE were credible, truthful, and supported by substantial corroborating evidence.

## YU BELATEDLY NOTIFIED PLAINTIFF THAT IT DID NOT TREAT HER RAPE COMPLAINT AS A TITLE IX MATTER

150. In November, 2021, Plaintiff spoke directly with Defendant Nissel for the first time. They discussed her continued concerns and demands for YU to implement reasonable security measures to protect her on YU's Wilf Campus. Several of Plaintiff's friends participated in this telephone call with Defendant Nissel and another YU administrator.

151. During this November, 2021 meeting, Defendant Nissel told Plaintiff *for the first time* that YU had not complied with Title IX's rules, regulations, and procedures with respect to her rape complaint against PERRY DOE.

152. Defendant Nissel also told Plaintiff that he and YU's General Counsel (Defendant Lauer) coordinated YU's response to her formal Title IX Complaint based on PERRY DOE's rape.

153. Defendant Nissel told Plaintiff that Title IX was not applicable to her rape allegations because her alleged rape occurred "off-campus." Instead, therefore, the YU Defendants responded to Plaintiff's rape complaint as a non-Title IX disciplinary matter only.

154. To date, YU has still not implemented *any* security measures to protect Plaintiff and make her less vulnerable to sexual assault and has still failed to take *any* steps that would protect Plaintiff or lessen her

vulnerability as posed by PERRY DOE's unrestricted and unregulated presence on YU's Wilf Campus.

155.   Defendant Nissel's November, 2021 statement to Plaintiff as to the applicability of Title IX was contrary to law and in violation of Title IX.

## TITLE IX DOES NOT AUTOMATICALLY EXCLUDE RAPE INCIDENTS WHICH OCCUR "OFF CAMPUS"

156.   On August 14, 2020, the U.S. Department of Education adopted a number of new regulations pertaining to Title IX.

157.   These regulations were effective as of August 14, 2020, and were memorialized in Volume 85 of the Federal Register, No. 97, May 19, 2020, "Non-Discrimination on the Basis of Sex in Education Programs on Activities Receiving Federal Financial Assistance" ("85 Fed. Reg."), at pp 30026 to 30579.

158.   Upon information and belief, each of the Defendants was well aware of these new Title IX regulations.   In fact, in 2021, Seyfarth conducted an extensive training program for and/or on behalf of Yeshiva University with respect to the content and impact of the new 2020 Title IX regulations.

159.   The 2020 Title IX regulations, while noting that for Title IX to be applicable, the sexual harassment or sexual abuse must occur within a

school's "education program or activity," defined that term in the context of

both "on campus" and "off campus" conduct:

> Title IX is clearly applicable for "all incidents of
> sexual harassment occurring on a [school's]
> campus[.]"

(85 Fed. Reg. at 30196).

> [T]he Department [of Education] reiterates that
> "off campus" does not automatically mean that the
> incident occurred outside the [school's] education
> program or activity.

(*Id.* at 30198).

> The Department [of Education] reiterates that the
> final regulations do not impose a geographic test or
> draw a distinction between on-campus misconduct
> and off-campus misconduct.

(*Id.*).

> [W]hether conduct occurs in a [school's] education
> program or activity does not necessarily depend on
> the geographic location of the incident.

(*Id.*).

> Instead, "education program or activity" relies on
> statutory or regulatory definitions of "program" or
> "activity," on the statement adoption from the
> Supreme Court's language in *Davis* added to §
> 106.44(a) that *education program or activity
> includes locations, events or circumstances over
> which the [school] exercised substantial control
> over the respondent (the accused party) and over
> the context in which the sexual harassment
> occurred*, and includes on-campus and off-campus

> buildings owned or controlled by a student
> organization officially recognized by a post-
> secondary institution.

(*Id.* at 30198-99) (emphasis added).

> [E]ven if a situation arises off campus it may still
> be part of the [school's] education program or
> activity if the [school] exercised substantial control
> over the context and the alleged harasser.

(*Id.* at 30199 n. 875).

160.   The 2020 Title IX regulations specifically provide that Title IX

may be applicable when—as may have occurred here—a sexual assault

occurred in an off-campus residential apartment.

> While such situations may be fact specific,
> [schools] must consider whether, for example, a
> sexual harassment incident between two students
> that occurs in an off-campus apartment (i.e., not a
> dorm room provided by the [school]) is *a situation*
> *over which the [school] exercised substantial*
> *control; if so, the [school] must respond when it*
> *has actual knowledge of sexual harassment or*
> *allegations of sexual harassment that occurred*
> *there.*

(*Id.*) (emphasis added).

161.   Although "no single factor is determinative [as to] whether a

[school] exercised substantial control over the respondent [i.e., the accused

harasser] and the context in which the harassment occurred," (85 Fed. Reg.

at 30197), the Department of Education mandates that all schools faced with

threshold questions as to whether sexual harassment (or sexual assault)
occurred within a school's "education program or activity" to the extent
necessary to trigger Title IX protections *must* carefully consider the scope of
each school's own education program or activity. (*Id.* at 30198):

> To ensure that [schools] adequately consider the
> resulting coverage of Title IX to each [school's]
> particular circumstances, the final regulations
> require that every *Title IX Coordinator,
> investigator, decision-maker*, and person who
> facilitates an informal resolution process, must be
> trained on (among other things) "the scope of the
> [school's] education program or activity."

(*Id.*) (*quoting*, Section 106.45(b)(1)(iii)) (emphasis added).

> [The Department of Education has] also revised §
> 106.45(b)(10)(i)(D) so that materials used to train
> Title IX personnel *must be posted on a [school's]
> website. These revisions ensure that a school's
> students and employees, and the public,
> understand the scope of the [school's] education
> program or activity for purposes of Title IX.*

(*Id.*) (emphasis added).

162.  Here, there are numerous factors which demonstrate that
Yeshiva University exercised substantial control over PERRY DOE,
Plaintiff, and the context in which PERRY DOE's rape of Plaintiff (in his
apartment) occurred.

163.   YU's Student Bill of Rights provides in relevant part that:

> The University is committed to providing options, support and assistance to victims/survivors of sexual assault, domestic violence, dating violence, and/or stalking to ensure that they can continue to participate in University-wide and campus programs, activities, and employment. *All victims/survivors of these crimes and violations have the following rights, regardless of whether the crime or violation occurs on campus, off campus*, or while studying abroad.

> All students have the right to … :  2. Have disclosures of … sexual assault treated seriously … 4. Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard …

(Student Bill of Rights at 1) (emphasis added).

164.   YU's Anti-Bullying and Hazing Policy for Students, which proscribes "bullying" which includes physical and/or sexual assault, provides in relevant part that:

> This Policy is intended to protect all students of the University, and applies to conduct that occurs on University premises and/or at University-sponsored and affiliated activities and events, whether on University premises or at other locations … *The University may also address off-campus behavior that occurs at other than University-sponsored or affiliated events if it determines that the behavior, or the continued presence of the accused perpetrator, impairs, obstructs, substantially interferes with or adversely affects the mission, process or functions of the University.*

(Anti-Bullying and Hazing Policy at 1) (emphasis added).

165. YU's Policy on Protecting Athletes provides in relevant part:

> The University is committed to ensuring the well-being, safety and protection of each of its student-athletes and will not tolerate bullying, hazing, harassment or other misconduct. In light of the influence, power and position of trust wielded by coaches and other members of the athletic staff, *as well as the influence and power that may be wielded by other student-athletes*, the University believes it is important to set forth guidelines to help define appropriate behavior and conduct of its athletic staff and student-athletes in order to cultivate a safe and positive environment for all student-athletes. *These guidelines apply to the behavior and conduct of* all members of the University athletic staff and *student-athletes, whether on-campus or off-campus.*

(Policy on Protecting Athletes at 1) (emphasis added).

> The University prohibits, and will not tolerate, any form of sexual harassment, including sexual abuse/assault.

(Policy on Protecting Athletes at 2).

> Sexual violence refers to physical contact with a sexual or intimate part of the body without consent. It includes various forms of sexual intercourse (e.g., rape, incest, statutory rape) as well as other forms of sexual touching (e.g., fondling).

(Policy on Protecting Athletes at 3).

