UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JANE DOE (A PSEUDONYM),

                     Plaintiff,                  No.: 1:22-CV-05405-PKC

    —against—

YESHIVA UNIVERSITY, ANDREW "AVI"
LAUER, ESQ., CHAIM NISSEL, SEYFARTH
SHAW, LLP, DOV KESSELMAN, ESQ., and
EMILY MILLER, ESQ.,

                     Defendants.
------------------------------------------------------------------X


**PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE
RESPECTIVE MOTIONS OF THE YESHIVA UNIVERSITY DEFENDANTS AND THE
<u>SEYFARTH DEFENDANTS TO DISMISS THE AMENDED COMPLAINT</u>**



                    Respectfully submitted,

                    **KEVIN T. MULHEARN, P.C.**

                    60 Dutch Hill Road
                    Suite 6B
                    Orangeburg, New York  10962
                    (845) 613-7059
                    kmulhearn@ktmlaw.net

                    *Attorneys for Plaintiff, JANE DOE*

                    On this 17th day of November, 2022

**TABLE OF CONTENTS**

**PAGES:**

**TABLE OF AUTHORITIES**                                                    v

**STATEMENT OF FACTS**                                                      1

    *Yeshiva University's "Official Policy" to Not Report Sexual*          1
    *Assaults in Violation of The Clery Act*

    *Plaintiff's Rape Allegations Against "PERRY DOE," a*                 2
    *Male Basketball Player for YU*

    *YU's $613 Million Fundraising Campaign Which Was*                   3
    *Underway at the Time of Plaintiff's Rape*

    *Plaintiff's Allegations Pertaining to the Defendants'*              4
    *"Investigation" of Her Rape Allegations*

    *Relevant Changes to Title IX Pursuant to the 2020*                  5
    *Title IX Regulations (the "Rule")*

**ARGUMENT**                                                               9

**I.    STANDARD OF REVIEW**                                               9

**II.   THRESHOLD JURISDICTIONAL ISSUES**                                  10

**III.  PLAINTIFF HAS SUFFICIENTLY PLED TITLE IX**                         11
    **CLAIMS AGAINST DEFENDANT YU**

    **A. THE 2020 TITLE IX REGULATIONS MANDATE THAT**                 11
    **THIS COURT USE THE "*GEBSER/DAVIS* FRAMEWORK"**
    **TO GUIDE ITS DETERMINATION AS TO WHETHER**
    **YU VIOLATED TITLE IX**

# <u>TABLE OF CONTENTS (cont.)</u>

**PAGES:**

**B. YU UNQUESTIONABLY FAILED TO COMPLY WITH**     14
**THE NEW RULE'S MANDATORY OBLIGATIONS FOR**
**A UNIVERSITY TO PROVIDE WRITTEN NOTICE TO A**
**COMPLAINANT OF THE DISMISSAL OF HER TITLE IX**
**CLAIM ALONG WITH THE SPECIFIC REASONS FOR**
**THE DISMISSAL**

**C. PLAINTIFF SUFFICIENTLY ALLEGES THAT HER RAPE**     16
**BY PERRY DOE IN HIS APARTMENT OCCURRED**
**WITHIN A YU "EDUCATION PROGRAM OR ACTIVITY"**
**—AS RECENTLY CLARIFIED BY THE U.S. DEPARTMENT**
**OF EDUCATION—BECAUSE AT THE TIME OF**
**PLAINTIFF'S RAPE, YU MAINTAINED BOTH**
**DISCIPLINARY CONTROL OVER PERRY DOE AND**
**REMEDIAL CONTROL OVER PLAINTIFF**

**D. PLAINTIFF SUFFICIENTLY ALLEGES THAT YU**     23
**VIOLATED TITLE IX BASED ON YU'S DELIBERATELY**
**INDIFFERENT RESPONSE TO PLAINTIFF'S RAPE**
**ALLEGATIONS AGAINST A FELLOW YU STUDENT**

   **1. The 2020 Title IX Regulations Support Plaintiff's**     23
      **Argument That YU Responded to Plaintiff's Sexual**
      **Harassment Complaint Against PERRY DOE With**
      **Actionable Deliberate Indifference**

   **2. A University That Permits an Accused Rapist to Remain**     24
      **on Campus, Without Imposing Any Restrictions,**
      **Regulations, or Security Measures That Would Protect**
      **His Alleged Student-Rape-Victim, May Be Deemed to**
      **Have Made the Alleged Student-Rape-Victim More**
      **Vulnerable to Sexual Harassment**

# TABLE OF CONTENTS (cont.)

**PAGES:**

**3. Plaintiff Has Sufficiently Alleged That YU's Failure to**              26
**Address Her Vulnerability to Continued Exposure to Her**
**Alleged Rapist on Campus, and Its Failure to Implement**
***Any* Security Measures in an Effort to Protect Her from**
**Him, Created a Hostile Educational Environment Which**
**Deprived Her of Educational Opportunities at YU**

**E. PLAINTIFF SUFFICIENTLY ALLEGES THAT YU**                              30
**VIOLATED TITLE IX PURSUANT TO PRE-ASSAULT**
**CONDUCT THAT MADE PLAINTIFF MORE**
**VULNERABLE TO RAPE: YU ADOPTED AN "OFFICIAL**
**POLICY" TO NOT REPORT SEXUAL ASSAULT ON**
**OR NEAR CAMPUS IN VIOLATION OF**
**THE CLERY ACT**

**IV.  PLAINTIFF HAS SUFFICIENTLY PLED AIDING AND**                        33
**ABETTING CLAIMS UNDER  THE NYCHRL AND NYSHRL**
**AGAINST THE SEYFARTH DEFENDANTS**

**A. THE SEYFARTH DEFENDANTS DO NOT DENY THAT**                           33
**THEY "DIRECTLY PARTICIPATED" IN THE**
**INVESTIGATION DIRECTED BY YU**

**B. PLAINTIFF SUFFICIENTLY ALLEGES THAT YU AND**                         35
**ITS ATTORNEY INVESTIGATORS ACTED  WITH A**
**DISCRIMINATORY MOTIVE**

**1. As The Second Circuit Recently Affirmed, A Plaintiff's**             37
**Burden To Plead Discriminatory Bias With Respect To A**
**Disciplinary Proceeding Is Minimal**

**2. The Seyfarth Defendants' "Explanation" As To Why They**             39
**Did Not Seek Plaintiff's Consent To Provide Them With**
**Access To Her Rape Kit Evidence (Including Photographs**
**That Depicted Bruises On Her Body) Is Preposterous**

## <u>TABLE OF CONTENTS (cont.)</u>

<u>PAGES:</u>

**3.  Plaintiff Sufficiently Pled That The Seyfarth Defendants     41
     Demonstrated A Bias Against Her On The Basis Of Sex By
     Unreasonably Favoring PERRY DOE Over Plaintiff In The
     Disciplinary Proceeding**

**CONCLUSION**                                                     45

# TABLE OF AUTHORITIES

**CASES:**                                                                                                          **PAGES:**

*Abdou v. Mahany*, 2021 U.S. Dist. LEXIS 120037 (SDNY 2021).        30

*Anderson News, LLC v. Am. Media. Inc.*,                                    10
    680 F.3d 162 (2d Cir. 2012).

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009).                                          9

*ATSI Commc'ns Inc. v. Shaar Fund Ltd.*,                                         9
    493 F.3d 87 (2d Cir. 2007).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).                            9

*Brown v. Arizona*, 23 F.4th 1173 (9th Cir. 2022).                         16, 18

*Brown v. Arizona*, 23 F.4th 11735 (9th Cir. 2022;                         18
    Fletcher, J., dissenting).

*Chase Grp. All., LLC v. City of New York Dept. of Fin., 620* F.3d         9
    146, (2d Cir. 2010).

*Chevron Corp. v. Donziger,* 325 F. Supp. 3d 371 (SDNY 2018).        30

*Cid v. ASA Inst. of Business and Computer Technology, Inc.*,            35
    2013 U.S. Dist. LEXIS 17458 (EDNY 2013).

*Crandell v. N.Y. College of Osteopathic Medicine*, 87 F.                25-26
    Supp. 2d 304 (SDNY 2000).

*Davis v. Monroe County Board of Educ.*, 526 U.S. 629 (1999).        13, 14,
                                                                                                         17, 21,
                                                                                                         24, 32

*Delisi v. Nat'l Assn. of Professional Women, Inc.*, 48 F.               34
    Supp. 3d 492 (EDNY 2014).

*Doe v. Baylor Univ.*, 240 F. Supp. 3d 646 (W.D. Tx. 2017).           30, 32

## <u>TABLE OF AUTHORITIES (cont.)</u>

| <u>CASES:</u> | <u>PAGES:</u> |
|---|---|
| *Doe v. Baylor Univ.*, 336 F. Supp. 3d 763 (W.D. Tx. 2018). | 31, 38, 42 |
| *Doe v. Board of Regents of Univ. Wisconsin*, 2021 U.S. Dist. LEXIS 212351 (W.D. Wis. 2021). | 37 |
| *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356 (SDNY 2015). | 38, 42-43 |
| *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016). | 38-43 |
| *Doe v. East Haven Board of Educ.,* 200 Fed. Appx. 46 (2d Cir. 2006). | 24-25 |
| *Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653 (SDNY 2020). | 14 |
| *Doe v. Univ. of Ill.*, 138 F.3d 653 (7th Cir. 1998). | 18 |
| *Doe v. Univ. of Memphis*, 2019 U.S. Dist. LEXIS 241446 (W.D. Tn. 2019). | 28-30 |
| *Doe v. Univ. of Scranton*, 2020 U.S. Dist. LEXIS 187526 (M.D. Pa. 2020). | 20 |
| *Dunson v. Tri-Maintenance and Contractors, Inc.*, 171 F. Supp. 2d 103 (EDNY 2001). | 33-35 |
| *Elias v. Rolling Stone LLC,* 872 F.3d 97 (2d Cir. 2017). | 9 |
| *Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004). | 34 |
| *Franklin v. Vertex Glob. Sols., Inc.*, 2022 U.S. Dist. LEXIS 23273 (SDNY 2022). | 34 |
| *Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978). | 44 |
| *Gallo v. Wonderly Co., Inc.*, 2014 U.S. Dist LEXIS 1004 (NDNY 2014). | 35 |

## <u>TABLE OF AUTHORITIES (cont.)</u>

**<u>CASES:</u>**                                                                                          **<u>PAGES:</u>**

*Gebser v. Lago Vista Independent School District*,                     13-14, 31
    524 U.S. 274 (1998).

*JD1 v. Canisius Coll.*, 2022 U.S. Dist. LEXIS 113451                     30-32
    (WDNY 2022).

*Karasek v. Regents of California*, 956 F.3d 1093 (9th Cir. 2020).       32

*Kelly v. Yale Univ.*, 2003 U.S. Dist. LEXIS 4543 (D. Conn. 2003).      14, 26, 30

*L.E. v. Lakeland Joint Sch. Dist. #272*, 403 F. Supp. 3d 388           26
    (D. Id. 2019).

*Lynch v. City of New York*, 952 F.3d 67 (2d Cir. 2020).                 10

*McGrath v. Dominican College*, 672 F. Supp. 2d 477                      2, 22
    (SDNY 2009).

*Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019).                  44

*Mohamed v. Marriott Int'l, Inc.*, 905 F. Supp. 141 (SDNY 1995).        33

*New York v. United States Dept. of Educ.*, 477 F.                      16-17
    Supp. 3d 279 (SDNY 2020).

*Palin v. N.Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019).                  9

*Roskin-Frazee v. Columbia Univ.*, 2018 U.S. Dist. LEXIS 28937          31
    (SDNY 2018).