166. YU's Policy on Protecting Athletes also provides that any

violation of that policy should be reported to both YU's Title IX Coordinator

and YU's General Counsel. (Policy on Protecting Athletes at 3).

167. YU's    Undergraduate    Student    Bill    of    Rights    and

Responsibilities/Undergraduate Student Disciplinary Procedures, provides in

relevant part that:

> Respect for one another is essential to preserving
> the spirit of community at Yeshiva University.
> Membership in the Yeshiva university community
> entails certain rights and responsibilities.    All
> members of the community are accorded those
> rights, and are equally accountable to uphold their
> responsibilities.    It is therefore important to
> maintain a clear statement of basic rights,
> obligations and responsibilities concerning both
> academic and personal conduct.

(Undergraduate Student Bill of Rights and Responsibilities at 2).

#### Freedom from Discrimination

> Students who are otherwise qualified have the
> right to participate fully in the University
> community without discrimination as defined by
> federal, state and local law.

(Undergraduate Student Bill of Rights and Responsibilities at 3).

#### Safety

> Students have the right to an environment that is
> conducive to learning and without unreasonable
> concerns for personal safety.  Behavior which is
> intimidating, threatening or hostile to individuals

> or groups is therefore regarded as a serious
> offense. Abusive or harassing behavior, verbal or
> physical, which demeans, threatens or injures
> another is subject to University disciplinary action.

(Undergraduate Student Bill of Rights and Responsibilities at 3).

### Discipline

> Students who are subject to University disciplinary
> action have the right to be treated with
> fundamental fairness.

(Undergraduate Student Bill of Rights and Responsibilities at 3).

### Responsibilities of Undergraduate Students

> The exercise and preservation of these rights
> requires respect for the rights of all others in the
> community. Undergraduate students enrolled at
> Yeshiva University assume an obligation to
> conduct themselves in a manner that is civil and in
> accordance with the University's function as an
> educational institution and performance of its
> mission. *Students are therefore expected to exhibit
> responsible behavior regardless of time, place, and
> medium.*

(Undergraduate Student Bill of Rights and Responsibilities at 5).

> Yeshiva University is a community that has always
> prided itself on the high standards of behavior and
> scholarship to which all members are held. To
> fulfill its function and mission, the University
> retains the power to maintain order with the
> University and discipline those who are disruptive
> of the educational process or fail to abide by the
> University's rules and regulations.

(Undergraduate Student Bill of Rights and Responsibilities at 5).

## UNDERGRADUATE STUDENT
## DISCIPLINARY PROCEDURES

Yeshiva University undergraduate students are
expected and required to abide by the policies,
rules and regulations established by the University
including, but not limited to, what is stated in the
University's publications and websites and in the
Undergraduate Student Bill of Rights and
Responsibilities. Students are expected to conduct
themselves in accordance with the highest ethical
and moral standards. Prohibited behavior includes
acts that are dishonest, immoral or unlawful; acts
that cause damage to property or harm to oneself
or to others; or acts that bring shame upon the
institution.

(Undergraduate Student Bill of Rights and Responsibilities at 7).

Students who violate any of these policies, rules,
regulations and other requirements are subject to
disciplinary action, whether the conduct occurs in
any University facility, or in connection with any
University-sponsored activity.     In addition,
*students whose off campus conduct violates any of
those policies, rules, regulations or other
requirements may also be subject to University
discipline.*     The University may impose
appropriate sanction which may include, but are
not limited to, letters of admonition, probation,
loss of privileges, and/or suspension or expulsion
from University housing or the University in
general.

(Undergraduate Student Bill of Rights and Responsibilities at 7) (emphasis

added).

168.   Yeshiva University, at all material times, thus maintained disciplinary and supervisory authority over PERRY DOE (for his rape of Plaintiff in his apartment) and YU also had an affirmative duty to take appropriate steps and measures to protect Plaintiff.   Accordingly, PERRY DOE's rape of Plaintiff in his apartment constitutes a sexual harassment incident over which YU had substantial control over *both* the respondent (i.e., the accused party, PERRY DOE), the complainant (Plaintiff), and the context in which PERRY DOE's rape/harassment of Plaintiff occurred.

169.   YU therefore, pursuant to Title IX and the 2020 Title IX regulations, had a legal duty to respond to Plaintiff's Title IX Complaint, as it occurred within YU's unique "education program and activity."

170.   YU, and the YU Defendants, Lauer, Nissel, Seyfarth, Kesselman, and Miller, were legally obligated to apply Title IX and its rules, regulations, and required procedures to Plaintiff's rape complaint against PERRY DOE.

171.   The YU Defendants violated Title IX, in the context of their threshold determination—which they never conveyed to Plaintiff—to dismiss her Title IX Complaint for failure to meet Title IX's education program and activity jurisdictional requirement allegedly because Plaintiff claimed that PERRY DOE had raped her in his "off-campus" apartment

because: (1) the YU Defendants, YU, Lauer, Nissel, Seyfarth, Kesselman, and Miller, failed to send Plaintiff written notice of their dismissal of her formal Title IX Complaint in violation of § 106.45(b)(3)(iii); (2) the YU Defendants failed to send Plaintiff written notice of their dismissal of her Title IX Complaint with "the reasons therefor" in violation of § 106.45(b)(3)(iii); (3) the YU Defendants failed to provide Plaintiff with any opportunity to appeal their dismissal of Plaintiff's formal Title IX Complaint, pursuant to § 106.45(b)(3)(i) on the alleged basis that Plaintiff failed to establish that her rape occurred within YU's "education program or activity;" (4) the YU Defendants, specifically Lauer, Nissel, Seyfarth, Kesselman, and Miller, failed to carefully consider the proper scope of YU's "education program and activity" in the context of the circumstances alleged by Plaintiff in violation of the 2020 Title IX Regulations (*see* 85 Fed. Reg. at 30198; Section 106.45(b)(1)(iii)); (5) the YU Defendants, particularly Lauer, Nissel, Seyfarth, Kesselman, and Miller, failed to receive the mandated training on the scope of YU's "education program or activity." (*See* 85 Fed. Reg. at 30198); (6) Yeshiva University failed to post any materials as to the mandatory training of its Title IX personnel with respect to the scope of YU's "education program or activity" on its website. (*See* 85 Fed. Reg. at 30198; Section 106.45(b)(10)(i)(D)); and (7) PERRY DOE's rape of

Plaintiff in his apartment met Title IX's "education program or activity"
jurisdictional requirement, and implicated all Title IX rules, regulations, and
procedures, because YU had substantial control over PERRY DOE,
including broad disciplinary and supervisory authority over him, as well as
substantial control over the complainant (Plaintiff), and the context of
PERRY DOE's rape of Plaintiff in his apartment.

## YU'S "NOT RESPONSIBLE" DETERMINATION

172. In March, 2021, Plaintiff was interviewed several times about
her rape allegations against PERRY DOE by the Seyfarth attorneys.

173. The Seyfarth attorneys interviewed Plaintiff in great detail and
asked her many of the same questions about emotionally difficult subjects on
numerous occasions. Upon information and belief, the Seyfarth attorneys
did not subject PERRY DOE to the same level of scrutiny and did not ask
him to repeatedly convey his version of the relevant events.

174. From March, 2021 through April, 2021, Plaintiff repeatedly
told Dean Sara Asher and the Seyfarth attorneys that she had significant fear
and anxiety about the likelihood of encountering PERRY DOE on YU's
Wilf Campus and, as Plaintiff reasonably feared for her physical safety, she
wanted reasonable security measures to be put in place at YU.

175.   On or about April 29, 2021, Defendant Nissel emailed Plaintiff that the Seyfarth attorneys had completed their investigative report and that such report was available for Plaintiff's review.

176.   Defendant Nissel, however, insisted that Plaintiff execute a non-disclosure agreement before YU would provide Plaintiff with access to the Seyfarth attorneys' investigative report.

177.   This request was illegal, as The Clery Act provides that a college or university is required to provide participants (including complainants) with full and unfettered access to all Title IX investigatory reports and relevant evidence and may not place any pre-conditions on such parties' receipt of said reports and/or evidence.

178.   Plaintiff, not represented by a lawyer, did not know that YU was forbidden by law from mandating that she sign a non-disclosure agreement before receiving the investigative report and summary of relevant evidence related to her Title IX rape complaint.