*Tomka v. Seiler*, 66 F.3d 1295 (2d Cir. 1995).                          33-34

*Vengalattore v. Cornell Univ.*, 36 F.4th 87, (2d Cir. 2022).           43

**TABLE OF AUTHORITIES (cont.)**

**STATUTES AND REGULATIONS:**                                **PAGES:**

28 U.S.C. § 1331                                             10

34 C.F.R. § 106                                             6

34 C.F.R. § 106.30                                          6

34 C.F.R. § 106.44                                          6-8, 28

34 C.F.R. § 106.44(a)                                       24

34 C.F.R. § 106.44(c)                                       25

34 C.F.R. § 106.45                                          6-8, 14,16, 23, 35

34 C.F.R. § 106.45(a)                                       23, 28, 36

34 C.F.R. § 106.45(b)(3)(iii)                               12, 14

85 Fed. Reg. at 30026                                       6

85 Fed. Reg. at 30032                                       14

85 Fed. Reg. at 30197                                       9, 22

85 Fed. Reg. at 30198                                       8, 24

85 Fed. Reg. at 30199                                       8-9

85 Fed. Reg. at 30240                                       38

85 Fed. Reg. at 30292                                       40

85 Fed. Reg. at 30294                                       41

85 Fed. Reg. at 30597                                       6

**TABLE OF AUTHORITIES (cont.)**

**STATUTES AND REGULATIONS:**                    **PAGES:**

Federal Rule of Civil Procedure 12(b)(1)          1,10

Federal Rule of Civil Procedure 12(b)(6)          1, 9

New York City Administrative Code, § 8-107 ("NYCHRL")    4

New York City Administrative Code, § 8-107(6)     33-37

New York Executive Law § 296 ("NYSHRL")           4

New York Executive Law § 296(6)                   33-35

Title IX of the Education Amendments of 1972      *Et. Seq.*

The Jeanne Clery Disclosure of Campus Security Police    1, 6, 22
    and Campus Crime Statistics Act ("The Clery Act"),
    20 U.S.C. § 1092(f)

Violence Against Woman Reauthorization Act of 2013    6
    ("VAWA"), 34 U.S.C. §§ 12291(a)(10), 12291(a), or
    12291(a)(30)

Volume 85 of the Federal Register, No. 97, May 19, 2020,    6
    Non-Discrimination on the Basis of Sex in Education
    Programs or Activities Receiving Federal Financial
    Assistance," ("85 Fed. Reg.") at pp. 30026 to 30597
    (and codified at 34 C.F.R. pt. 106).

Plaintiff, JANE DOE (a pseudonym), by and through her attorneys, Kevin T. Mulhearn, P.C., hereby respectfully submits this Omnibus Memorandum of Law in Opposition to the Yeshiva University Defendants'[1] Motion to Dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) and in Opposition to the Seyfarth Defendants'[2] Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## STATEMENT OF FACTS

Plaintiff hereby incorporates by reference each of the facts asserted in her Amended Complaint, dated July 12, 2022 (Doc. No. 16).

*Yeshiva University's "Official Policy" to Not Report Sexual Assaults in Violation of The Clery Act*

The Jeanne Clery Disclosure of Campus Security Police and Campus Crime Statistics Act ("The Clery Act"), 20 U.S.C. § 1092(f), enacted on November 8, 1990, requires all colleges and universities that receive federal financial assistance to keep and disclose to the U.S. Department of Education (Department of Education"), on an annual basis, information about crimes—including sexual assaults—which occur on or near their campuses.  (Am. Compl. ¶¶ 29-35).

Since 2001, Yeshiva University ("YU") has adopted and implemented an official policy to not report to the Department of Education, or its own students, any and all sex crimes, including rape or nonconsensual fondling, that occurred on or near its campus for YU's undergraduate college for men (Wilf Campus).  YU reported ZERO forcible rapes or sexual assaults on or near its major campuses from 2001 to 2020.  (Am. Compl. ¶¶ 36-39).  YU'S false narrative of ZERO

---

[1] The "Yeshiva University ("YU") Defendants" are Yeshiva University, Andrew "Avi" Lauer, Esq. (YU's General Counsel), and Chaim Nissel (YU'S Title IX Coordinator).

[2] The "Seyfarth Defendants" are Seyfarth Shaw, LLP, and Dov Kesselman, Esq.   Plaintiff hereby withdraws all causes of action against Emily Miller, Esq.  As to Ms. Miller only, Plaintiff will shortly file a Notice of Voluntary Discontinuance, as well as a motion to amend the caption of this case.  Plaintiff also hereby provides notice to the Court that she is withdrawing her Intentional Infliction of Emotional Distress ("IIED") claims (Count VII) against the Seyfarth Defendants only.  (Plaintiffs' IIED claims remain against the YU Defendants).

rapes at the school for 20 years is, given the prevalence of sexual assaults at colleges and universities, virtually impossible. (*See* Am. Compl. ¶¶ 41-43).

From 2001 to present, numerous YU students have reported rapes and/or sexual assaults by other YU students on or near YU's Wilf Campus. (Am. Compl. ¶¶ 46-50). In 2018, at least one female YU student made a complaint to YU and its Title IX office and Chaim Nissel, YU's Title IX Coordinator, in which she alleged that she had been raped by a YU male student on or near campus. (Am. Compl. ¶ 47). YU nevertheless knowingly and fraudulently failed to report any of these sexual assault allegations, including the one made to its Title IX Office and Defendant Nissel in 2018—to the Department of Education or YU students (including Plaintiff) or prospective students, in its annual Security Reports or otherwise. (Am. Compl. ¶¶ 50-51). This conduct by YU constitutes a willful violation of The Clery Act. *See McGrath v. Dominican College*, 672 F. Supp. 2d 477, 491-92 (SDNY 2009) (this Court sustained fraud cause of action predicated upon college's deliberate choice to not comply with The Clery Act's sexual assault reporting requirements, which painted misleading picture of campus security and induced woman to enroll at the college where she was raped).

YU's calculated choice to adopt an official policy of Clery Act non-compliance, and to deceive and mislead the U.S. Department of Education, YU's female students, and all prospective female students, about sex crimes that have occurred on or near YU's campuses, has made every female student who has attended YU, from 2001 to present, including Plaintiff, more vulnerable to rape and/or sexual assault on or near YU's campuses. (Am. Compl. ¶¶ 54-55).

<u>*Plaintiff's Rape Allegations Against "PERRY DOE," a Male Basketball Player for YU*</u>

In January, 2021, Plaintiff JANE DOE was a full-time YU student-athlete (who played on a YU women's athletic team) (Am. Compl. ¶ 67). Plaintiff is female. On January 24, 2021,

Plaintiff went on a first date with "PERRY DOE" (a pseudonym), a full-time YU student-athlete who played on YU's highly successful Men's Basketball Team.  (Am. Compl. ¶ 66).  PERRY DOE is male.  That evening, when Plaintiff visited PERRY DOE in his off-campus residential apartment, PERRY DOE raped Plaintiff.  (Am. Compl. ¶ 77).

As Plaintiff resisted sexual contact, PERRY DOE was compelled to use physical force and violence to effectuate his rape of Plaintiff.  He grabbed her by the neck to hold her down and then forcefully pushed open her legs with a knee.  This conduct left discernible marks on Plaintiff's body:  a bruise on her neck and a deep bruise (which looked like a welt) on her inner thigh.  (Am. Compl. ¶¶ 81-87).  When she returned to her apartment after being raped, Plaintiff told several of her female roommates that she had been raped by PERRY DOE and also texted a male friend about the incident.  (Am. Compl. ¶¶ 91-92).

The next evening, January 25, 2021, Plaintiff went to Columbia Presbyterian Hospital for a rape exam.  (Am. Compl. ¶¶ 96-97).  On January 25, 2021, a nurse examiner at Columbia Presbyterian Hospital conducted a rape kit examination of Plaintiff.  The evidence collected included detailed photographs taken by the nurse examiner of the bruise on Plaintiff's neck and the bruise (welt) on Plaintiff's inner thigh.  (Am. Compl. ¶¶ 98-99).

### YU's $613 Million Fundraising Campaign Which Was Underway at the Time of Plaintiff's Rape

In 2019, YU embarked on the most aggressive and ambitious fundraising campaign in its history with a target fundraising goal of $613 Million.  (Am. Compl. ¶¶ 18-20).  On January 24, 2021, the day Plaintiff was raped, YU was still in the "quiet phase" of its campaign and had not yet made any public announcements about it.  (Am. Compl. ¶ 19).  In  2021,  YU's  Basketball Team, which included PERRY DOE, was on an unprecedented winning streak that garnered YU extraordinarily positive local, national and international media attention.  (Am. Compl. ¶ 22).

In late 2021, YU capitalized on its Basketball Team's high profile and featured that wildly successful team in its public roll-out of YU's unprecedented fundraising campaign. (Am. Compl. ¶ 23). When Plaintiff made her formal complaint of sexual harassment (through PERRY DOE's sexual assault) on or about February 18, 2021 (Am. Compl. ¶¶ 110-112), YU, Defendant Lauer (YU's General Counsel), and Defendant Nissel (YU's Title IX Coordinator), recognized that Plaintiff's rape allegations against PERRY DOE—if substantiated and publicized—"would cause the University to suffer significant negative publicity" that could harm YU's finances by hindering YU's "values-based" fundraising effort. (Am. Compl. ¶¶ 21).

Thereafter, the YU Defendants, in cooperation with its long-time litigation counsel, Seyfarth Shaw, LLP, and its attorneys, Defendant Kesselman and Emily Miller, conspired to conduct a "sham investigation" of Plaintiff's rape complaint with a pre-determined "not responsible" outcome. (Am. Compl. ¶ 25).

*Plaintiff's Allegations Pertaining to the Defendants' "Investigation" of Her Rape Allegations*

The Amended Complaint alleges that both the YU Defendants and the Seyfarth Defendants conducted and directly participated in a "sham investigation" of Plaintiff's rape allegations against PERRY DOE which constituted violations of federal (Title IX), state (NYSHRL), and local (NYCHRL) laws which prohibit discrimination on the basis of sex.

Plaintiff alleges that she made a formal Title IX complaint of her rape to YU administrators on or about February 18, 2021. (Am. Compl. ¶ 111). Thereafter, the YU Defendants and the Seyfarth Defendants conspired to conduct a sham investigation with a predetermined "not responsible" outcome. (Am. Compl. ¶ 25). On or before March 4, 2021, the Defendants promptly dismissed Plaintiff's Title IX complaint apparently because it occurred off-campus and, in their view, was outside of any YU education program or activity. (Am. Compl. ¶¶ 117, 153).

The Defendants failed to provide written notice to Plaintiff—who had no attorney—that it had dismissed her Title IX complaint—and failed to provide Plaintiff with written notice of the reasons for YU's dismissal of her Title IX complaint.  (Am. Compl. ¶ 218(1) & (2)).   The Defendants also failed to notify Plaintiff that the Seyfarth attorneys had blatant conflicts of interest based on the firm's long-time role as YU's counsel in sex abuse cover-up litigation and the lead attorney's (Dov Kesselman, Esq.) status as a member of YU's General Counsel's Council—in which he affirmed that he "believed in the mission" of YU.  (Am. Compl. ¶ 134).

The "sham" nature of the Seyfarth attorneys' "investigation" of Plaintiff's rape complaint was manifested by the Seyfarth attorneys' failures:  (1) to seek Plaintiff's consent to speak with the Columbia Presbyterian Hospital nurse examiner who conducted Plaintiff's rape kit examination on January 25, 2021 (Am. Compl. ¶ 187), (2) to seek Plaintiff's consent for the Seyfarth attorneys to obtain access to the rape kit photographs which depicted the bruises on Plaintiff's body (her neck and inner thigh) that were inflicted by PERRY DOE during the commission of his rape (Am. Compl. ¶¶ 185-186); and (3) to interview Plaintiff's two roommates with whom she spoke about the rape the same night it occurred.  (Am. Compl. ¶¶ 91, 218(10).[3]

On May 26, 2021, YU issued its decision which declared that it had concluded that PERRY DOE was not responsible for "sexual assault" in violation of YU policies.  (Am. Compl. ¶ 191). Thereafter, for several months, Plaintiff tried, to no avail, to appeal YU's determination based upon unexamined evidence: the rape kit evidence and photographs.  (Am. Compl. ¶¶ 196-198).