179.   Accordingly, on April 29, 2021, Plaintiff executed the non-disclosure agreement drafted and tendered to her by YU.

180.   Upon information and belief, said non-disclosure agreement is null and void and of no force and effect.   Plaintiff seeks a declaratory judgment from this Court which makes that legal determination and finding.

181. YU provided Plaintiff with an encrypted copy of the Seyfarth attorneys' investigative report on or about April 30, 2021.

182. As this investigative report rehashed her traumatic rape narrative, and contained complicated legal language, Plaintiff reviewed this investigative report from her computer but did not understand many of its terms as well as its overall impact and effect.

183. YU caused the encrypted document to no longer be reviewable, by Plaintiff and/or an attorney or advisor, within just a few days after her receipt of that encrypted document.

184. When YU erased the encrypted document from Plaintiff's computer, Plaintiff had not reviewed such document with an attorney or anyone else.

185. At the outset of their "investigation," Plaintiff advised the Seyfarth attorneys that she had undergone a rape examination at Columbia Presbyterian Hospital, and that the Hospital had collected "rape kit" evidence from her, on January 25, 2021 (the day after her rape). Plaintiff also provided Seyfarth attorneys with a copy of her discharge form from Columbia Presbyterian Hospital for January 25, 2021.

186. At no time during their "investigation," did the Seyfarth attorneys ever ask Plaintiff to provide her consent for them to obtain her rape

kit evidence (including photographs of bruises on her body) from Columbia Presbyterian Hospital.

187. At no time during their "investigation," did the Seyfarth attorneys ask Plaintiff for her consent for them to interview the Nurse Examiner who conducted Plaintiff's rape kit examination at Columbia Presbyterian Hospital on January 25, 2021.

188. Plaintiff was not aware that she needed to provide the Seyfarth attorneys with her specific consent to examine the rape kit evidence in order for Seyfarth attorneys to obtain or examine that evidence from Columbia Presbyterian Hospital.   When she provided Seyfarth with her hospital discharge form (for January 25, 2021), she assumed that the Seyfarth attorneys had access to obtain and review her rape kit evidence.   The Seyfarth attorneys never told her or suggested otherwise.

189. The Seyfarth attorneys' failure to obtain or request Plaintiff's rape kit evidence—which would have provided strong evidentiary support for Plaintiff's rape allegations—has no innocent or innocuous explanation.

190. Only "investigators" who had no interest in ascertaining the truth would have turned their backs on this extremely probative evidence.

191. On May 26, 2021, Defendant Nissel forwarded a letter to Plaintiff (Ex. A hereto) in which he stated that "After an extensive

investigation, it has been determined that the evidence does not support a finding that [PERRY DOE] violated the [University's Non-Discrimination and Anti-Harassment] Policy."

192. This May 26, 2021 letter did not provide any reasons or rationale for YU's "not responsible" determination and failed to summarize the evidence considered or YU's assessment of the credibility of the witnesses and the evidence considered by YU's "investigators."

193. Nor did this May 26, 2021 letter provide Plaintiff with notice that the Seyfarth attorneys' potential conflicts of interest or biases in favor of YU and PERRY DOE may have served as a basis for an appeal.

194. In this May 26, 2021 letter, Defendant Nissel did not summarize the relevant evidence and provided no facts, grounds, reasons, or rationales for YU's "not responsible" determination.

195. Defendant Nissel also failed to notify Plaintiff that, *inter alia*, conflicts of interest or biases were a potential basis of appeal of YU's dismissal of Plaintiff's Title IX Complaint.

196. In or about June, 2021, Plaintiff repeatedly attempted to appeal YU's "not responsible" determination on the basis that YU failed to consider her probative rape kit evidence.

197.  Defendant Nissel repeatedly rejected her efforts at appeal, failed to convene an appeal panel as required by both Title IX and YU's own Policy, and failed to review or have any appeal panel, or any YU employee or agent, review Plaintiff's unexamined yet critical rape kit evidence.  Upon information and belief, Defendant Nissel consulted with and received advice or direction from Defendant Lauer, YU's General Counsel, prior to rejecting Plaintiff's repeated attempts to appeal YU's "not responsible" determination based on the probative rape kit evidence that the YU "investigators" had ignored.

198.  YU's and Defendant Nissel's consistent failure to permit Plaintiff to allow her probative "rape kit" evidence to be reviewed and considered on appeal, has no innocent or innocuous explanation.

199.  Only a university and Title IX Coordinator who have no interest in ascertaining the truth and are invested in the success of a rape cover-up, would continue to block Plaintiff from being able to present her "rape kit" evidence to the YU fact-finders.

## COUNT ONE:
## VIOLATION OF TITLE IX (AGAINST YESHIVA UNIVERSITY)

200.  Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

201. Title IX, 20 U.S.C. § 1681 (a) (1972), provides in pertinent part

that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

202. Title IX regulates all schools that receive federal funding, including Yeshiva University.

203. Title IX provides a private cause of action against a recipient of federal funds for discrimination based on sex, sexual harassment, and sexual abuse.

204. Indeed, a single sexual assault (which Plaintiff in this case suffered) constitutes severe and objectively offensive sexual harassment for Title IX purposes.

205. YU, upon information and belief, is and was at all material times a university that is a recipient of federal financial assistance and is thus subject to Title IX.

**Post-Assault Claim**

206. YU is liable to the Plaintiff under Title IX because, at all material times, high-ranking administrators and officials of YU with remedial and corrective authority were deliberately indifferent to a known

act of sexual abuse and/or sexual harassment (i.e., PERRY DOE's rape of Plaintiff), which occurred under YU's substantial control of PERRY DOE and the context of his rape of Plaintiff, as part of YU's unique education programs and activities.

207.   Indeed, Defendant YU's deliberate indifference to its High-ranking administrators' and officials' actual knowledge of PERRY DOE's rape of Plaintiff in his apartment, made female students (particularly Plaintiff), vulnerable to sexual abuse, sexual harassment, and discrimination at YU.

208.   As YU took no punitive action against PERRY DOE and no remedial action on behalf of Plaintiff, and YU failed to conduct a real, legitimate, fair, and impartial investigation, failed to implement any reasonable security measures, and failed to permit Plaintiff to appeal YU's "not responsible" determination, Plaintiff was subject to frequent and regular interactions with PERRY DOE on YU's campus. These interactions threatened Plaintiff's physical safety and made Plaintiff particularly vulnerable to further sexual abuse, sexual harassment, and discrimination from PERRY DOE.   YU's deliberate indifference to the conduct of PERRY DOE, and its failure to restrict, regulate, or monitor PERRY DOE's presence on YU's Wilf Campus, or to provide Plaintiff with any reasonable security

measures at YU's Wilf Campus, created a hostile educational environment at YU (particularly on its Wilf Campus) which reasonably caused Plaintiff to fear for her physical safety.

209. Plaintiff, moreover, did suffer continued sexual harassment and discrimination at YU as a result of the deliberate indifference of high-ranking YU administrators and officials with remedial and corrective authority in the face of their actual knowledge that Plaintiff had suffered, and was continuing to suffer, sexual abuse, sexual harassment, and discrimination at YU.

210. At least one of the other members of the YU basketball team ascertained that Plaintiff had accused PERRY DOE of rape. This basketball player, formerly Plaintiff's friend, proceeded to slut-shame her in a social situation, called her a "whore" and a "slut," insulted her character, and impugned her credibility. This former friend told Plaintiff: "You're so dumb for letting this happen to you."

211. Upon information and belief, at all material times, YU and its high-ranking administrators and officials had actual knowledge of a substantial risk of serious harm to students, such as Plaintiff and other female students, in a context where multiple prior allegations of rape, sexual abuse, and sexual harassment of female YU students had been lodged

nst various YU students and these sexual misconduct, rape, and sexual

assment allegations (including Plaintiff's allegations against PERRY

DOE) were well known to various high-ranking administrators, Board of

Directors members, officials, and employees of YU.

212.   Upon information and belief, at all material times, PERRY

DOE targeted, discriminated against, raped, and sexually harassed Plaintiff

at YU, because she was a female, and YU's high-ranking administrators,

officials, and directors, had actual knowledge that PERRY DOE, a

participant in YU's education programs and activities, had sexually abused

and sexually harassed Plaintiff because she was a woman.