_Relevant Changes to Title IX Pursuant to the 2020 Title IX Regulations (the "Rule")_

On August 14, 2020, the U.S. Department of Education adopted a number of new regulations which substantially changed the Title IX landscape for colleges and universities. These

---

[3] Plaintiff specifically identified these two witnesses to the Seyfarth attorneys.  (Am. Comp. ¶ 218(10)).

regulations were effective as of August 14, 2020 and were memorialized in Volume 85 of the Federal Register, No. 97, May 19, 2020, "Non-Discrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," ("85 Fed. Reg.") at pp. 30026 to 30597 (and codified at 34 C.F.R. pt. 106) (*i.e.*, the "Rule").

The Rule created a three-pronged definition of sexual harassment that includes conduct on the basis of sex that satisfies any one of the following criteria: (1) *quid pro quo* sexual harassment; (2) "Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [school's] education program or activity;" or (3) "sexual assault," as defined by The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("The Clery Act"), 20 U.S.C. § 1092 (f), or "dating violence," as defined in the Violence Against Woman Reauthorization Act of 2013 ("VAWA"), 34 U.S.C. §§ 12291(a)(10), 12291(a), or 12291(a)(30). (34 C.F.R. § 106.30(a)).

In the context of sexual harassment, moreover, the Rule defines "education program or activity" to include "locations, events, or circumstances over which the [school] exercised substantial control over both the respondent and the context in which the sexual harassment occurs." (34 C.F.R. § 106.44(a)).

The Rule also provides that:

> (1)    A school "must investigate the allegations in a formal complaint" by a student who alleges sexual harassment. (34 C.F.R. § 106.45(b)(3)).

> (2)    "Formal complaint" means "a document filed by a complainant or signed by the Title IX Coordinator alleging sexual harassment against a respondent [the accused person] and requesting that the [school] investigate the allegation of sexual harassment … A formal complaint may be filed with the Title IX Coordinator in person, by mail, or by electronic mail … [or] by any additional method designated by the [school]." (34 C.F.R. § 106.30(a)).

(3)    "In response to a formal complaint, a [school] must follow a grievance process that complies with [34 C.F.R. § 106.45]." (34 C.F.R. § 106.44).

(4)    If the conduct alleged in a student's formal complaint "did not occur in the [school's] education program or activity," "then the [school] must dismiss the formal complaint with regard to that conduct for purposes of sexual harassment under Title IX or [34 C.F.R. § 106.45]." (34 C.F.R. § 106.45(b)(3)(i)).

(5)    "Upon a dismissal required or permitted under [34 C.F.R. § 106.45(b)(i) …, *a [school] must promptly send written notice of the dismissal and reason(s) therfor simultaneously to the parties.*" (34 C.F.R. § 106.45(b)(3)(iii) (emphasis added)).

(6)    Upon receipt of a sexual harassment complaint from a student, "a [school's] response *must* treat complainants and respondents equitably by offering supportive measures as defined in [34 C.F.R.] §106.30 to a complainant and by following a grievance process that complies with [34 C.F.R. § 106.45] before" imposing any disciplinary sanctions against respondent. (34 C.F.R. § 106.44(a) (emphasis added)).

(7)    Upon receipt of a sexual harassment complaint from a student, the "Title IX Coordinator *must* promptly contact the complainant to discuss the availability of supportive measures as defined in [34 C.F.R.] § 106.30, consider the complainant's wishes with respect to supportive measures, inform the complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing a formal complaint." (34 C.F.R. § 106.44(a)).

(8)    The Rule defines "supportive measures" as follows: "*Supportive Measures* means non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such supportive measures are designed to restore or preserve equal access to the [school's] education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the [school's] educational environment, or deter sexual harassment." (34 C.F.R. § 106.44(a)).

(9)    "Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of

work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures." (*Id.*)

(10)    "Nothing in this part [34 C.F.R. § 106.44] precludes a [school] from removing a respondent from the [school's] education program or activity on an emergency basis, provided that the [school] undertakes an individualized safety and risk analysis, determines that an immediate threat to the physical health or safety of any student … arising from the allegations of sexual harassment justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal." (34 C.F.R. § 106.44(c)).

(11)    A school's grievance process must, *inter alia*, "[r]equire an objective analysis of all relevant evidence—including both inculpatory and exculpatory evidence …" (34 C.F.R. § 106.45(b)(ii)).

With respect to on-campus and off-campus distinctions for alleged sexual harassment based upon sexual assault, the Rule further provides:

(1)    The [DOE] reiterates that "off campus" does not automatically mean that the incident occurred outside the [school's] education program or activity. (85 Fed. Reg. at 30198).

(2)    The [DOE] reiterates that the final regulations do not impose a geographic test or draw a distinction between on-campus misconduct and off-campus misconduct. (*Id.*)

(3)    [E]ven if a situation arises off campus it may still be part of the [school's] education program or activity if the [school] exercised substantial control over the context and the alleged harasser. (*Id.* at 30199 n. 875).

The 2020 Title IX Regulations specifically provide that Title IX may be applicable when—as here—a sexual assault occurred in a student's off-campus residential apartment:

(1)    While such situations may be fact specific, [schools] must consider whether, for example, a sexual harassment incident that occurs between two students that occurs in an off-campus apartment … is a situation over which the [school] exercised substantial control; if so, the [school] must respond when it has actual knowledge of

sexual harassment or allegations of sexual harassment that occurred there.  (*Id.*)

(2)     In the context of sexual assault incidents that occur in a student's off-campus apartment, the Department of Education now mandates that a court's determination as to whether the school exercised the requisite "substantial control" to trigger Title IX must be "fact specific" (*Id.*) and that "*no single factor is determinative* [as to] whether a [school] exercised substantial control over the … accused harasser … and the context in which the harassment occurred." (*Id.* at 30197) (emphasis added).  This fact-sensitive issue is thus extraordinarily ill-suited for summary disposition.

## ARGUMENT

## I.   STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6) the Court must accept as true all well-pleaded factual allegations and draw all inferences in plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809-10 (2d Cir. 2019) (*quoting*, *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All., LLC v. City of New York Dept. of Fin.,* 620 F.3d 146, 150 (2d Cir. 2010).   To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (*quoting*, *Twombly*, 550 U.S. at 555).

A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (*citing*, *Twombly*, 550 U.S. at 556). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."

*Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (*quoting*, *Anderson News, LLC v. Am. Media. Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)).

Under this standard, Plaintiff's claims against both the Yeshiva Defendants and the Seyfarth Defendants race past the line of "plausibility." Each of Plaintiff's claims—to the extent they are challenged by Defendants in their respective motions to dismiss—should survive.

## II.   <u>THRESHOLD JURISDICTIONAL ISSUES</u>

Plaintiff alleges that this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiff has sufficiently raised several federal questions as to whether Yeshiva University violated Title IX. The Yeshiva University Defendants ("YU Defendants") argue that this case should be dismissed pursuant to Rule 12(b)(1) because this Court lacks subject matter jurisdiction over Plaintiff's claims. (YU Defendants' Brief at 11, 12-16). That argument depends entirely on the false premise that Plaintiff's Title IX claims against YU are deficient as a matter of law. As Plaintiff has sufficiently pled Title IX claims against YU for discrimination based on sex (Count I) and Retaliation (Count II), this Court has "federal question: Jurisdiction pursuant to 28 U.S.C. § 1331.

The YU Defendants also argue that the Complaint fails to allege diversity jurisdiction. As suggested in Plaintiff's September 21, 2022 pre-motion letter to the Court (Doc. No. 33 at 2), Plaintiff is no longer asserting diversity jurisdiction as an alternative ground for the Court to assert subject matter jurisdiction over this dispute. This issue is thus now entirely moot.

The YU Defendants further argue that if this Court dismisses Plaintiff's Title IX claims against YU, it should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. (YU Brief at 21-22). On this narrow point, Plaintiff does not disagree.

### III.   PLAINTIFF HAS SUFFICIENTLY PLED TITLE IX CLAIMS AGAINST DEFENDANT YU

The Amended Complaint pleads that Yeshiva University violated Title IX by discriminating against her on the basis of sex  (Count I) (Am. Compl. ¶¶ 200-220) and retaliation (Count II) (Am. Compl. ¶¶ 241-256).   Plaintiff alleges that YU violated Title IX in three distinct ways:  (1) after Plaintiff made a formal Title IX Complaint which notified YU administrators that a fellow YU student, PERRY DOE, had raped her in his off-campus apartment, YU failed to comply with Title IX's mandatory grievance procedures (Am. Compl ¶ 218); (2) YU was deliberately indifferent to Plaintiff's rape allegations by exposing Plaintiff to a potential encounter with her rapist—by providing PERRY DOE with unfettered, unrestricted and unregulated access to YU's Wilf Campus and by denying Plaintiff's repeated requests for reasonable security measures that would protect Plaintiff from PERRY DOE at YU's Wilf Campus (Am. Compl. ¶¶ 140-149, 208, 218); and (3) YU adopted an "official policy" (beginning in 2001) to not report sexual assaults on or near campus in violation of The Clery Act's annual reporting mandate, which made YU's female students, including Plaintiff, more vulnerable to being raped by a fellow YU student (such as PERRY DOE) (Am. Compl. ¶¶ 29-55, 394-415).

The YU Defendants confine their attack of Plaintiff's Title IX claims to but one argument: Yeshiva University did not have control over the context in which Plaintiff's sexual harassment occurred.  (YU Brief at 12-16).  The YU Defendants argue *exclusively* that Title IX is inapplicable because PERRY DOE's alleged rape of Plaintiff on January 24, 2021 took place in his off-campus residential apartment:  "*Plaintiff has failed to allege any facts … demonstrating that Yeshiva University had any control over [PERRY DOE's] apartment or that their date was in any way connected to any school sponsored activity.*"  (YU Brief at 12) (emphasis added).

This is the YU Defendants' *only* substantive legal argument that attacks the legal sufficiency of Plaintiffs' Title IX claims (or, for that matter, the legal sufficiency of any of the state law claims asserted by Plaintiff against the YU Defendants). The YU Defendants ignore the Amended Complaint's well-pled allegations which invoke Title IX based on YU's failure to provide Plaintiff with written notice (or any notice) of YU's dismissal of her formal Title IX Complaint (Am. Compl. ¶¶ 171, 218(1) & (2)), YU's alleged post-assault deliberate indifference to Plaintiff's rape allegations (Am. Compl. ¶¶ 206-220), and YU's adoption of an official policy to violate The Clery Act's sexual assault reporting obligations. (Am. Compl. ¶¶ 29-55).

Plaintiff's Title IX claims against YU should thus survive the YU Defendants' motion to dismiss for four reasons: (1) there can be no reasonable dispute that YU failed to comply with the Title IX grievance procedures as set forth in the 2020 Title IX Regulations, because, upon receiving Plaintiff's formal Title IX Complaint on or about February 18, 2022, YU summarily dismissed her Title IX claim without providing her with either written notice of the dismissal or the alleged reasons for the dismissal[4]; (2) the 2020 Title IX Regulations, which address when an off-campus sexual assault of a student by another student takes place within the school's "education program or activity" to the extent necessary to trigger Title IX's grievance procedures, clarify that a school is responsible for the "context of harassment" that occurs in a student's off-campus apartment when, as here, the school maintains disciplinary *and* remedial control and authority over both the harasser and the victim; (3) a university is responsible under Title IX for its deliberate indifference to a complainant's sexual assault allegations (even for sexual assaults

---

[4] Plaintiff alleges that YU did not notify Plaintiff that it did not treat Plaintiff's rape complaint as a Title IX matter, and did not comply with Title IX's rules, regulations, and procedures, until November, 2021, months after YU had completed its "investigation" and reached its pre-ordained "not responsible" determination. (Am. Compl. ¶¶ 150-153). As YU does not dispute these pinpoint allegations, it tacitly admits to violating 34 C.F.R. § 106.45(b)(3)(iii).

that occurred off-campus) where the university unreasonably exposes a student to further on-campus encounters with her alleged rapist and creates a hostile educational environment which deprives the victim of educational opportunities provided by the university; and (4) YU is responsible for its pre-assault conduct—its adoption of an "official policy" to not report sexual assaults on or near campus in violation of The Clery Act—which made Plaintiff vulnerable to being raped by PERRY DOE in his off-campus apartment.