213.   YU and its administrators and directors, at all material times,

had the authority and obligation to investigate Plaintiff's rape and sexual

abuse allegations against PERRY DOE as a Title IX matter, and take all

appropriate enforcement, punitive, or remedial actions against PERRY DOE

or on behalf of Plaintiff, but deliberately and maliciously chose not to do so,

and deliberately and maliciously deceived Plaintiff about their Title IX

jurisdictional and legal authority.

214.   YU and its administrators, officials, and directors, therefore, at

all material times, had the authority and obligation to punish and take

appropriate enforcement action against one of its students, PERRY DOE, for

his rape and sexual abuse of Plaintiff, but deliberately and maliciously chose not to do so, and deliberately and maliciously lied to Plaintiff about YU's Title IX jurisdictional and legal authority to punish and take appropriate enforcement action against PERRY DOE.

215.   Plaintiff, at all material times, relied upon YU's aforesaid representations (orally and in writing) to her.

216.   YU took no remedial action, failed to conduct a real, bona fide, fair, and impartial investigation of Plaintiff's rape allegations, implemented no security measures to protect Plaintiff, failed to impose any disciplinary measures against PERRY DOE for his alleged misconduct, and failed to permit Plaintiff to appeal YU's "not responsible" determination.

217.   YU's deliberate indifference to its actual knowledge of Plaintiff's Title IX Complaint, includes its blatant disregard for the rules, regulations, and procedures of Title IX and its implementing regulations.

218.   Indeed, YU violated Title IX by, *inter alia:*

(1)   failing to provide Plaintiff with notice of its dismissal of Plaintiff's Title IX Complaint;

(2)   failing to provide Plaintiff with the reasons for its dismissal of Plaintiff Title IX Complaint;

(3)   failing to carefully consider the scope of YU's education program and activities in the context of allegations that one YU student-athlete raped another YU student-athlete in his residential apartment;

(4)   failing to provide its Title IX Coordinator and/or its Title IX investigators (i.e., the Seyfarth attorneys) with the requisite training as to the scope of its education programs or activities;

(5)   failing to publish on the YU website such training materials and information;

(6)   failing to conduct a live hearing for Plaintiff's rape complaint;

(7)   failing to provide Plaintiff with an attorney/advisor with respect to the "investigation" of her rape allegations against PERRY DOE;

(8)   failing to subject PERRY DOE to examination or cross-examination with respect to Plaintiff's rape allegations against him;

(9)   failing to fairly and impartially collect and examine all relevant evidence;

(10)    failing to interview several fact witnesses whom Plaintiff had specifically identified;

(11)    failing to request and obtain Plaintiff's probative rape kit evidence from Columbia Presbyterian Hospital;

(12)    failing to notify Plaintiff that she was required to provide her consent to Columbia Presbyterian Hospital in order for Columbia Presbyterian Hospital to provide and/or show the Seyfarth attorneys Plaintiff's probative rape kit evidence;

(13)    failing to request and examine photographs taken by Columbia Presbyterian Hospital's Nurse Examiner, which depicted bruises that PERRY DOE inflicted upon Plaintiff's body while he raped her;

(14)    failing to conduct a real, bona fide, and impartial investigation of Plaintiff's rape allegations against PERRY DOE;

(15)    failing to permit Plaintiff to appeal YU's "not responsible" determination;

(16)    failing to disclose to Plaintiff the blatant conflicts of interest and biases of Seyfarth Shaw, LLP, Kesselman,

and Miller, in favor of YU and PERRY DOE and against Plaintiff;

(17) failing to notify Plaintiff that the "conflict of interest" or "bias" of the "investigators" of her rape allegation was a possible ground for her to appeal YU's "not responsible" determination;

(18) failing and refusing to provide Plaintiff with *any* reasonable security measures to protect Plaintiff from possible encounters with PERRY DOE on YU's Wilf Campus; and

(19) failing to treat Plaintiff and PERRY DOE equally and impartially as, upon information and belief, the Seyfarth attorneys cruelly asked Plaintiff to answer the same or nearly identical questions about the most traumatic event of her life on multiple occasions while *not* affording PERRY DOE that same level of scrutiny with respect to his version of events.

219. As a direct and proximate result of the aforesaid actions of YU, Plaintiff suffered severe emotional distress, mental anguish, and emotional and physical pain and suffering.

220. YU's response to PERRY DOE's known discrimination against Plaintiff constitutes deliberate indifference and was clearly unreasonable in light of all of the known circumstances.

**Pre-Assault Claim**

221. Even prior to PERRY DOE's rape of Plaintiff on January 24, 2021, YU engaged in conduct which violated Title IX.

222. At all times from 2001 to present, by expressly adopting and approving a policy to not report all sex crimes that occurred on or near YU's Wilf Campus and/or Beren Campus, to the U.S. Department of Education (and to its students and prospective students in YU's annual Security Reports for its campuses), YU maintained a policy of deliberate indifference to sexual harassment and sexual misconduct.

223. At all material times from 2001 to present, YU and its high-ranking administrators and directors, including YU Presidents, Norman Lamm, Richard Joel, and Ari Berman, its General Counsel, Andrew "Avi" Lauer, Esq., and its Title IX Coordinator, Chaim Nissel, had actual and specific knowledge that female participants in YU's education programs and activities had a heightened risk of sexual assault, rape, and sexual harassment because of their participation in such education programs or activities.

224. Indeed, by adopting its policy of gross non-compliance with The Clery Act's crime reporting requirements, and its deliberate non-reporting of sex crimes that occurred on or near YU's campuses, YU and its high-ranking administrators deliberately and maliciously painted a false and inaccurate picture of safety at or near YU's campuses for female students, and this increased YU's female students' risks of suffering rapes and sexual assaults (particularly by other YU students) on or near YU's campuses.

225. Moreover, by reason of YU's non-reporting policy, YU and its administrators knew that female students at YU were deprived of a reasonable ability or mechanism to report rapes or sexual assaults that occurred on or near YU's campuses and/or were perpetuated by male YU students against female YU students.

226. At all material times, all student participants in YU's education programs and activities, including Plaintiff and PERRY DOE, were subject to the control, jurisdiction, and authority of YU, pursuant to Title IX, YU's school policies, procedures, and practices, and/or otherwise.

227. As a direct and proximate result of YU's acts and omissions *prior to* PERRY DOE's rape of Plaintiff on January 24, 2021, Plaintiff was raped by PERRY DOE and thus suffered harassment and sexual abuse that

was so severe, pervasive, and objectively unreasonable, that it deprived Plaintiff of educational opportunities and benefits provided by YU.

228.   Accordingly, YU is liable to Plaintiff under Title IX for adopting, implementing, and maintaining a policy of deliberate non-reporting of sex crimes (in violation of The Clery Act) that occurred on or near YU's campuses to the U.S. Department of Education and all YU students and/or prospective YU students.

229.   YU's adoption of the non-reporting of sex crimes as the University's official school policy, discriminated against all female student participants in YU's education programs and activities (including Plaintiff) on the basis of sex.

## Harm Caused By YU's Title IX Violations

230.   At all material times, YU's conduct towards Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of Plaintiff's rights, interests, and welfare.

231.   At all material times, YU's conduct towards Plaintiff was seriously harmful to the public—which has a compelling interest in ensuring that college students within the community—including Plaintiff—be free

from sexual abuse and harassment, as well as retaliation in the form of unwarranted adverse actions, in a college or university environment.

232. As a direct and proximate result of YU's conduct prior to January 24, 2021, Plaintiff was raped by PERRY DOE and suffered and continues to suffer from severe emotional distress, pain and suffering, and mental anguish.

233. As a direct and proximate result of YU's violation of Title IX, Plaintiff suffered horrendous sexual abuse, sexual harassment, verbal abuse, and severe emotional distress and mental anguish.

234. PERRY DOE's rape of Plaintiff on January 24, 2021, and YU's failure to restrict or limit his presence on YU's Wilf Campus, thereafter, constituted gender bias and harassment so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to the educational opportunities and benefits provided by YU.