Each of these reasons, standing alone, is sufficient for Plaintiff's Title IX claims to survive. Taken together, Plaintiff has established a compelling, multi-pronged basis for this Court to reject the YU Defendants' threshold challenge to Plaintiff's Title IX claims.

A. **THE 2020 TITLE IX REGULATIONS MANDATE THAT THIS COURT USE THE "*GEBSER/DAVIS* FRAMEWORK" TO GUIDE ITS DETERMINATION AS TO WHETHER YU VIOLATED TITLE IX**

In 1998, in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), the Supreme Court analyzed the conditions under which a school district will be liable for an employee sexually harassing a student. *Gebser* held that where a school has actual knowledge of an employee sexually harassing a student but responds with deliberate indifference to such knowledge, the school itself has engaged in discrimination which subjects it to Title IX liability. *Id.* at 290. The following year, in 1999, in *Davis v. Monroe County Board of Educ.*, 526 U.S. 629 (1999), the Supreme Court held that where sexual harassment is committed by a fellow student rather than a school employee, the same standards of actual knowledge and deliberate indifference apply. *Id.* at 650. The *Davis* Court also crafted a standard for when conduct becomes actionable sexual harassment under Title IX: "[F]unding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of

access to the educational opportunities or benefits provided by the school." *Id.*[5]

In the 2020 Title IX Regulations, the Department of Education referred to the "*Gebser/Davis* framework," which consists of the Supreme Court's definitions in those cases of "actionable sexual harassment, the school's actual knowledge, and the school's deliberate indifference." (85 Fed. Reg. at 30032). The Department emphasized the primacy of such *Gebser/Davis* framework in any Title IX analysis: "The *Gebser/Davis* framework is the starting point for ensuring that the Department's Title IX regulations recognize the conditions under which a school's response to sexual harassment violates Title IX." (*Id.*).

**B.   YU UNQUESTIONABLY FAILED TO COMPLY WITH THE NEW RULE'S MANDATORY OBLIGATIONS FOR A UNIVERSITY TO PROVIDE WRITTEN NOTICE TO A COMPLAINANT OF THE DISMISSAL OF HER TITLE IX CLAIM ALONG WITH THE SPECIFIC REASONS FOR THE DISMISSAL**

The Department of Education expressly provided in the new Rule that if a university receives a sexual assault complaint from a student and thereafter makes a threshold determination that the conduct alleged occurred outside a school's education programs or activities, the university *must* dismiss the student's Title IX complaint and promptly provide written notice of both the dismissal and the reasons for the dismissal to both the complainant and the respondent. (34 C.F.R. § 106.45(b)(3)(iii)). This is now a mandatory obligation under Title IX; it is not a mere option or suggestion. (*See* 85 Fed. Reg. at 30290).

The Amended Complaint alleges that:

(1)   Plaintiff made a formal complaint of her sexual harassment to YU on or about February 18, 2021 (Am. Compl. ¶¶ 110-113, 116-117).[6]

---

[5] *See Kelly v. Yale Univ.*, 2003 U.S. Dist. LEXIS 4543, *8-9 (D. Conn. 2003) ("there is no question that a [single] rape … constitutes severe and objectively offensive sexual harassment under the standard set forth in *Davis*".).

[6] The "formal complaint" requirement for Title IX sexual harassment cases contains a flexible, subjective element. *See Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 666 (SDNY 2020) (when plaintiff left a meeting with college administrators "with the belief that a formal complaint [had been] made and [college] would investigate the assault,"

(2)     YU through Defendant Lauer and Defendant Nissel, coordinated YU's response to Plaintiff's formal Title IX Complaint, and treated her complaint as a non-Title IX disciplinary matter, and thus dismissed her Title IX Complaint at the outset of its "investigation" of her rape allegations.  (Am. Compl. ¶¶ 150-153).

(3)     YU failed to provide Plaintiff with notice of its dismissal of her formal Title IX Complaint.  (Am. Compl. ¶¶ 218(1)).

(4)     YU failed to provide Plaintiff with the reasons for its dismissal of her formal Title IX Complaint.  (Am. Compl. ¶¶ 218(2)).

(5)     During its "investigation," YU never notified Plaintiff that it had dismissed Plaintiff's formal Title IX Complaint because she alleged that PERRY DOE had raped her off-campus.  (Am. Compl. ¶ 153).

(6)     YU never told Plaintiff that it had made a threshold determination that Plaintiff's rape did not take place with any YU "education program or activity."  (Am. Compl. ¶¶ 171, 218(1) & (2)).

(7)     YU failed to provide its YU Coordinator (Defendant Lauer) *and* designated investigators (the Seyfarth attorneys) with the requisite training as to the scope of YU's education programs or activities.  (Am. Compl. ¶¶ 218(4) & (5)).

The YU Defendants do not even attempt to refute any of these averments.  They do not deny that Plaintiff made a formal Title IX Complaint to YU administrators with remedial authority on or about February 18, 2022.  They admit that YU dismissed Plaintiff's Title IX claim because they determined at the outset that her rape at PERRY DOE's off-campus apartment did not occur within any university "education program or activity."  (YU Brief at 9).  They do not deny that the

---

and college administrators provided plaintiff with no information or instructions regarding formal complaint requirements, this court rejected college's argument that plaintiff had not filed a formal complaint.).,

YU Defendants never sent Plaintiff any written notice that specifically informed her that YU had dismissed her Title IX Complaint.  They do not deny that during its "investigation" YU never sent Plaintiff any notice, written or otherwise, which informed her of the reasons for YU's dismissal of her Title IX Complaint or notified her that YU had determined that her rape had not occurred within any YU "education program or activity" because it took place off-campus.  They do not deny that YU never provided any training as to the "program or activity" parameters for Title IX claims to either any of the YU Defendants or any of the Seyfarth Defendants.

The YU Defendants do not and cannot make any non-frivolous argument that YU complied with its mandatory Title IX obligations as memorialized in 34 C.F.R. § 106.45(b)(3)(iii), with respect to its stealth dismissal of Plaintiff's Title IX Complaint.  For this reason alone, this Court should deny the YU Defendants' motion to dismiss Plaintiff's Amended Complaint.

**C.**    **PLAINTIFF SUFFICIENTLY ALLEGES THAT HER RAPE BY PERRY DOE IN HIS APARTMENT OCCURRED WITHIN A YU "EDUCATION PROGRAM OR ACTIVITY"—AS RECENTLY CLARIFIED BY THE U.S. DEPARTMENT OF EDUCATION—BECAUSE AT THE TIME OF PLAINTIFF'S RAPE, YU MAINTAINED BOTH DISCIPLINARY CONTROL OVER PERRY DOE AND <u>REMEDIAL CONTROL OVER PLAINTIFF</u>**

The YU Defendants assert that *Brown v. Arizona*, 23 F.4th 1173 (9th Cir. 2022), "appears to be the first decision directly deciding the applicability of Title IX to off-campus conduct involving a student athlete since the 2020 Regulations were enacted."  (YU Brief at 15).  This is a misleading statement.  As *Brown* involved a state university's response to alleged off-campus sexual assaults that took place *in 2016*, *id.* at 1176-77, the 2020 Title IX Regulations (which were not retroactive) had no bearing on that case.  *Brown* made no mention of these new regulations.

This is a distinction that makes a difference as it is uncontroverted that the Department of Education's 2020 Title IX Regulations redefined the "program or activity" requirement for Title IX cases in a manner within its statutory authority.  *See New York v. United States Dept. of Educ.*,

477 F. Supp. 3d 279, 295 & 299 (SDNY 2020) ("The DOE … concluded that the Rule and the Supreme Court's approach to "program or activity" in the context of Title IX should be aligned." *Id.* at 294-95 (*quoting, Davis*, 526 U.S. at 644 (""[t]he statute's plain language' prohibiting any person from being 'subject[ ] to discrimination' 'confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs.'")).

This case is one of first impression, not just in the Second Circuit, but in the entire United States, as it presents an issue that has not yet been decided in any federal court:  do the 2020 Title IX Regulations modify a court's analysis as to whether a college or university exercises substantial control over both the harasser *and the context in which the known harassment occurs?*

Plaintiff submits, respectfully, that they do.

As the Department of Education explained, the key Supreme Court case which discusses the "education program or activity" requirement in a student-on-student sexual harassment case is *Davis v. Monroe Cty. Board of Educ.*, 526 U.S. 629 (1999).  The plaintiff in *Davis* had been sexually harassed by another student at the school.  *Id.* at 646.  The Supreme Court limited a school's liability for student-on-student sexual harassment to circumstances where the school "exercises substantial control over the harasser and the context in which the known harassment occurs."  *Id.* at 644-45 ("If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at minimum, "cause [students] to undergo" harassment or "*make them liable or vulnerable" to it*.) (emphasis added; citations omitted).

While the *Davis* Court did not define "context" its meaning may be inferred from several passages in its opinion.  First, the Supreme Court explained that where the harassment occurs

"during school hours and on school grounds," the misconduct takes place "under" an "operation" of the school. *Id.* at 646. Second, the Supreme Court cited with approval *Doe v. Univ. of Ill.*, 138 F.3d 653 (7th Cir. 1998), in which the Seventh Circuit had "[found] liability where [the] school fail[ed] to respond properly to student-on-student sexual harassment that takes place while the students are involved in school activities *or otherwise under the supervision of school employees.*" *Davis*, 526 U.S. at 646 (*quoting, Doe v. Univ. of Ill.*, 138 F.3d at 661) (emphasis added)).

The Supreme Court thus summarized the applicable law: "We … conclude that recipients of federal funding may be liable for "subject[ing] their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student harassment *and the harasser is under the school's disciplinary authority.*" *Id.* at 646-47 (emphasis added).

The Hon. William A. Fletcher, a distinguished jurist and former law professor at the University of California, Berkeley, in his dissenting opinion in *Brown v. Arizona*, 23 F.4th 1173, 1184-95 (9th Cir. 2022; Fletcher, J., dissenting), correctly stated that *Davis* makes clear that "while the physical location of the harassment can be an important indication of the school's control over the "context" of the alleged harassment, *the key consideration is whether the school has disciplinary authority over the harasser in the setting in which the harassment takes place.*" *Id.* at 1191 (*citing, Davis,* 526 U.S. at 644) ("Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference *where it lacks the authority to take remedial action.*") (emphasis added).

Judge Fletcher further explained that such a setting—where a school maintains control because of its retained authority to take remedial action—could be a "school playground … an off-campus field trip, an off-campus research project … or "*an off-campus residence for which the*

*school pays the rent and where students reside with permission of the school*." *Id.* at 1191 (emphasis added). Accordingly, "[i]f the harassment occurs in such a setting—that is, in a "context" over which the institution has substantial control—the institution may be held liable for deliberate indifference under Title IX even though the harassment takes place off the physical property of the institution." *Id.*

Here, Plaintiff alleges, upon information and belief,  that YU retained control over the setting (PERRY DOE's apartment) of Plaintiff's harassment for numerous reasons:

(1)      "PERRY DOE was a member of the [YU] Varsity Basketball Team and in such capacity as a YU student-athlete, subject to additional [YU] policies and rules which provided Yeshiva University with control and authority over him and his activities to a much greater extent than Yeshiva University normally exercised over its students." (Am. Compl. ¶ 66).

(2)      "[A]s Plaintiff was a student-athlete at YU, she was entitled to certain protections and rights from YU that were not normally afforded to non-student-athletes at YU." (Am. Compl. ¶ 67).

(3)      PERRY DOE was an F-1 Visa foreign student who attended Yeshiva University pursuant to an F-1 Student Visa. (Am. Compl. ¶ 68). PERRY DOE's status as a foreign student was conditioned upon, *inter alia*, his continued enrollment as a full-time student in an academic education program at Yeshiva University, . . . and his ability to maintain sufficient funds for his self-support. (Am. Compl. ¶ 69).