235. PERRY DOE's rape, sexual abuse and harassment of Plaintiff was exacerbated by the post-assault sexual harassment and verbal abuse of Plaintiff by other YU students, in which they mocked and ridiculed Plaintiff for her rape allegations, and impugned Plaintiff's honesty and credibility about her rape allegations.

236. All of this harassment had a concrete, negative effect on Plaintiff's ability to receive an education at YU.

237. The aforementioned sexual harassment of Plaintiff by PERRY DOE and others was so severe, pervasive and objectively offensive, that it grossly undermined and detracted from Plaintiff's educational experience at YU, impacted her ability to perform academically, and effectively denied Plaintiff equal access to YU's resources, opportunities, and benefits.

238. All of this harm to Plaintiff was reasonably foreseeable to YU at the time of its violation[s] of Title IX.

239. Plaintiff, pursuant to 42 U.S.C. § 1988, and related authority, also seeks and is entitled to receive all reasonable attorneys' fees, costs, and expenses, to be incurred in connection with his Title IX claims.

240. Plaintiff is thus entitled to compensatory damages and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of her Title IX claims, from Defendant YU.

## COUNT TWO:
## RETALIATION IN VIOLATION OF TITLE IX
## (AGAINST YESHIVA UNIVERSITY)

241. Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

242. Retaliation against individuals because they complain of sex discrimination is intentional discrimination that violates the clear terms of Title IX.

243. On or about February 18, 2021, Plaintiff was engaged in protected activities when she complained to YU's Title IX Office about PERRY DOE's rape and sexual abuse.

244. From March, 2021 through June, 2021, Plaintiff was engaged in protected activities when she participated in YU's "investigation" of her rape allegations.

245. From February, 2021 through November, 2021, Plaintiff was engaged in protected activities when she repeatedly requested that YU implement reasonable security measures to protect her from PERRY DOE on YU's Wilf Campus.

246. At all material times, Defendant, YU, and its various high-ranking administrators, agents, and employees, including Lauer and Nissel, had actual and/or constructive knowledge of the aforesaid protected activities of Plaintiff.

247. In or about 2021, Defendant YU took adverse school-related action against Plaintiff, through its administrators, agents, and employees, by failing and refusing to provide Plaintiff with a real, bona fide, fair, and

impartial investigation of her rape allegations against PERRY DOE, failing and refusing to implement *any* reasonable security measures to protect Plaintiff from PERRY DOE on YU's Wilf Campus, and failing to permit Plaintiff to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct.

248.   As a direct and proximate result of Plaintiff's rape, sexual abuse, and sexual harassment claims, Defendant YU took the aforesaid school-related adverse retaliatory actions against Plaintiff shortly after Plaintiff complained to Defendant YU and its administrators, repeatedly, and in detail, about her rape, sexual abuse, and sexual harassment by PERRY DOE—shortly after Plaintiff requested that YU implement reasonable security measures that would protect her from PERRY DOE on YU's Wilf Campus—and shortly after Plaintiff attempted to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct.

249.   YU took all of these school-related adverse actions against Plaintiff in retaliation for her allegations of rape and sexual abuse against PERRY DOE.

250.   As a direct and proximate result of Defendant YU's conduct, Plaintiff suffered severe emotional anguish and pain and suffering, a severe loss of self-esteem, self-confidence, and self-worth, and humiliation.

251.   As a direct and proximate result of the aforesaid actions of YU, Plaintiff suffered severe emotional distress, mental anguish and emotional and physical pain and suffering.

252.   At all material times, a retaliatory motive held and acted upon by the YU Defendants played a part in YU's above-referenced adverse actions against Plaintiff.   The YU Defendants, indeed, were enraged and horrified that a female YU student-athlete would publicly accuse a fellow YU student-athlete of a violent and unprovoked rape, and YU became even more enraged when Plaintiff refused to accept YU's sham investigation and bogus determination of her rape complaint—and wrote a critical letter to YU's student newspaper which documented her ordeal.

253.   The temporal proximity of Plaintiff's protected activities and YU's adverse actions against her is by itself sufficient to establish the requisite causal connection for Plaintiff's Title IX retaliation claim.

254.   The above-described actions of Defendant YU against Plaintiff were willful, wanton, and malicious, harmed the community's interest in ensuring that its colleges and universities do not tolerate an environment where the rape, sexual abuse, and/or sexual harassment of students by other students is tolerated, condoned, or encouraged.

255. Plaintiff is entitled to recover reasonable attorneys' fees from Defendant YU, pursuant to 42 U.S.C. § 1988, or other authority.

256. As a direct and proximate result of Defendant YU's aforesaid conduct towards Plaintiff, Plaintiff is entitled to recover compensatory damages, and reasonable attorneys' fees.

## COUNT THREE:
## VIOLATION OF NYCHRL, N.Y.C. ADMIN. CODE § 8-107(4)
## (AGAINST YESHIVA UNIVERSITY)

257. Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

258. Pursuant to the New York City Council's enactment of the Local Civil Rights Restoration Act of 2005 ("Restoration Act"), claims under the New York City Human Rights Law ("NYCHRL") should not be treated merely as coextensive with state and federal civil rights statutes.

259. The NYCHRL, indeed, is a one-way ratchet, by which interpretations of state and federal civil rights statutes can only serve as a floor below which the City's Human Rights Law cannot fall.

260. Thus, the NYCHRL's standards governing discrimination claims are as or more generous to plaintiffs than those under analogous federal statutes—including Title IX—so that a claim that satisfies federal law necessarily satisfies the NYCHRL.

261. Moreover, NYCHRL provisions must be construed liberally for the accomplishment of its uniquely broad and remedial purposes.

262. This is true even if similar federal or New York State civil and human rights laws with comparably worded provisions have been construed more narrowly.

263. Because the NYCHRL standard is more liberal than the corresponding federal and state law standards, courts must analyze NYCHRL claims separately and independently from any federal and state law claims.

264. A plaintiff who has sufficiently pleaded a discrimination claim under Title IX has also adequately pleaded a corresponding discrimination claim under the NYCHRL.

265. N.Y.C. Admin. Code § 8-107(4) provides in relevant part:

4. Public accommodations.

a. It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation:

1. Because of any person's actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation, uniformed service or immigration or citizenship status, directly or indirectly:

> (a) To refuse, withhold from or deny to such
> person the full and equal enjoyment, on equal
> terms and conditions, of any of the
> accommodations, advantages, services, facilities or
> privileges of the place or provider of public
> accommodation; …

266. N.Y.C. Admin. Code § 8-102, which sets forth the definitions

of terms used under the NYCHRL, defines place or provider of public

accommodation as follows:

> The term "place or provider of public
> accommodation" includes providers, whether
> licensed or unlicensed, of goods, services,
> facilities, accommodations, advantages or
> privileges of any kind, and places, whether
> licensed or unlicensed, where goods, services,
> facilities, accommodations, advantages or
> privileges of any kind are extended, offered, sold,
> or otherwise made available. Such term does not
> include any club which proves that it is in its
> nature distinctly private. A club is not in its nature
> distinctly private if it has more than 400 members,
> provides regular meal service and regularly
> receives payments for dues, fees, use of space,
> facilities, services, meals or beverages directly or
> indirectly from or on behalf of non-members for
> the furtherance of trade or business. **For the
> purposes of this definition, a corporation
> incorporated under the benevolent orders law
> or described in the benevolent orders law but
> formed under any other law of this state, or a
> religious corporation incorporated under the
> education law or the religious corporation law
> is deemed to be in its nature distinctly private.**
> No club that sponsors or conducts any amateur
> athletic contest or sparring exhibition and
> advertises or bills such contest or exhibition as a

> New York state championship contest or uses the
> words "New York state" in its announcements is a
> private exhibition within the meaning of this
> definition.

(Emphasis added).

267. Yeshiva University is not a "religious corporation" that is

exempt from § 8-107(4), pursuant to § 8-102.

268. YU is, and at all material times, has been, incorporated under

the New York Education Law.