(4)      "[I]n 2021, Yeshiva University paid all or some of PERRY DOE's rent for his Washington Heights apartment." (Am. Compl. ¶ 71). "[W]ithout YU's financial assistance, PERRY DOE could not have afforded to reside in his apartment and would thus not have been able to attend YU." (Am. Compl. ¶ 72). Moreover, "YU expressly provided PERRY DOE with

permission and authorization to reside in his Washington Heights apartment.  PERRY DOE would not have been able to rent his Washington Heights apartment without YU's expressed permission, approval, and direct involvement and facilitation."  (Am. Compl. ¶ 73).[7]

(5)     The landlord of PERRY DOE's Washington Heights apartment has a policy and practice of not renting apartments to persons under 21-years-old, unless they are students at Yeshiva University.  (Am. Compl. ¶ 74).  The landlord of PERRY DOE's Washington Heights apartment also has a policy and practice of not renting apartments to non-citizens of the United States, unless they are students at Yeshiva University.  (Am. Compl. ¶ 75).  Accordingly, "PERRY DOE would not have been permitted to rent his apartment in Washington Heights, unless he was a student at Yeshiva University and subject to the school's discipline, control, and authority at all times he was residing in or using that apartment."  (Am. Compl. ¶ 76).

(6)     YU's Student Bill of Rights provides that all YU students who are victimized by sexual assaults have the right to participate in a fair and impartial process, with adequate notice and a meaningful opportunity to be heard, "*regardless of whether the [sexual assault] occurs on campus [or] off campus*[.]"  (Am. Compl. ¶ 163) (emphasis added).

(7)     YU's Anti-Bullying and Hazing Policy for Students, which proscribes bullying (including sexual assault), provides that YU retains the authority to "address off-campus behavior that occurs at other than University-sponsored or affiliated events if it determines that the behavior, *or the continued presence of the accused perpetrator*, impairs, obstructs, substantially interferes with or adversely affects the mission, process or functions of the University."  (Am. Compl. ¶ 164) (emphasis added).

---

[7] *See Doe v. Univ. of Scranton*, 2020 U.S. Dist. LEXIS 187526 *20-21 (M.D. Pa. 2020) (Court granted plaintiff leave to amend pleadings to allege sufficient facts to state a Title IX claim.  Factors relevant to whether a university had substantial control over off-campus apartments—where alleged sexual assaults took place—included whether university "must approve housing choices for students before they may occupy a housing unit.").

(8)      YU's Policy on Protecting Athletes provides that "the University is committed to ensuring the well-being, safety and protection of each of its student-athletes and will not tolerate … harassment or other misconduct."  Moreover, "the University prohibits, and will not tolerate, any form of sexual harassment, including sexual abuse/assault."  "In light of … the influence and power that may be wielded by other student-athletes, the University believes it is important to set guidelines to help define appropriate behavior and conduct of its … student-athletes in order to cultivate a safe and positive environment for all student-athletes.  *These guidelines apply to the behavior and conduct of … student-athletes, whether on campus or off campus*."  (Am. Compl. ¶ 165) (emphasis added).

(9)      YU's Undergraduate Students Bill of Rights and Responsibilities/Undergraduate Student Disciplinary Procedures Policy contains numerous mandates for high ethical and responsible behavior for YU students "regardless of time, place, and medium."  Moreover, "students whose off campus conduct violates any of [YU's] policies, rules, regulations or other requirements may also be subject to University discipline[,]" which may include "letters of admonition, probation, loss of privileges, and/or suspension or expulsion[.]"  (Am. Compl. ¶ 167).

Accordingly, pursuant to its published rules, procedures, and policies, YU retained both disciplinary control and authority over PERRY DOE (including his conduct that occurred in his Yeshiva-funded apartment) *and* remedial control and authority over Plaintiff.  These policies, in aggregate, demonstrate that YU *repeatedly* represented to its students that YU would retain *disciplinary authority* over accused rapists *and remedial* authority on behalf of alleged rape victims whenever a YU student alleges sexual assault by another YU student, regardless of where that sexual assault occurred.  *See Davis*, 526 U.S. at 644-47.  Unlike in *Brown* or any of the cases cited by the YU Defendants, the unique YU policies referenced in the Amended Complaint obliterate

*any* distinction between YU's promised responses to students—both alleged victims and accused rapists—for sexual assaults that occur off-campus as opposed to on-campus.

Particularly in light of the Department of Education's recent mandate that a determination of the "substantial control" issue must be "fact-specific" and that "no single factor is determinative [as to] whether a [school] exercised substantial control over the … alleged harasser … and the context in which the harassment occurred" (85 Fed. Reg. at 30197), this Court should not decide this complex issue as a matter of law, prior to discovery.

This is particularly true because the Amended Complaint adds yet another factor to the "substantial control" equation as Plaintiff alleges that the context of her rape at PERRY DOE's apartment must also be considered in the context of YU's official policy to not comply with The Clery Act—and its intentional failure to report any and all sexual assaults and/or rapes that occurred on or near its campuses for 20 years.   This official policy, Plaintiff alleges, fraudulently induced her to enroll in and remain as a student at YU (Am. Compl. ¶¶ 292-411), which directly contributed to her rape by PERRY DOE (Am. Compl. ¶¶ 413-414).   *See McGrath*, 672 F. Supp. 2d at 491 (The plaintiff plausibly alleged fraud action where she pled that the college failed to disclose numerous sexual assaults at the school—in violation of The Clery Act—"plaintiff justifiably relied on [the college's] misrepresentation of campus safety when she decided to enroll and live on campus …, and was injured [raped] as a result").   Here, the YU Defendants do not argue in their motion to dismiss that Plaintiff failed to sufficiently plead a fraud cause of action against YU based on nearly identical allegations.   (*See* Am. Compl. ¶¶ 393-419).

As the YU Defendants should have determined that PERRY DOE's rape of Plaintiff occurred within a YU education program or activity, the 2020 Title IX Regulations imposed upon YU an obligation to comply with numerous new grievance procedures, including, for instance,

providing the parties with a live hearing, mandating the parties have counsel with them at said hearing, and providing complainant with an opportunity for her attorney to cross-examine her alleged rapist.  (*See* 34 CFR § 106.45).  None of this happened.

It is uncontroverted that YU failed to comply with these Title IX procedural requirements, as YU administrators, Defendant Lauer (YU's General Counsel) and Defendant Nissel (YU's Title IX Coordinator), determined at the outset of the investigation to treat Plaintiff's complaint as a non-Title IX disciplinary proceeding (with less rigorous procedural requirements), rather than a Title IX matter.  (*See* Am. Compl. ¶ 153); *see also*, 34 C.F.R. § 106.45(a) ("For the purpose of addressing formal complaints of sexual harassment, a recipient's grievance process *must* comply with the requirements of this section.") (emphasis added).

For these reasons, this Court should not determine as a matter of law that PERRY DOE's rape of Plaintiff did not occur within any YU "education program or activity."

**D.  PLAINTIFF SUFFICIENTLY ALLEGES THAT YU VIOLATED TITLE IX BASED ON YU'S DELIBERATELY INDIFFERENT RESPONSE TO PLAINTIFF'S RAPE ALLEGATIONS AGAINST A FELLOW YU STUDENT**

**1.  The 2020 Title IX Regulations Support Plaintiff's Argument That YU Responded to Plaintiff's Sexual Harassment Complaint Against PERRY DOE With Actionable Deliberate Indifference**

The 2020 Title IX Regulations provide unequivocally that a school may be liable for violating Title IX based on its deliberate indifference in response to sexual harassment and/or abuse allegations, where the initial sexual abuse occurred both off-campus *and* outside the school's educations programs or activities:

> *[I]f a student is sexually assaulted outside of an education program or activity but subsequently suffers Title IX harassment in an education program or activity, then these final regulations apply to the latter act of sexual harassment[.]*  (85 Fed. Reg. at 30198).

> *[W]hether conduct occurs in a [school's] education program or activity does not necessarily depend on the geographic location of the incident. Instead, "education*

*program or activity" relies on statutory and regulatory definitions or "program or activity" on the statement adopted from the Supreme Court's language in <u>Davis</u> added to § 106.44(a) that education program or activity includes locations, events or circumstances over which the [school] exercised substantial control over the respondent and over the context of which the sexual harassment occurred…  (Id. at 30198-30199).*

*The final regulations would similarly analyze whether sexual harassment (i.e., unwelcome conduct on the basis of sex so severe, pervasive and objectively offensive that it effectively deprives a complainant of equal access to education) in the [school's] program or activity triggered a [school's] response obligations regardless of whether such sexual harassment stemmed from the complainant's allegations of having suffered sexual assault (e.g., rape) outside the [school's] program or activity.  (Id. at 30200) (citing, Doe v. East Haven Board of Educ., 200 Fed. Appx. 46, 48 (2d Cir. 2006)).*

*[W]hether framed as a "hostile environment" (as in [earlier] Department guidance) or as "effective denial of a person's equal access" to education (as in these final regulations), sexual harassment is a form of sex discrimination actionable under Title IX when it occurs in an education program or activity.  (Id. at 30201) (citing, Doe v. East Haven Board of Educ., 200 Fed. Appx. at 48)).*

**2. A University That Permits an Accused Rapist to Remain on Campus, Without Imposing Any Restrictions, Regulations, or Security Measures That Would Protect His Alleged Student-Rape-Victim, May Be Deemed to Have Made the Alleged <u>Student-Rape-Victim More Vulnerable to Sexual Harassment</u>**

The *Davis* Court made clear that to "subject" a student to harassment a school need only make that student "vulnerable" to that harassment.  *Id.* at 645.  Numerous federal courts, including several in the Second Circuit, have relied on *Davis* to hold that actionable "discriminatory harm" under Title IX can include the harm faced by student-victims who are rendered vulnerable to future harassment when they remain at the school and endure an educational environment that constantly exposes them to a potential encounter with their harasser or assailant.  *See Doe v. Baylor Univ.*, 240 F. Supp. 3d 646, 660 (W.D. Tx. 2017) (where, *inter alia*, Baylor University failed to ensure student-victims of sexual assault that they would not be subjected to continuing assault, court determined that plaintiffs plausibly alleged that Baylor was deliberately indifferent to their reports of sexual assaults, which deprived them of educational opportunities to which they were entitled); *Kelly v. Yale Univ.*, 2003 U.S. Dist. LEXIS 4543, *9 (D. Conn. 2003) (where alleged victim of

sexual assault alleged that, following her assault, her assailant's continued presence on campus was harassing because it exposed her to the possibility of an encounter with him, court held that "*a reasonable jury could conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of educational opportunities provided by the university*.") (emphasis added); *Crandell v. N.Y. College of Osteopathic Medicine*, 87 F. Supp. 2d 304, 316 (SDNY 2000) ("Actionable sexual harassment is not limited to that committed by a current teacher, but includes that committed by former teachers, staff *and even other students if the presence of the perpetrator at the institution would be expected to create a hostile environment*.") (emphasis added); *Doe v. East Haven Board of Educ.,* 200 Fed. Appx. 46, 48 (2d Cir. 2006) (Second Circuit held that the plaintiff sufficiently alleged sexual harassment to which the school was deliberately indifferent where the harassment consisted of on-campus taunts and name-calling directed at plaintiff after she had reported being raped *off-campus* by two high school boys).  (*See* Am. Compl. ¶ 210), in which Plaintiff alleges that she was called a "slut" and a "whore" by a male YU basketball player, who blamed her for being raped.).[8]

This Court, in *Crandell*, set forth a rule which provides that a school's alleged post-assault deliberate indifference to a report of sexual abuse must be examined in the context of the initial sexual assault, regardless of whether that sexual assault took place on-campus or off-campus:

> In evaluating hostile environment claims, courts have adopted a 'totality of the circumstances' approach, that rejects the disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment.

*Id.* at 319.

---

[8] *See also*, 34 C.F.R. 106.44(c), a new 2020 Title IX Regulation, which provides that a school may entirely remove an accused rapist from a school on an "emergency basis" if the school determines that the accused rapist is an "immediate threat to the physical health or safety of any student."