269. YU's own Amendment to its Charter adopted December 15,

1967 provides that:

> 1. This corporation, incorporated as The Rabbi
> Isaac Eichanan Theological Seminary Association
> under the Membership Corporations Law of the
> State of New York on March 20, 1897, the name
> of which was subsequently changed by the
> Regents of the University of the State of New
> York to Yeshiva University, is hereby continued as
> an **educational corporation under the Education
> Law** of the State of New York ...
>
> ...
>
> 9. Yeshiva University is and continues to be
> organized and operated **exclusively for
> educational purposes ...**

(Emphasis added).

270.   YU's organizing documents do not expressly indicate that YU has a religious purpose.   To the contrary, YU organized itself as an "educational corporation" and for educational purposes, exclusively.

271.   YU's amended charter represented a departure from its initial charter which stated an exclusively religious purpose, to wit, "to promote the study of Talmud".

272.   Then, in 1967, YU amended its charter to state that it "is and continues to be organized and operated exclusively for educational purposes".

273.   In an April 27, 2021 letter from faculty members of YU's Benjamin N. Cardozo Law School to YU's President, Ari Berman, the authors emphasized that YU, "as a non-sectarian institution of higher education, must abide by the "proscriptions" contained "under federal, state, and city civil rights laws, all of which prohibit discrimination on the basis of sex[.]"

274.   Law professors within YU's own community have thus recognized that YU is not a religious corporation and is subject to the NYCHRL.

275.   While the 1965 NYCHRL excluded "colleges and universities" from classification as a place of public accommodation, in 1991 the New York City Council removed this exemption from the NYCHRL.   The NYCHRL thus applies to Yeshiva University.

276.   The legislative intent of the NYCHRL requires that any exemptions be narrowly construed in order to minimize discriminatory conduct.

277.   YU is a place of public accommodation as set forth in N.Y.C. Admin. Code § 8-107(4).

278.   N.Y.C. Admin. Code § 8-107(4) prohibits any entity which is a place of public accommodation, from discriminating against any person, through any of its agents or employees, on the basis of sex.

279.   For the reasons set forth above, pursuant to the NYCHRL, Plaintiff is entitled to recover compensatory damages from YU.

280.   YU's conduct, and the conduct of YU's agents and employees, was willful, malicious, shocking, outrageous, and negatively affected the emotional and physical health of Plaintiff, caused Plaintiff to suffer severe emotional distress and mental anguish, and gives rise to egregious emotional distress damages.

281.  YU engaged in discrimination against Plaintiff on the basis of sex with willful and wanton negligence or recklessness, as well as a conscious disregard of the rights of others, and/or engaged in conduct so reckless as to amount to such disregard.

282.  At all material times, Defendants had knowledge that their conduct towards Plaintiff, and their handling of her rape allegations, was in violation of city, state, and federal anti-discrimination laws.

283.  As a result of YU's violation of the NYCHRL, Plaintiff is entitled to punitive damages.

284.  Plaintiff, pursuant to N.Y.C. Admin. Code § 8-502(g), and related authority, also seeks and is entitled to receive all reasonable attorneys' fees, costs, and expenses, to be incurred in connection with her NYCHRL claims.

285.  Plaintiff is thus entitled to compensatory damages, including damages for her severe and extreme emotional distress, punitive damages, and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of her NYCHRL claims, from Defendant YU.

## COUNT FOUR:
## VIOLATION OF NYCHRL, N.Y.C. ADMIN. CODE § 8-107(7)
## "RETALIATION" (AGAINST YESHIVA UNIVERSITY)

286.   Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

287.   N.Y.C. Admin. Code § 8-107(7) ("Retaliation"), provides that "[i]t shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate against any person because such person has (i) opposed any practice forbidden under this chapter ...; (v) requested a reasonable accommodation under this chapter ..."

288.   As set forth above, Plaintiff opposed and complained about YU's discrimination against Plaintiff, which is a practice forbidden by the NYCHRL, and, on numerous occasions, requested reasonable accommodations from YU (i.e., with respect to her numerous requests for YU to implement reasonable security measures), and attempted to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct.

289.   YU, nonetheless, discriminated and retaliated, and continues to discriminate and retaliate, against Plaintiff by: (1) continuing to deprive her of a real, bona fide, fair, and impartial investigation of her rape allegations

against PERRY DOE; (2) continuing to deny her requests to appeal YU's "not responsible" determination with respect to PERRY DOE's conduct; and (3) continuing to deny her numerous requests for YU to provide her with reasonable accommodations and implement reasonable security measures at its Wilf Campus.

290.   Pursuant to § 8-107(7) of the NYCHRL, therefore, Plaintiff is entitled to receive compensatory damages from YU.

291.   YU's conduct, and the conduct of YU's agents and employees, was willful, malicious, shocking, outrageous, and negatively affected the emotional and physical health of Plaintiff, caused Plaintiff to suffer severe emotional distress and mental anguish, and gives rise to egregious emotional distress damages.

292.   YU engaged in retaliation and discrimination against Plaintiff by, *inter alia*, failing to conduct a real, bona fide, fair, and impartial investigation of her rape allegations against PERRY DOE, failing to provide Plaintiff with any ability to appeal YU's predetermined finding of "not responsible," and failing to provide Plaintiff with any reasonable accommodations, including implementing reasonable security measures at YU's Wilf Campus.

293.   YU thus engaged in retaliation and discrimination against Plaintiff on the basis of sex with willful and wanton negligence or recklessness, as well as a conscious disregard of the rights of others, and/or engaged in conduct so reckless as to amount to such disregard.

294.   At all material times, Defendants had knowledge that their conduct towards Plaintiff, and their retaliation and discrimination against her, was in violation of city, state, and federal anti-discrimination laws.

295.   As a result of YU's violation of § 8-107(7) of the NYCHRL, Plaintiff is entitled to punitive damages.

296.   Plaintiff, pursuant to N.Y.C. Admin. Code § 8-502(g), and related authority, also seeks and is entitled to receive all reasonable attorneys' fees, costs, and expenses, to be incurred in connection with her NYCHRL claims.

297.   Plaintiff is thus entitled to compensatory damages, including damages for her severe and extreme emotional distress, punitive damages, and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of her NYCHRL claims, from Defendant YU.

**COUNT FIVE:**
**VIOLATION OF NYCHRL, N.Y.C. ADMIN. CODE § 8-107(6),**
**"AIDING AND ABETTING" (AGAINST ANDREW "AVI" LAUER,**
**ESQ., CHAIM NISSEL, SEYFARTH SHAW, LLP, DOV**
**KESSELMAN, ESQ. AND EMILY MILLER, ESQ.)**

298. Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

299. N.Y.C. Admin. Code § 8-107(6) ("Aiding and Abetting"), provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

300. Plaintiff has valid claims for discrimination and retaliation against YU in violation of NYCHRL (Sections 8-107(4) and 8-107(7)).

301. As set forth above, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller each actively participated in, and had a direct and primary role with significant responsibilities, in YU's discrimination against Plaintiff in violation of § 8-107(4).

302. As set forth above, Defendants, Lauer, Nissel, Seyfarth, Kesselman, and Miller each actively participated in, and had a direct and primary role with significant responsibilities, in YU's retaliation and discrimination against Plaintiff in violation of § 8-107(7).

303. At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller, were in charge of, or had vital roles in YU's sham "investigation" as to Plaintiff's alleged rape by PERRY DOE.

304. At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller, were involved in YU's sham "investigation" as to Plaintiff's Title IX Complaint regarding her alleged rape by PERRY DOE, and participated in, developed, formulated and/or ratified said "investigation's" processes, procedures, rules, findings, conclusions, and determinations.

305. At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller intentionally and maliciously conducted, participated in, and/or ratified a sham investigation that (1) was specifically designed to shield and protect PERRY DOE from any serious consequences for his sexual harassment and sexual abuse of Plaintiff; and (2) retaliated against Plaintiff for making such charges against PERRY DOE by refusing to provide her with any supportive measures and refusing to permit Plaintiff to appeal YU's "not responsible" determination.

306. At all material times, therefore, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller "aided and abetted" Defendant YU's harm to Plaintiff's rights and interests in violation of § 8-107(6) of the NYCHRL.

307. For the reasons set forth above, pursuant to § 8-107(6) of the NYCHRL, Plaintiff is entitled to receive compensatory damages from Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller.