In *L.E. v. Lakeland Joint Sch. Dist. #272*, 403 F. Supp. 3d 388, 899-900 (D. Id. 2019), the District Court held that a student-victim of sexual assault that had occurred during an off-campus football camp plausibly alleged a Title IX claim against the school district.  The "true nature" of [plaintiff's] Title IX claim is that he was subjected to a hostile learning environment due to continued harassment at the school "when the school district knew that he had been sexually assaulted off-campus by fellow students the previous summer."  *Id.* at 900.  Quoting the above *Crandell* rule, the *L.E.* Court explained that the off-campus sexual assault of plaintiff "provide[d] important context for [plaintiff's] Title IX claim."  *Id.*  Accordingly, "the District [could] not sever the Camp incident [the sexual assault] from any later harassment at the school."  *Id.*

This Court, therefore, when considering whether Plaintiff sufficiently pled that YU's response to her rape allegations against PERRY DOE constituted "deliberate indifference" in violation of Title IX, is likewise required to consider the alleged rape itself in that calculus.  *See id.*; *Kelly*, 2003 U.S. Dist. LEXIS 4543 at *9; *Crandell*, 87 F. Supp. 2d at 319.  This Court should thus consider the alleged rape incident in conjunction with the post-assault harassment that Plaintiff endured at YU within its educational programs and activities—which made her more vulnerable to rape, after she reported PERRY DOE's off-campus rape to YU administrators.  (*See* Am. Compl. ¶¶ 140-149, 220-229, 394-415); *see also*, *L.E.*, 403 F. Supp. 3d at 900; *Kelly*, 2003 U.S. Dist. LEXIS 4543 at *9; *Davis*, 526 U.S. at 644-45.

3. **Plaintiff Has Sufficiently Alleged That YU's Failure to Address Her Vulnerability to Continued Exposure to Her Alleged Rapist on Campus, and Its Failure to Implement *Any* Security Measures in an Effort to Protect Her from Him, Created a Hostile <u>Educational Environment Which Deprived Her of Educational Opportunities at YU</u>**

Here, the Amended Complaint alleges that following PERRY DOE's rape of Plaintiff:

(1)     "PERRY DOE's continued and unregulated presence on campus created a hostile environment that effectively deprived Plaintiff of the educational benefits and opportunities provided by YU." (Am. Compl. ¶ 141).

(2)     "PERRY DOE's continued, unrestricted and unregulated presence on Wilf Campus was harassing to Plaintiff because it exposed her to the possibility of another encounter with PERRY DOE and thus caused her to suffer much fear and anxiety." (Am. Compl. ¶ 142).

(3)     Plaintiff repeatedly expressed to YU officials and agents her fear of encountering PERRY DOE on Wilf Campus, and thus "repeatedly requested that YU implement appropriate security measures that would prevent Plaintiff from encountering PERRY DOE on YU's Wilf Campus[.]" "YU[, nevertheless,] failed to implement *any* security measures and failed to take *any* steps that would protect Plaintiff or lessen her vulnerability posed by PERRY DOE's continued and unrestricted presence on campus." (Am. Compl. ¶ 145).

Plaintiff thus alleges at length that YU administrators repeatedly denied her requests for reasonable security measures which she insisted that she needed because of her reasonable fear of another harassing encounter with PERRY DOE.  (Am. Compl. ¶¶ 140-149).  Such potential security measures ran the gamut from: (1) completely barring PERRY DOE from YU's Wilf Campus; (2) barring PERRY DOE from certain areas at Wilf Campus; (3) barring PERRY DOE, completely or from certain areas, from YU's Wilf Campus at certain designated times (particularly when Plaintiff was scheduled to be on campus); (4) removing PERRY DOE from the YU Basketball Team and all team activities; and (5) providing Plaintiff with campus escorts when she needed to be on YU's Wilf Campus.  (Am. Compl. ¶ 144).  YU refused to provide Plaintiff with *any* security measure which would have reduced her fear and anxiety and lessened her vulnerability to a post-rape harassing encounter with PERRY DOE.  This conduct violated the Rule's new

mandate that a college or university *must* provide a complainant who alleges that she has been raped with reasonable "supportive measures."  *See* 85 Fed. Reg. at 30181 (*citing*, 34 C.F.R. § 106.44(a)).  The YU Defendants do not and cannot provide any justification for YU to deny Plaintiff *any* supportive measures that would enhance her security.

The YU Defendants entirely ignore Plaintiff's well-pled allegations which allege that YU's deficient response to her rape allegation against PERRY DOE made Plaintiff vulnerable to an on-campus encounter with PERRY DOE and thus created a hostile educational environment which deprived her of educational opportunities at YU. (Am. Compl. ¶¶ 54-55, 140-149).  They make no effort whatsoever to refute or challenge Plaintiff's allegations that PERRY DOE's continued, unfettered, and unregulated presence on YU's Wilf Campus created a hostile educational environment which deprived Plaintiff of educational opportunities that were provided by YU.  They likewise make no effort to refute or challenge Plaintiff's additional allegations that YU's failure and refusal to provide Plaintiff with *any* security measures on YU's Wilf Campus created a hostile environment at YU which deprived Plaintiff of educational opportunities. (Am. Compl. ¶¶ 140-149).  The YU Defendants' motion papers do not demonstrate even the slightest understanding of a controlling principle:  a school's post-assault deliberate indifference to a student's report of off-campus sexual assault itself constitutes a violation of Title IX.

In *Doe v. Univ. of Memphis*, 2019 U.S. Dist. LEXIS 241446 (W.D. Tn. 2019), the District Court examined a Title IX claim from a female student who alleged that she had been raped *off-campus* by two different fellow university students.  Plaintiff sued the university not for the rapes themselves but "for its deliberate indifference to her assault and liability to harassment following those rapes, and for fostering a hostile environment on campus that resulted from both the rapes themselves and her reports of the rapes to the police and university."  *Id.* at 19.

Much like the YU Defendants in this case, the University of Memphis ("UOM") argued "that it [had] no liability whatsoever for sexual assaults that occur off campus." *Id.* at 18. UOM's motion—like the YU Defendants' motion here—did "not address Plaintiff's allegations concerning events that occurred on campus subsequent to the alleged assaults," and UOM, instead, "attempt[ed] to disclaim all responsibility by drawing a bright-line" which provides categorically that a "University does not have a legal duty under Title IX to address off-campus assaults in private settings involving its students." *Id.* at 18-19 (*quoting*, UOM's Brief (ECF No. 60 at 461)).

The *Doe v. University of Memphis* Court held that, "applying the principles from *Gebser* and *Davis* to Plaintiff's allegations, she … sufficiently pleaded a Title IX cause of action under both deliberate indifference and hostile environment theories." *Id.* at 21. The Court, in rejecting UOM's bright-line argument, concluded that the pleading "provide[d] detailed factual allegations of harassment occurring in contexts that Defendant appears to control, even though the alleged sexual assaults did not ultimately occur in a context within Defendant's control." *Id.* at 21-22.

Here, the Amended Complaint pleads post-assault harassment by YU, as well as the creation of a hostile educational environment for Plaintiff (*see* Am. Compl ¶¶ 54-55, 140-149). The YU Defendants ignore these averments and instead exclusively advance the same bright-line rule that was rejected by the *Doe v. Univ. of Memphis* Court. (YU Brief at 16-22). This Court should not draw the bright line advocated by the YU Defendants where both the law itself and its implementing regulations *emphatically* provide that it should not exist in the Title IX context.

Especially in view of the 2020 Title IX Regulations (which buttress the *Doe v. Univ. of Memphis* Court's rationale), this Court should determine that Plaintiff has sufficiently alleged that YU violated Title IX pursuant to its deliberate indifference in response to Plaintiff's off-campus rape allegations.

Plaintiff has thus plausibly alleged Title IX claims against YU, regardless of whether her initial rape at PERRY DOE's off-campus apartment occurred within or outside YU's educational programs or activities. *See Doe v. Baylor Univ.*, 240 F. Supp. 3d at 660; *Doe v. Univ. of* Memphis, 2019 U.S. Dist. LEXIS 241446 at *21-22; *Kelly*, 2003 U.S. Dist. LEXIS 4543 at *9; *Crandell*, 87 F. Supp. 2d at 316.

As the YU Defendants chose not to make any argument on this point, moreover, they have waived or abandoned any such argument and may not properly resurrect any such argument for the first time in their reply papers. *See Chevron Corp. v. Donziger,* 325 F. Supp. 3d 371, 379 n. 21 (SDNY 2018) ("It is well established… that arguments first raised in reply briefs are forfeited or waived."; *Abdou v. Mahany*, 2021 U.S. Dist. LEXIS 120037, *8 & n.4 (SDNY 2021) (This Court, citing *Chevron*, rejected legal theory that defendant "raise[d] for the first time on reply.").

**E. PLAINTIFF SUFFICIENTLY ALLEGES THAT YU VIOLATED TITLE IX PURSUANT TO PRE-ASSAULT CONDUCT THAT MADE PLAINTIFF MORE VULNERABLE TO RAPE: YU ADOPTED AN "OFFICIAL POLICY" TO NOT REPORT SEXUAL ASSAULTS ON OR NEAR ITS CAMPUSES IN VIOLATION OF THE CLERY ACT**

Here, Plaintiff also alleges that YU's official policy to not report sexual assaults to both the Department of Education (in violation of The Clery Act) and its students created a heightened risk of sexual assault for YU's female students. (Am. Compl. ¶¶ 394-414). This heightened risk made female YU students, including Plaintiff, more vulnerable to rape and sexual assault at or near YU's campuses. (Am. Compl. ¶¶ 54-55, 414).

In the Amended Complaint, Plaintiff specifically asserts a "pre-assault" claim as part of Count I (violation of Title IX) against YU. (Am. Compl. ¶¶ 221-237). As YU does not seek Rule 26(b)(6) dismissal of that portion of Count I, YU has not challenged Plaintiff's "pre-assault" claim and, accordingly, that uncontested claim should survive. *See JD1 v. Canisius Coll.*, 2022 U.S.

Dist. LEXIS 113451, *23-24 (WDNY 2022) (where defendant college failed to challenge pre-assault claim of one John Doe plaintiff but challenged the pre-assault claims of two other John Doe plaintiffs, the Court analyzed only the pre-assault claims that were actually challenged; the Court, moreover, sustained all three pre-assault claims).

"The Supreme Court has repeatedly explained that where the Title IX violation in question is caused by an institution's discriminatory policy or custom, courts need not apply the actual notice and deliberate indifference framework typically used in cases involving institutional liability for sexual harassment or assault." *Doe v. Baylor Univ.*, 336 F. Supp. 3d 763, 779 (W.D. Tx. 2018) (*citing*, *Gebser*, 524 U.S. at 290 (stating that the actual notice and deliberate indifference requirements are restricted to those cases "that do not involve [an] official policy of the [funding recipient]"); and *Davis*, 526 U.S. at 642 (acknowledging that an institution cannot be liable unless it has notice that its conduct could subject it to a damages claim but providing that "this institution … is not a bar to liability where a funding recipient intentionally violates the statute.").

In *Doe v. Baylor Univ.*, the plaintiffs—all alleged victims of sexual assault by Baylor students—alleged that "despite being informed of multiple sexual assaults between 2008 and 2011, Baylor reported to the U.S. Department of Education that no such assaults took place on campus during that period." *Doe v. Baylor Univ.*, 336 F. Supp. 3d at 783.  The Court concluded that "[t]hese alleged facts, construed as true, "raise a right to relief above the speculative level" that Baylor's policy or custom of inadequately handling and even discouraging reports of peer sexual assault *constituted an official policy of discrimination* that created a heightened risk of sexual assault, thereby inflicting the injury of which Plaintiffs complain)." *Id.*[9]

---

[9] The duration of Baylor's "official policy" of not reporting student-on-student sexual assaults (3 years) was far shorter than alleged in this case (20 years).  (*See* Am. Compl. ¶¶ 36-41).

This Court, in *Roskin-Frazee v. Columbia Univ.*, 2018 U.S. Dist. LEXIS 28937, *16-17 & n. 3 (SDNY 2018), cited an earlier version of the *Baylor* case, to illustrate that in circumstances similar to those in this case, a pre-assault Title IX claim may plausibly be alleged: *Doe 1* held that defendant created a heightened risk of sexual assault "by, [*inter alia*], failing to investigate reported sexual assaults, discourag[ing] those who reported sexual assaults from naming their assailants or otherwise coming forward[,]" and *falsifying reports to the DOE of sexual assaults on campus.* *Id.* at 16-17 n.3 (*quoting, Doe v. Baylor Univ.*, 240 F. Supp. 3d 646, 662 (W.D. Tx. 2017).