308.   The conduct of Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller was willful, malicious, shocking, outrageous, and negatively affected the emotional and physical health of Plaintiff, caused Plaintiff to suffer emotional distress and mental anguish, and gives rise to egregious emotional distress damages.

309.   Defendants, Lauer, Nissel, Seyfarth, Kesselman, and Miller aided and abetted YU's discrimination and retaliation against Plaintiff on the basis of her sex with willful and wanton negligence or recklessness, as well as conscious disregard of the rights of others, and/or engaged in conduct so reckless as to amount to such disregard.

310.   At all material times, Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller had knowledge that their conduct towards Plaintiff, and their willful participation in YU's sham investigation of Plaintiff's rape allegations, aided and abetted YU's violations of city, state, and federal anti-discrimination laws, in violation of § 8-107(6).

311.   As a result of Defendants Lauer, Nissel, Seyfarth, Kesselman, and Miller's violations of § 8-107(6) of the NYCHRL, Plaintiff is entitled to punitive damages.

312.   Plaintiff, pursuant to N.Y.C. Admin. Code § 8-502(g), and
related authority, also seeks and is entitled to receive all reasonable
attorneys' fees, costs, and expenses, to be incurred in connection with her
NYCHRL claims.

313.   Plaintiff is thus entitled to compensatory damages, including
damages for her severe and extreme emotional distress, punitive damages,
and reasonable attorneys' fees, costs, and expenses incurred in the
prosecution of her NYCHRL "aiding and abetting" claims, from Defendants
Lauer, Nissel, Seyfarth, Kesselman, and Miller.

## COUNT SIX:
## BREACH OF FIDUCIARY DUTIES (AGAINST
## YESHIVA UNIVERSITY and CHAIM NISSEL)

314.   Plaintiff repeats and realleges each of the above-stated
paragraphs of this Complaint as if fully set forth herein.

315.   Under New York law, a fiduciary relation exists between two
persons when one of them is under a duty to act or give advice for the
benefit of the other upon matters within the scope of relation.

316.   Here, at all material times, Plaintiff had a fiduciary relationship
(and special relationship), with YU and Defendant Nissel, and YU and
Defendant Nissel owed fiduciary duties to Plaintiff, because it is obvious
that Plaintiff relied on YU and Defendant Nissel and reasonably trusted YU

and Defendant Nissel to act reasonably, honestly, and fairly with respect to Plaintiff's participation in YU's educational programs and activities, and especially with respect to her participation in her Title IX Complaint to YU's Title IX Office following her rape by PERRY DOE.

317.   At all material times, the relationship between Plaintiff and YU and Defendant Nissel was one in which: (1) Plaintiff had extreme vulnerability to YU and Defendant Nissel, which (2) resulted in the empowerment of YU and Defendant Nissel, the stronger parties, by Plaintiff, the weaker party, (3) which empowerment had been solicited and accepted by YU and Defendant Nissel, and (4) prevented Plaintiff from effectively protecting herself with respect to her participation in YU's education programs and activities and YU's and Defendant Nissel's "investigation" and dismissal of her Title IX Complaint.

318.   To the extent that Plaintiff and YU had themselves engaged in a contract for Plaintiff to attend YU as a student, the fiduciary duties of YU arising from that contract were independent of that contract.

319.   At all material times, Plaintiff placed and reposed great trust and confidence in YU and Defendant Nissel and reasonably relied upon YU's and Defendant Nisel's superior expertise or knowledge with respect to the issues of Plaintiff's Title IX Complaint, YU's "investigation" of

Plaintiff's rape allegations, and the mandated rules, regulations, and procedures with respect thereto.

320.   At all material times, YU and Defendant Nissel owed duties to Plaintiff to fully disclose material facts related to the applicability of Title IX to her rape complaint and the blatant conflicts of interests and biases of the Seyfarth attorneys in favor of YU and PERRY DOE and against Plaintiff.

321.   YU and Defendant Nissel, by their aforesaid acts and omissions, including their failures to disclose to Plaintiff that Title IX was in fact applicable to her rape allegations, that all Title IX rules, regulations, and procedures should have governed and dictated the form and content of YU's investigation of Plaintiff's rape allegations, and that the Seyfarth attorneys (Seyfarth, Kesselman, and Miller) had glaring and obvious conflicts of interest and biases in favor of YU and PERRY DOE and against Plaintiff which should have disqualified them from serving as "investigators" of Plaintiff's rape complaint against PERRY DOE, breached their fiduciary duties to Plaintiff.

322.   As a direct and proximate result of YU's and Defendant Nissel's breach of fiduciary duties to Plaintiff, Plaintiff has suffered, and continues to suffer, severe emotional distress, mental anguish, and pain and suffering.

323.  At all material times, YU's and Defendant Nissel's conduct towards Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of Plaintiff's rights, interests, and welfare, and was seriously harmful to the public—which has a compelling interest in ensuring that college and university students within the community—including Plaintiff—be given a full and fair opportunity to enjoy the benefits of higher education free from fraud, retaliation (for reporting rape and sexual abuse), violations of her civil rights, and other gross misconduct.

324.  The aforesaid conduct of YU and Defendant Nissel entitles Plaintiff to receive punitive damages, as well as compensatory damages.

## COUNT SEVEN:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST EACH DEFENDANT)

325.  Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

326.  As described herein, the Defendants' conduct towards Plaintiff, a member in good-standing in a YU education program, who had the great misfortune of being raped and sexually abused by PERRY DOE, a YU undergraduate student, was extreme and outrageous.

327.   The Defendants' conduct against Plaintiff was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

328.   The Defendants' aforesaid conduct against Plaintiff, in which the Defendants conspired to cover-up Plaintiff's rape allegations, conducted a sham investigation that ignored probative evidence that supported Plaintiff's account of the incident, and rendered a preordained "not responsible" verdict against PERRY DOE, was intended to cause, or made with a disregard of the probability of causing, Plaintiff to suffer severe emotional distress.

329.   Plaintiff, in fact, suffered severe emotional distress as a direct and proximate result of the Defendants' aforesaid acts and omissions.

330.   By reason of the foregoing, and as a direct and proximate result of the Defendants' conduct, Plaintiff sustained physical and psychological injuries, including but not limited to, severe emotional distress, depression, humiliation, embarrassment, fright, anger, anxiety, and has been caused to suffer pain and mental anguish, emotional and psychological damage as a result thereof, and, upon information and belief, some or all of these injuries are of a permanent and lasting nature.

331.   At all material times, the Defendants' conduct towards Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of Plaintiff's rights, interests, and welfare, and was seriously harmful to the public—which has a compelling interest in ensuring that college and university students within the community—including Plaintiff—be given a full and fair opportunity to enjoy the benefits of higher education free from sexual assault, fraud, retaliation (for reporting rape and sexual abuse), violations of her civil rights, and other gross misconduct.

332.   The aforesaid conduct of the Defendants entitles Plaintiff to receive punitive damages, as well as compensatory damages.

## COUNT EIGHT:
## DECEPTIVE PRACTICES IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE ACTS AND PRACTICES) (AGAINST YESHIVA UNIVERSITY)

333.   Plaintiff repeats and realleges each of the allegations contained in this Complaint as if each said allegation has been set forth at length.

334.   New York General Business Law ("GBL") § 349 prohibits deceptive and misleading business practices, and its scope is broad.

335.   GBL § 349 on its face applies to virtually all economic activity.

336.   GBL § 349 applies to educational services and/or goods provided to educational consumers by private universities like YU.

337.  GBL § 349 thus encompasses a significantly wider range of deceptive business practices that were never previously condemned by decisional law.  Indeed, GBL § 349 was intended to be broadly applicable, extending far beyond the reach of common law fraud.

338.  At all material times, Plaintiff (as well as her parents) were consumers of educational services.

339.  At all material times, YU engaged in a broad-based marketing scheme, which was designed to induce Jewish students to enroll in, and complete, their post-secondary and graduate studies at YU.

340.  Said marketing scheme appealed, *inter alia*, to young Jewish women who lived in the New York tri-state area, as well as young Jewish women who lived in other states and abroad.

341.  The YU marketing scheme included each and every year from 2001 to 2020, YU's Security Reports for each campus at YU, including YU's Wilf Campus.