Here, the Amended Complaint sufficiently alleges that:  (1) YU maintained an official policy of deliberate indifference to reports of sexual misconduct (*see* Am. Compl. ¶¶ 36-41); (2) which created a heightened risk of sexual harassment for YU's female students, including Plaintiff, that was known or obvious (*see* Am Compl. ¶¶ 394-414); (3) in a context subject to YU's control, as YU and only YU was responsible for reporting sexual assaults of its students to the Department of Education (*see* Am. Compl. ¶¶ 36-40); and (4) as a result, Plaintiff suffered harassment—a violent rape (*see* Am. Compl. ¶ 414)—that was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by YU.  *See Karasek v. Regents of California*, 956 F.3d 1093, 1112 (9th Cir. 2020) (*citing, Davis*, 526 U.S. at 650,) (the *Karasek* Court developed a standard—as paraphrased in this paragraph—for pre-assault Title IX claims); *see also*, *JD1*, 2022 U.S. Dist. LEXIS 113451 at *23 (adopting and applying the *Karasek* standard for pre-assault Title IX claims).

Especially because the YU Defendants do not challenge Plaintiff's pre-assault Title IX allegations, Plaintiff's Title IX claims predicated on YU's adoption of its official policy to not report sexual assaults on or near its campuses should survive the YU Defendants' motion to dismiss.  The YU Defendants, again, do not even argue otherwise.

**IV.    PLAINTIFF HAS SUFFICIENTLY PLED AIDING AND ABETTING CLAIMS UNDER  THE NYCHRL AND NYSHRL AGAINST THE SEYFARTH DEFENDANTS**

Plaintiff asserts aiding and abetting claims against Defendants Seyfarth Shaw, LLP, and Dov Kesselman, Esq. (as well as Defendants Andrew "Avi" Lauer, Esq. and Chaim Nissel) pursuant to the New York City Human Rights Law ("NYCHRL") and the New York State Human Rights Law ("NYSHRL") (Count XII).

The NYSHRL provides that it is an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article (including discrimination and retaliation) or to attempt to do so (N.Y. Exec. Law § 296(6)).  The New York City Administrative Code uses virtually identical language, see N.Y. Admin. Code § 8-107(6), and is thus subject to the same analysis as the NYSHRL.  *Dunson v. Tri-Maintenance and Contractors, Inc.*, 171 F. Supp. 2d 103, 113-14 (EDNY 2001) (*citing*, *Mohamed v. Marriott Int'l, Inc.*, 905 F. Supp. 141, 157 (SDNY 1995) (noting that the identical wording of the NYSHRL and NYCHRL evidence "clear intent" for parallel interpretation).  Any analysis of aiding and abetting under the NYSHRL thus applies equally to claims brought under § 8-107(6).  *Id.*

**A.  THE SEYFARTH DEFENDANTS DO NOT DENY THAT THEY "DIRECTLY PARTICIPATED" IN THE INVESTIGATION DIRECTED BY YU**

The Seyfarth Defendants state that to be liable as an aider or abettor under the NYSHRL or NYCHRL, the defendant must have "actually participated in the discriminatory conduct of the primary violator, and shared the intent or purpose of, and thus have a "community purpose" with the principal actor (Seyfarth Brief at 10)  (citations omitted).  For good reason, the Seyfarth Defendants overlook the fact that when an independent contractor-—like a hired investigator—*directly participates* in the discriminatory acts of his employer, the shared intent and community of purpose elements for aiding and abetting are satisfied.  *See id.; see also*, *Tomka v. Seiler*, 66

F.3d 1295, 1317 (2d Cir. 1995) ( any defendant who "actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the (NYSHRL]."); *Franklin v. Vertex Glob. Sols., Inc.*, 2022 U.S. Dist. LEXIS 23273, *37 n. 16 (SDNY 2022) (this Court held that "community of purpose" and shared intent elements for aiding and abetting are satisfied when—as here—the defendant "*actually participated in the [discriminatory] conduct giving rise to the claim.*") (emphasis added).

*Dunson* illustrates this point quite well.  There, a company hired a firm to  undertake   an investigation in response to a complaint about an employee's conduct.  Plaintiff (the employee), who alleged he was fired based on his age, alleged the investigation was conducted as a pretext in response to employee's refusal to retire.  *Id.* at 103.  The plaintiff-employee sued, *inter alia*, the investigators, for aiding and abetting their employer's violations of the NYSHRL and NYCHRL by producing a sham investigative report that unfairly reflected the evidence.  *Dunson* held that to the extent the investigators "did actively participate in the formulation, implementation and reporting of the investigation which defendants do not contest, plaintiff sufficiently alleged a triable issue of fact as to whether the investigators aided and abetted his former employer in violation of the NYSHRL and NYCHRL.  *Id.* at 115-16.

Contrary to the Seyfarth Defendants assertion, there are *many* cases in this circuit which held that a failure to adequately conduct an investigation can support aiding and abetting claims under the NYSHRL and/or NYCHRL.  *See, e.g.*, *Delisi v. Nat'l Assn. of Professional Women, Inc.*, 48 F. Supp. 3d, 492, 495-96 (EDNY 2014) (aiding and abetting claims against general counsel of company sufficiently pled when plaintiff alleged that general counsel failed to promptly and adequately investigate her claims of sexual harassment); *Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004) (Summary judgment denied on NYSHRL claims where defendants took no

action to remedy discriminatory acts of which they were aware); *Gallo v. Wonderly Co., Inc.*, 2014 U.S. Dist. LEXIS 1004, *28 (NDNY 2014) ("Failing to investigate complaints of discrimination amounts to acquiescence in and aiding and abetting the creation of a hostile work environment."); *Cid v. ASA Inst. of Business and Computer Technology, Inc.*, 2013 U.S. Dist. LEXIS 17458, * 15-16 (EDNY 2013) (failure to properly investigate complaints of discrimination provides sufficient basis for aiding and abetting liability under the NYCHRL).

Here, the Seyfarth Defendants do not and cannot deny that they "directly participated in the YU Defendants investigation" of Plaintiff's sexual harassment complaint.  Accordingly, the only way the Seyfarth Defendants can strike Plaintiff's aiding and abetting claims against them at this early stage is to establish as a matter of law that the principal actor, Yeshiva University, did not engage in any discriminatory acts against Plaintiff.  *See Dunson*, 171 F. Supp. 2d at 115-16. YU does not directly challenge Plaintiff's NYCHRL (Count III) or NYSHRL (Count X) claims against it; nor do Defendants Lauer and Nissel directly challenge Plaintiff's aiding and abetting (in violation of the NYCHRL and NYSHRL) claims against them (Counts V and XII).  The Seyfarth Defendants thus have an extraordinarily high burden of establishing that the YU Defendants did not discriminate against Plaintiff on the basis of sex. The Seyfarth Defendants do not come close to meeting this burden.

## B.  PLAINTIFF SUFFICIENTLY ALLEGES THAT YU AND ITS ATTORNEY INVESTIGATORS ACTED  WITH A DISCRIMINATORY MOTIVE

The Seyfarth Defendants argue that "Doe cannot plead any facts about the investigators that plausibly suggest that Yeshiva intended to discriminate against her because of her gender, much less that Seyfarth knew about and shared that discriminatory intent."  (Seyfarth Brief at 13). The Seyfarth Defendants' entire argument on discriminatory motive ignores the Department of Education's clear pronouncement that "[a] recipient's treatment of a complainant … in response

to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under Title IX." 34 C.F.R. § 106.45(a).

The Seyfarth Defendants allege that "Doe does not plead that Yeshiva in any way asked or instructed the Seyfarth Defendants to reach a particular result, discriminate against Defendant because of her sex, or do anything other than conduct an honest investigation." (Seyfarth Brief at 13). This assertion is patently false.

The Amended Complaint specifically alleges that: "soon after Plaintiff made her formal Title IX Complaint to YU's Title IX Office, Yeshiva University, and its agents and employees, Lauer and Nissel, jointly made a knowing, conscious, and calculated decision: (1) to conduct a sham "investigation" of Plaintiff's allegations; (2) to arrive at a preordained "not responsible" verdict with respect to the conduct of Plaintiff's alleged rapist ("PERRY DOE"); (3) to hire as its "investigators" of Plaintiff's allegations,  a law firm, Seyfarth Shaw, LLP ("Seyfarth"), and two attorneys from Seyfarth, Kesselman, and Miller,  which—as YU's long-time litigation counsel in myriad sex abuse litigations in New York State—had glaring and obvious conflicts of interests and biases in favor of Yeshiva University and PERRY DOE and against Plaintiff, and was willing to go along with YU's planned sham investigation and pre-determined outcome; (4) to deliberately breach and  fail to comply with numerous specific Title IX rules, regulations, and procedures; . . . (6) to ignore substantial evidence that supported Plaintiff's claims; (7) to deliberately fail to interview fact witnesses (including several specifically identified by Plaintiff) who could corroborate Plaintiff's claims by testifying as to her statements and state of mind soon after the incident occurred; and (8) to deliberately choose not to obtain or request access to Plaintiff's rape kit evidence collected by Columbia Presbyterian Hospital the day after Plaintiff's alleged rape, which would have corroborated Plaintiff's allegations that her rapist used force and violence to

inflict visible physical injuries on her body during his rape."  (Am. Compl. ¶ 25).

Plaintiff also alleges discriminatory intent by Defendants based on Defendants' interest in burnishing YU's reputation and avoiding negative publicity or financial losses for the school, particularly in view of YU's $613 Million fundraising campaign, which began in 2019, was launched publicly in December 2021, and featured the Yeshiva University Men's Basketball Team as a centerpiece of its campaign.  (Am. Comp. ¶¶ 17-23).

The Seyfarth Defendants' beside the point argument that YU never "communicated a purpose to discriminate against Doe (let alone on the basis of her gender) to the Seyfarth Defendants" (Seyfarth Brief at 14), is easily refuted by the pleading's averments that: (1) Seyfarth, Kesselman, and Miller conveyed to the YU Defendants their willingness "to go along" with YU's sham investigation with a pre-determined "not responsible" outcome (Am. Compl. ¶ 25)[10]; (2) Seyfarth, Kesselman, and Miller willingly engaged in a conspiracy with the YU Defendants "to conceal and cover-up the YU basketball player's rape of Plaintiff" (Am. Compl. ¶ 26); (3) that Seyfarth, Kesselman, and Miller never disclosed to Plaintiff their blatant conflicts of interest in favor of Yeshiva University (Am. Compl. ¶¶ 121-130); and (4) Seyfarth's actual "investigation" was replete with procedural irregularities and inexplicable failures to make any effort to obtain critical information.  (Am. Compl. ¶¶ 218(1) & (2), 185-186).

## 1.    As The Second Circuit Recently Affirmed, A Plaintiff's Burden To Plead Discriminatory Bias With Respect To A Disciplinary Proceeding Is Minimal

As a threshold matter, Plaintiff may challenge the Defendants' disciplinary proceeding procedures and determination pursuant to an erroneous outcome theory.  *See Doe v. Board of Regents of Univ. Wisconsin*, 2021 U.S. Dist. LEXIS 212351, *13-14 (W.D. Wis. 2021) (holding

---

[10] Plaintiff does not plead with specificity precisely when the YU Defendants' communications with the Seyfarth Defendants took place because she is not privy to those facts.  That information awaits discovery.

that a plaintiff, whether the alleged perpetrator or victim, must prove only that "gender bias was a motivating factor behind the erroneous finding."); *Doe v. Curators of the Univ. of Mo.*, 2022 U.S. Dist. LEXIS 159076, *73-75 (W.D. Mo. 2022) (all victims of sex discrimination, whether alleged perpetrators or victims, "may challenge the disciplinary process based on an erroneous-outcome theory. . . It would be counter intuitive to find that [a disciplinary process used] by a University to address sexual harassment claims in educational institutions could itself by used to discriminate against either the accused or the accuser based on their gender."); *see also*, *New York v. U.S. Dept. of Educ.*, 477 F. Supp. 3d 279, 295 (SDNY 2020) (Title IX permits a complainant, as well as a respondent, "to claim sex discrimination wherever a requirement of the grievance procedure is not met.") (*citing*, 85 Fed. Reg. at 30240).