342.  At all material times, as stated above and otherwise, YU made material misrepresentations to Plaintiff (and her parents), as well as every other female student at YU, and thousands of prospective female students or applicants, by making false, deceptive, misleading, and fraudulent statements in its Security Reports as to the number and frequency of sex

crimes (i.e., rape and forcible fondling) that occurred on or near YU''s campuses, including YU's Wilf Campus.

343. Upon information and belief, at all material times, YU knew that the above representations were false in that, *inter alia:*

> (i) YU knew that numerous female students had been raped and/or sexually assaulted on or near YU's campuses (including YU's Wilf Campus) from 2001 through January 24, 2021.
>
> (ii) Many of these rapes and sexual assaults were reported to, and otherwise known by, YU and YU administrators and/or directors.
>
> (iii) YU and its administrators and directors made the craven but conscious decision to conceal their knowledge of these rapes and sexual assaults from female students at YU (including Plaintiff), parents, and thousands of prospective female students and applicants.
>
> (iv) YU knew that information on rapes and sexual assaults on or near YU's campuses (including Wilf Campus) would have had an impact on the decision of prospective students and students, including Plaintiff, to apply for

admission and enroll as students at YU, or to continue their studies at YU.

(vii)   YU and its administrators intended to misrepresent the safety of the school's campuses in order to induce female students (including Plaintiff) to enroll at YU and to induce students already enrolled at YU (including Plaintiff) to continue their studies at YU's undergraduate and graduate education programs.

344.   Each of YU's aforesaid misrepresentations was likely to mislead and deceive a reasonable consumer acting reasonably under the circumstances.

345.   YU's aforesaid conduct constitutes consumer-oriented conduct in that YU engaged in acts or practices that had and continue to have a broad impact on consumers at large, not just Plaintiff.

346.   Every female student who attended YU, and every prospective female student considering YU as her college or university program, was impacted by YU's aforesaid deceptive practices.  This is especially true of the numerous female students, from 2001 through 2022, who attended YU and were raped and sexually assaulted on or near YU's campuses, including YU's Wilf Campus.

347. Each of the aforesaid misrepresentations related to YU's campus safety, and prevalence of sex crimes on or near YU's campuses, was likely to mislead and deceive a reasonable consumer acting reasonably under the circumstances.

348. In determining what types of conduct may be deceptive practices under New York law, New York courts should apply an objective standard which asks whether the representation or omission was likely to mislead a reasonable consumer acting reasonably under the circumstances, taking into account not only the impact on the average consumer, but also on the vast multitude which the statutes were enacted to safeguard—including the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.

349. Here, YU took great pains, at great expense, to make sure that appearances and general impressions, buttressed by a bombardment of positive yet false representations about campus safety and sex crimes on or near YU's campuses, would lead a reasonable education consumer into thinking that YU provided female students a chance to obtain an exemplary post-secondary and/or graduate education, rooted in Jewish traditions, in a safe and nurturing environment.

350. YU thus engaged in "deceitful conduct" in violation of GBL §
349.

351. The aforesaid conduct of YU evinces a high degree of moral
culpability, was so flagrant as to transcend mere carelessness, constitutes
willful and wanton negligence or recklessness, and thus gives rise to
punitive damages.

352. Moreover, as a result of the YU's violation of GBL § 349,
Plaintiff is entitled to receive treble damages, compensatory damages, as
well as reasonable attorneys' fees, pursuant to GBL § 349 (h), and/or other
authority.

353. Plaintiff is entitled to receive compensatory damages against
YU, treble damages, punitive damages, and reasonable attorneys' fees, costs,
and expenses incurred in the prosecution of these claims.

## COUNT NINE:
## FALSE ADVERTISING IN VIOLATION OF NEW YORK
## GENERAL BUSINESS LAW § 350 (FALSE ADVERTISING)
## (AGAINST YESHIVA UNIVERSITY)

354. Plaintiff repeats and realleges each of the allegations contained
in this Complaint as if each said allegation has been set forth at length.

355.   New York General Business Law ("GBL") § 350 (False Advertising) prohibits false advertising "in the conduct of any business, trade or commerce or in the furnishing of any service."

356.   GBL § 350-a(1) defines false advertising as advertising that is "misleading in a material respect."

357.   Pursuant to the aforesaid acts and omissions, particularly with respect to the reporting of crimes that were published in YU's annual Security Reports, YU engaged in "false advertising" in violation of GBL § 350.

358.   The aforesaid conduct of YU evinces a high degree of moral culpability, was so flagrant as to transcend mere carelessness, constitutes willful and wanton negligence or recklessness, and thus gives rise to punitive damages.

359.   Moreover, as a result of the YU's violation of GBL § 350, Plaintiff is entitled to receive treble damages, compensatory damages, as well as reasonable attorneys' fees, pursuant to GBL § 349 (h), and/or other authority.

360.   Plaintiff is entitled to receive compensatory damages against YU, treble damages, punitive damages, and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of these claims.

## COUNT TEN:
## VIOLATION OF N.Y. EXECUTIVE LAW, § 296(7)
## (AGAINST YESHIVA UNIVERSITY)

361.   Plaintiff hereby repeats and realleges each of the allegations in

this Complaint as if each has been fully set forth at length.

362.   Claims under the New York Human Rights Law are evaluated

under the same standards as analogous claims under Title IX.

363.   New York Executive Law § 296(7) provides that:

> It shall be unlawful discriminatory practice for any person
> engaged in any activity to which this section applies to retaliate
> or discriminate against any person because he…has opposed
> any practice under this article or because he…has filed a
> complaint, testified or assisted in any proceeding under this
> article.

364.   Section 296(7) applies to "persons," which, pursuant to New

York Executive Law § 292(1), include "individuals, partnerships,

associations, corporations, legal representatives, trustees, trustees in

bankruptcy, or receivers."

365.   Defendant YU, moreover, is a "corporation" under New York

law.

366.   New York Executive Law § 296 prohibits any person, including

a school or university, from discriminating against any other person on the

basis of sex.

367.  For the reasons set forth above, YU discriminated and retaliated

against Plaintiff, in violation of New York Executive Law § 296(7), because,

*inter alia*, she opposed and complained of PERRY DOE's rape (which in

itself constituted discrimination and harassment), filed a formal complaint

against PERRY DOE with YU's Title IX Office, requested that YU

implement reasonable security measures at YU's Wilf Campus, and sought

to appeal YU's "not responsible" determination with respect to PERRY

DOE's conduct.

368.  Pursuant to New York Executive Law § 296(7), therefore,

Plaintiff is entitled to recover compensatory damages, including damages for

egregious emotional distress and mental anguish, from YU.

## COUNT ELEVEN:
## VIOLATION OF N.Y. EXECUTIVE LAW, § 296(4)
## (AGAINST YESHIVA UNIVERSITY)

369.  Plaintiff hereby repeats and realleges each of the allegations

contained in this Complaint as if each has been fully set forth at length.

370.  Claims under the New York Human Rights Law are evaluated

under the same standards as analogous claims under Title IX.

371.  New York Executive Law § 296(4) provides that:

> It shall be unlawful discriminatory practice for an
> educational institution . . . to permit the harassment
> of any student . . . by reason of her . . . sex or
> status as a victim of domestic violence[.]

372.   Section 296(4) applies to "educational institutions," which includes private colleges and universities, like Yeshiva University, which are not under the supervision of the regents of the State of New York and are not otherwise public schools.

373.   New York Executive Law § 296 prohibits any person, including a school or university, from discriminating against any other person on the basis of sex.

374.   For the reasons set forth above, in violation of New York Executive Law § 296(4), YU discriminated against Plaintiff on the basis of her sex and gender.

375.   Pursuant to New York Executive Law § 296(4), therefore, Plaintiff is entitled to recover compensatory damages, including damages for egregious emotional distress and mental anguish, from YU.

## COUNT TWELVE:
## VIOLATION OF NEW YORK EXECUTIVE LAW § 296(6) ("AIDING AND ABETTING"): AGAINST ANDREW "AVI" LAUER, ESQ., CHAIM NISSEL, SEYFARTH SHAW, LLP, DOV KESSELMAN, ESQ., and EMILY MILLER, ESQ.

376.   Plaintiff hereby repeats and realleges each of the allegations contained in this Complaint as if each has been fully set forth at length.