Here, at the pleading stage, Plaintiff's burden of pleading the requisite discriminatory bias is minimal. In *Doe v. Columbia Univ.*, 831 F.3d 46, 57-58 (2d Cir. 2016), the Second Circuit reversed the District Court's dismissal of a Title IX complaint which alleged that plaintiff was subjected to discrimination on account of sex in the imposition of university discipline against him. The District Court had concluded that any bias in favor of the woman accuser "could equally have been—and more plausibly was—prompted by lawful, independent goals such as a desire (enhanced, perhaps by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity." *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 371 (SDNY 2015). The Second Circuit emphasized that such reasoning failed to recognize a court's obligation to draw reasonable inferences in favor of the sufficiency of the complaint. Indeed, "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is

plausible." *Columbia Univ.*, 831 F.3d at 57 (emphasis in original).

In *Columbia Univ.*, the Second Circuit noted that "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in evidence), it is plausible to infer … that the evaluator has been influenced by bias." *Id.* Accordingly, "[t]he alleged fact that the [investigator] and [final decision-makers] chose to accept an unsupported … version [of the incident] over Plaintiff's *and declined even to explore the testimony of Plaintiff's identified witnesses,* if true, *gives plausible support to the proposition that they were motivated by bias in discharging their responsibilities to fairly investigate* and adjudicate the dispute." *Id.* (emphasis added).

Here, Plaintiff alleges that the Seyfarth Defendants declined to explore the testimony of two state-of-mind witnesses (specifically identified by Plaintiff during communications with the investigators) to whom Plaintiff conveyed the details of her rape *immediately* after she returned from her attacker's apartment on the night of January 24, 2021.  (Am. Compl. ¶ 91).  Plaintiff further alleges that the Seyfarth Defendants failed to make any effort to collect the rape kit evidence from Columbia Presbyterian Hospital, which included photographs of the bruises inflicted upon Plaintiff (to her neck and thigh) by PERRY DOE, when he used violence to perpetuate his rape by restraining her by grabbing her throat and forcefully pushing open her legs with his knee.  (Am. Compl. ¶¶ 84-85, 97-100).

### 2.     The Seyfarth Defendants' "Explanation" As To Why They Did Not Seek Plaintiff's Consent To Provide Them With Access To Her Rape Kit Evidence (Including Photographs That Depicted Bruises On Her Body) Is Preposterous

The Seyfarth Defendants, remarkably, argue that they bear no fault for "not requesting [Plaintiff's] consent to interview the nurse examiner and to obtain the alleged 'rape kit evidence (including photographs of bruises on her body)' at the hospital where she visited the emergency

room." (Seyfarth Brief at 17). The Seyfarth Defendants attempt to justify their investigative failure to seek and collect this highly probative evidence as follows: "*[W]hen dealing with evidence of a highly personal and intimate nature, investigators have very good reason to rely upon the complainant to provide the evidence that she wants them to review so as not to unnecessarily invade her privacy* … Doe acknowledges that she always was the one with access to her medical information … and she … never provided it to the investigators …" (Seyfarth Brief at 17) (emphasis added).

That line of reasoning is pure nonsense on stilts. Every aspect of the Seyfarth Defendants' "investigation" was of a "highly personal" and "intimate" nature; they were, after all, supposed to be investigating an alleged rape procured by force and violence. Defendants do not because they cannot deny Plaintiff's central allegations that the Seyfarth Defendants *never* asked Plaintiff for her consent for them to interview the nurse examiner—and never asked Plaintiff for her consent for them to obtain access to and review the rape kit (and photographs of the bruises on Plaintiff's body), even though Plaintiff notified the Seyfarth Defendants that she had visited Columbia Presbyterian Hospital for a rape examination on January 25, 2021 and even provided them with a copy of her hospital discharge papers. (Am. Compl. ¶¶ 185-186).

The Seyfarth Defendants would thus have this Court ignore the uncontroverted fact that the 2020 Title IX Regulations provide that the "burden to impartially gather evidence and present it" to the decision-maker in a disciplinary proceeding *rests upon a school (and/or its designated investigators)*, rather than on the complainant. (85 Fed. Reg. at 30292 ("The Department believes that the scope of § 106.45(b)(5)(i) appropriately obligates a [school] to undertake a thorough search for relevant facts and evidence pertaining to a particular case[.]")).[11]

---

[11] The 2020 Title IX Regulations further provide that, with limited exceptions (not applicable here), a school "may not adopt rules excluding certain types of relevant evidence (*e.g.*, lie detector test results or rape kits)" from the scope

As the Amended Complaint alleges, it is difficult to fathom a non-discriminatory reason as to why:  (1) the Seyfarth investigators did not ask Plaintiff to provide them with access to the rape kit evidence and photographs, which would have corroborated Plaintiff's account that PERRY DOE had used force and violence to perpetuate his rape of Plaintiff.  (Am. Compl. ¶¶ 98-100), and (2) the Seyfarth Defendants did not interview the state-of-mind witnesses identified by Plaintiff (Am. Compl. ¶¶ 91, 218(10)).   Plaintiff, pursuant to *Columbia Univ.'s* rationale, has thus sufficiently alleged that the Seyfarth Defendants "were motivated by bias in discharging their responsibilities to fairly investigate … the dispute." *Columbia Univ.* 831 F.3d at 57.

### 3. Plaintiff Sufficiently Pled That The Seyfarth Defendants Demonstrated A Bias Against Her On The Basis Of Sex By Unreasonably Favoring PERRY DOE Over Plaintiff In The Disciplinary Proceeding

The Amended Complaint likewise sufficiently alleges that the Seyfarth Defendants demonstrated a bias against Plaintiff on the basis of sex.  *Columbia Univ.* is again instructive on this point.  In *Columbia Univ.*, the Complaint alleged that prior to the disciplinary hearing against a male student accused by a female student of sexual assault, the Columbia student body and the media had harshly criticized Columbia for "not taking seriously complaints of female students alleging sexual assaults by male students." *Id.*   The Complaint further alleged that the "University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue." *Id.*

Columbia argued—and the District Court agreed—that the pleaded facts did not support an inference of intentional sex discrimination because "any motivation on the part of the [University disciplinary] panel to demonstrate that it takes such complaints seriously is not the same thing as a motivation to discriminate against an accused male student." *Id.*  The District

---

of their investigations.  (85 Fed. Reg. at 30294).

Court thus concluded that "any bias in favor of [the female plaintiff] could equally have been—and more plausibly was—prompted by lawful, independent goals, such as a desire (enhanced, perhaps by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity." *Id.* (*quoting Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 371 (SDNY 2015)).

The Second Circuit—in reversing the District Court—held that: "The Complaint alleges that, having been severely criticized in the student body and public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes." *Id.* at 57-58.

The Second Circuit held that "[t]here is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults." *Id.* at 58. The Second Circuit also ascribed a similarly plausible discriminatory motivation to the investigator because she knew about the criticisms of the University and it was "plausible that she was motivated to refute those criticisms by siding with the accusing female and against the accused male." *Id.*

In *Columbia Univ.* the Second Circuit set forth a rule that should be controlling on the discriminatory intent issue now before this Court:

> A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantage that might result from unbiased action. *A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad*

> *publicity, has practiced sex discrimination, notwithstanding that the*
> *motive for the discrimination did not come from ingrained or*
> *permanent bias against that particular sex.*

*Id.* at 58 n. 11 (emphasis added).

Here, the Complaint alleges that all of the Defendants were motivated to burnish and protect Yeshiva University's reputation and avoid negative publicity for the school, particularly in light of YU's $613 Million fundraising campaign—which featured (and continues to feature) YU's highly successful Men's Basketball Team.  (Am. Compl. ¶¶ 20-23).  Defendant Kesselman, as a member of YU's General Counsel's Council, further proclaimed that he shared YU's "mission." The Seyfarth Defendants, moreover, had an additional economic motive to continue to receive substantial legal fees from YU in sex abuse defense cases—which would potentially be jeopardized if Plaintiff's rape allegation against a male member of YU's Men's Basketball Team were credited by YU and/or publicized.  (Am. Compl. ¶¶ 128-138).

The Seyfarth Defendants' argument on discriminatory motive mirrors the argument that was categorically rejected by the Second Circuit in *Columbia Univ.  See Columbia Univ.*, 831 F.3d at 57-58.  The Second Circuit expressly stated, indeed, that motivations of a university and/or its investigator to avoid "negative publicity" or "Title IX liability" "are not necessarily … distinct from sex bias."  *Id.* at 58 n. 11.  The Seyfarth Defendants' argument that Plaintiff has failed to sufficiently allege discriminatory bias on the basis of sex is meritless based: (1) on the well-pleaded allegations that all the Defendants unreasonably favored PERRY DOE over Plaintiff in the disciplinary dispute in order to avoid "negative publicity" for YU and corresponding financial losses (through reduced fundraising amounts obtained) (Am. Compl. ¶¶ 128-138), as well as (2) the myriad allegations outlining the gross deficiencies and procedural irregularities of the Seyfarth Defendants during their direct participation as "investigators" in the disciplinary process initiated

by Plaintiff's formal Title IX Complaint to YU.  (*See, e.g.,* Am. Compl. ¶ 218); *see also, id.* at 57-58; *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106-107 (2d Cir. 2022) (where a complaint alleging gender discrimination in violation of Title IX alleged, *inter alia*, that the university failed to act in accordance with university disciplinary procedures, *the university failed to interview potential witnesses identified by an involved party as having relevant information*, and made incorrect findings that were contrary to weight of evidence, allegations were "sufficient to permit a plausible inference that the bias was on account of sex."); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 n. 48 (2d Cir. 2019) (Given that "procedural irregularity alone" may suggest some form of bias, when there are "clear procedural irregularities in a university's response to allegations of sexual misconduct," the Second Circuit concluded that "even minimal evidence of sex-based pressure on the university is sufficient" to permit a plausible inference that the "bias [was] on account of sex.").

Here, the Amended Complaint is replete with allegations that the YU Defendants and the Seyfarth Defendants acted with gross procedural irregularities when responding to and "investigating" Plaintiff's rape allegations.  These irregularities include the Seyfarth Defendants' abject failure to request Plaintiff's consent to obtain access to the rape kit evidence (and photographs of Plaintiff's bruises on her neck and thigh), and the Seyfarth Defendants' failure to interview several state-of-mind witnesses identified by Plaintiff.

The Amended Complaint alleges that "[t]he Seyfarth attorneys' failure to obtain or request Plaintiffs' rape kit evidence [which included photographs of bruises on her body that were inflicted by PERRY DOE]—which would have provided strong evidentiary support for Plaintiff's rape allegations—has no innocent or innocuous explanation."  (Am. Compl. ¶ 189).  When, as here, conduct is completely unexplainable, "it is more likely than not [that the party accused of discrimination], who we generally assume acts only with *some* reason, based his decision on an

impermissible consideration such as [sex]." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

Plaintiff has no doubt plausibly alleged that the Seyfarth Defendants discriminated against her on the basis of sex.   This Court, accordingly, should deny the Seyfarth Defendants' motion to dismiss the actions against them which allege that they aided and abetted YU's violations of the NYCHRL and the NYSHRL.  (Counts V and XII).

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Plaintiff, JANE DOE, respectfully requests that this Honorable Court issue an Order:  (1) denying the Yeshiva University Defendants' motion to dismiss the Amended Complaint in its entirety; (2) denying the Seyfarth Defendants' motion to dismiss the Amended Complaint in its entirety; (3) mandating that the parties proceed with discovery as expeditiously as practicable; and (4) granting Plaintiff any other, different, or further relief to which this Court seems just, necessary, or proper.

Dated:    November 17, 2022
              Orangeburg, New York

Respectfully submitted,

**KEVIN T. MULHEARN, P.C.**

*Kevin T. Mulhearn /S*
_____
By:  Kevin T. Mulhearn
60 Dutch Hill Road, Suite 6B
Orangeburg, New York 10962
(845) 613-7059
kmulhearn@ktmlaw.net

*Attorneys for Plaintiff, JANE DOE*